

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

BANK OF AMERICA,                    )
NATIONAL ASSOCIATION,               )
as indenture trustee, custodian,    )
and collateral agent for            )
OCALA FUNDING, LLC,                 )
101 South Tyron St                  )
Charlotte, NC      Plaintiff,       )
28202                               )              Case No.:
          -against-                 )
                                    )
FEDERAL DEPOSIT INSURANCE           )
CORPORATION, in its capacity as     )              Jury Trial Demanded
receiver for COLONIAL BANK, and     )
in its capacity as receiver for     )
PLATINUM COMMUNITY BANK,            )
                                    )
          Defendants.               )
_____    )

## COMPLAINT

Plaintiff, Bank of America, National Association, successor by merger to LaSalle

Bank National Association ("Bank of America"), acts as indenture trustee, collateral

agent and custodian and in other representative capacities (in any and all such capacities,

the "Trustee") with respect to the short term notes and the subordinated notes issued by

Ocala Funding, LLC ("Ocala Funding") for its complaint against defendant: (i) Federal

Deposit Insurance Corporation ("FDIC") as receiver for Colonial Bank; (ii) and FDIC as

receiver for Platinum Community Bank (hereinafter, collectively or individually, "FDIC-

Receiver" or "Defendant"):

**Nature of the Case**

1.      The Trustee brings this action to recover losses incurred by Ocala Funding at the hands of Colonial Bank ("Colonial") and Platinum Community Bank ("Platinum"). As the primary lender to and co-conspirator with Taylor, Bean & Whitaker Mortgage Corp. ("TBW"), a home mortgage originator and servicer, Colonial actively participated in a multi-year, multi-billion dollar fraud, which directly contributed to approximately $1.75 billion in losses for Ocala Funding's investors.  As an affiliate of and co-conspirator with TBW, Platinum also participated in the fraud and contributed directly to Ocala Funding's losses.  Although now under FDIC receivership, Colonial and Platinum remain responsible for Ocala Funding's losses and, as such, the Trustee's respective proofs of claim filed in the Colonial and Platinum receiverships should be allowed by FDIC-Receiver.

2.      Although many details remain obscure — and the Trustee has not yet obtained any documents or other evidence from Colonial or Platinum — TBW's, Colonial's, and Platinum's demise appear to have resulted from a complex fraudulent scheme in which executives at TBW, Colonial, and, upon information and belief, Platinum contrived ways to double- and triple-pledge mortgages and steal assets in order to conceal their declining financial condition following the implosion of the real estate markets.

3.      TBW, Colonial, and Platinum accomplished this fraud through, among other vehicles, Ocala Funding, a wholly-owned subsidiary of TBW formed for the sole purpose of financing TBW's mortgage originations.  Ocala issued short-term notes and used the proceeds to purchase TBW-originated mortgages; Ocala then sold the mortgages

to pay off the notes as they came due or to purchase additional mortgages from TBW. Deutsche Bank AG ("DB") and BNP Paribas Mortgage Corporation ("BNP") were purchasers of the notes. In the wake of TBW's, Colonial's, and Platinum's respective failures, it now is clear that Ocala Funding cannot repay the notes issued by Ocala Funding in July 2009 in full because of the fraudulent scheme perpetrated by TBW, Colonial, and Platinum.

4.      On November 19, 2009, the Trustee timely filed a proof of claim in the Colonial receivership, which sought, *inter alia*, allowance of a general unsecured claim against Colonial insofar as it was complicit in the fraud that resulted in losses to Ocala Funding. On December 9, 2009, the Trustee timely filed a proof of claim in the Platinum receivership, which sought, *inter alia*, approximately $62 million fraudulently transferred from Ocala Funding accounts at Bank of America.

5.      The Trustee maintains valid claims to recover from Colonial and Platinum losses incurred by Ocala Funding. Yet, on August 4, 2010 FDIC-Receiver disallowed the Trustee's Colonial proof of claim in its entirely. FDIC-Receiver's only explanation for its disallowance of the Trustee's Colonial claim was that "[t]he claim has not been proven to the satisfaction of the Receiver." And with respect to the Platinum proof of claim, the FDIC-Receiver has failed to provide timely notice to the Trustee of a determination either to allow or disallow the claim.

6.      The Trustee, therefore, brings this action to obtain a declaratory judgment that the Trustee's claims should be allowed and Ocala Funding's investors are entitled to their equitable share of assets distributed by the Colonial and Platinum receivership estates.

## The Parties

7.      Bank of America is a National Banking Association with its principal

place of business located in Charlotte, North Carolina.  Pursuant to a Second Amended

and Restated Base Indenture ("Indenture"), dated as of June 30, 2008, Bank of America

is the trustee for Ocala Funding.

8.      Colonial was a state-chartered, non-member bank organized and existing

under the laws of the State of Alabama with a principal place of business located in

Montgomery, Alabama.  At all relevant times, Colonial was a wholly owned subsidiary

of Colonial BancGroup Inc.

9.      Platinum Community Bank was a federally chartered savings association

owned by Platinum Bancshares, Inc. ("Bancshares").  Platinum's principal place of

business was Rolling Meadows, Illinois.  TBW owned a controlling interest in

Bancshares.

10.      The FDIC is the federal agency charged by law with, among other duties,

administering the Federal Deposit Insurance Act (the "FDI Act") and the federal bank

deposit insurance system.  Defendant FDIC-Receiver is the receiver appointed to

administer the receivership estates of Colonial and Platinum.

## Jurisdiction

11.      This action arises under the laws of the United States including the FDI

Act, 12 U.S.C. § 1811 et seq., as amended.  This Court has jurisdiction over the subject

matter pursuant to 12 U.S.C. §§ 1819(b)(2)(A) and 1821(d)(6), and 28 U.S.C. § 1331.

This Court also has original subject matter jurisdiction, pursuant to 28 U.S.C. § 1332,

because the parties are of diverse citizenship and the amount in controversy is over

$75,000, exclusive of interest and costs.

12.      Venue is proper in the District of Columbia, pursuant to 12 U.S.C.

§ 1821(d)(6) and 28 U.S.C. § 1391(e).

### Facts Common to All Causes of Action

#### Colonial Bank

13.      Colonial primarily was a retail and commercial bank.  Prior to

receivership, Colonial held approximately $26 billion in assets and maintained

approximately 350 branches located in Florida, Alabama, Georgia, Nevada, and Texas.

14.      Colonial's Mortgage Warehouse Lending Division ("MWLD") was

headquartered in Orlando, Florida and principally provided short-term, secured funding

to mortgage lending companies.  TBW was MWLD's largest customer.  Revenue

generated by MWLD accounted for approximately 20% of Colonial's pre-tax income

and, in 2008 and 2009, MWLD was one of Colonial's few banking segments that

reported a profit.

15.      On June 15, 2009, Colonial consented to the entry of a cease and desist

order by FDIC and the Alabama Superintendent of Banks under which Colonial agreed to

raise its Tier 1 Leverage Capital Ratio to not less than 8 percent and its Total Risk-Based

Capital Ratio to not less than 12 percent.

16.      As of June 30, 2009, Colonial's Tier I Leverage Capital Ratio was 4.18%,

below the 8% required by FDIC and the State of Alabama.

17.      In a press release dated July 31, 2009, Colonial's parent Colonial

BancGroup, Inc. disclosed that as of June 30, 2009, it was not in compliance with capital

requirements for Tier I Leverage Ratio and Total Risk-Based Capital Ratio as required by orders with the Federal Reserve, FDIC and the State of Alabama.  The release further stated "management has concluded that there is substantial doubt about Colonial's ability to continue as a going concern."

18.     On August 4, 2009, the New York Times reported that the FBI and the Special Inspector General of the Treasury Department's Troubled Asset Relief Program had raided Colonial and TBW.  The New York Times further identified "the viability of Colonial" as an "urgent concern," and reported that Colonial's failure to secure a cash infusion from either TBW or the Treasury Department "suggests that neither side believes the bank can survive."

19.     On August 7, 2009, Colonial BancGroup disclosed that it was the target of a criminal investigation by the U.S. Department of Justice relating to accounting irregularities in its mortgage lending unit, and that it might be put into receivership.

<u>Platinum Community Bank</u>

20.     Platinum was a federally chartered savings association with its main office located in Rolling Meadows, Illinois.

21.     In July 2008, TBW acquired the controlling interest in Platinum Bankshares Inc., Platinum's holding.  At the time, TBW's chairman stated that the acquisition of "Platinum Community Bank is an opportunity for TB&W to participate in the community bank process and essentially pilot the offerings we ask our community bank customers to adopt."

22.     As of August 29, 2009, Platinum had total assets of $345.6 million and total deposits of $305.0 million.

Taylor Bean & Whitaker Mortgage Corp.

23.     TBW, based in Ocala, Florida, was founded in 1982 and, before its collapse, was one of the largest privately held mortgage lending companies in the United States.

24.     Lee Bentley Farkas ("Farkas") was the chief executive officer of TBW until July 2003.  Farkas remained TBW's chairman until August 2009.  Farkas was the majority shareholder of TBW.

25.     TBW's core business was (i) originating, underwriting, processing and funding conforming and non-conforming[1], conventional, government-insured residential mortgages; (ii) the sale of mortgages into the secondary market to government-sponsored enterprises such as the Federal Home Loan Mortgage Corporation ("Freddie Mac"); and (iii) mortgage payment processing and loan servicing.

26.     In 2008, TBW was responsible for originating approximately $30 billion in mortgages.  By July 2009, TBW was servicing more than 512,000 mortgages having an unpaid principal balance in excess of $80 billion.

27.     TBW generally sold mortgages it purchased or originated to investors in the secondary market ("Takeout Investors").  The mortgages were sold either individually, in pools of mortgages, or as part of mortgaged-backed securities, which obligations were guaranteed, in part, by Freddie Mac or the Government National Mortgage Association ("Ginnie Mae").

---

[1]     Conforming loans generally are loans that meet the normal Freddie Mac or Ginnie Mae guidelines. Non-conforming loans generally are all other loans, which include Alt-A loans, jumbo loans, second-lien mortgages, and subprime loans.

28.     At all relevant times, TBW retained the right to service substantially all of the mortgages it sold into the secondary market.

29.     As a servicer of mortgages, TBW generally was required to:  (i) collect principal and interest ("P&I") payments from individual borrowers; (ii) collect and hold in escrow tax and insurance ("T&I") payments from individual borrowers; (iii) disburse P&I payments to the owners of each mortgage loan; and (iv) disburse T&I payments to the appropriate taxing authority and insurance provider.

30.     After July 2008, TBW processed payments of T&I, as well as other escrow related payments, through Escrow Disbursement Clearing Accounts ("EDCA") at Platinum.  In addition, refunds of excess T&I monies were paid to borrowers from the Platinum EDCA account.

31.     TBW's principal banking relationship was with Colonial where it maintained more than 116 bank accounts, 110 of which were used in TBW's mortgage servicing operations.

32.     TBW maintained an account at Colonial called the Custodial Funds Clearing Account (Account #8037152645) ("CFCA").

33.     TBW maintained an account at Colonial called the Master Advance Account (Account #8026069362) ("MAA").

34.     TBW maintained an account at Colonial called the Investor Funding Account (Account #8026069354) ("IFA").

35.     TBW funded its purchase and origination of mortgages through various purchase and credit facilities.

36.     A key component of TBW's financing and continued operation was its long-standing relationship with Colonial.

37.     Beginning in September of 1999, Colonial provided TBW with a traditional mortgage warehouse lending facility (the "Mortgage Warehouse Facility"), which continued in various forms until a hold was placed on all of TBW's accounts in August 2009.

38.     Included in the Mortgage Warehouse Facility was an overline facility (the "Overline"), which provided certain additional funding capacity for TBW.

39.     Starting in 2002, Colonial began providing TBW with additional funding options through various participation facilities.  Under the terms of these facilities, which in recent years were referred to as COLB facilities ("COLB"), TBW sold to Colonial a participation interest (usually 99%) in mortgages, which were then sold to Takeout Investors or allocated to a particular mortgage security for which other financing was available.

40.     Although at one time TBW maintained multiple sources of "wet funding," over time all but one of those sources diminished or disappeared completely.[2]  Upon information and belief, by August 2008, TBW's only source of wet funding was COLB at Colonial.

41.     TBW also entered into additional borrowing facilities with Colonial, known as assignment of trade participation facilities ("AOT") under which Colonial

---

[2]     In general, "wet funding" is the provision of money to an individual borrower at the time of the closing of the mortgage loan before the delivery of original loan documents to the lender.  Because of the risk that there could be some issue with respect to the perfection of a security interest after funds have been provided, there historically have been fewer sources of "wet funding" than there are for other types of financing.

would purchase participation interests (typically 99%) in trades held by TBW with respect to agency securities (both Freddie Mac and Ginnie Mae) and securities issued by private label issuers.

42.     Once TBW allocated a loan to an agency or private label securitization (through a trade with a Takeout Investor), the loan — which had been funded by COLB (or other facilities) — could be moved to the AOT until the ultimate settlement of the underlying trades with a Takeout Investor.

43.     Collectively, COLB and AOT facilities provided TBW with funding capacity through Colonial in excess of $3 billion for the origination, purchase, and ultimate sale of loans.

44.     TBW's secondary marketing group principally was responsible for the sale of loans to investors, and TBW's treasury group, in conjunction with members of senior management, was responsible for administering the various funding sources.

<u>Ocala Funding, LLC</u>

45.     TBW established Ocala Funding in 2005 as a special purpose, bankruptcy-remote subsidiary to provide liquidity to TBW's mortgage origination business by purchasing mortgages from TBW and holding them pending their ultimate sale to Freddie Mac, thereby allowing TBW to use those immediate proceeds to originate more mortgages.

46.     Ocala Funding funded its operations by issuing debt, including short-term notes, secured by the underlying mortgages and other facility assets.

47.     Between December 2007 and July 2009, DB and BNP purchased all of the outstanding short-term notes issued by Ocala Funding.  These notes each matured in 30 days or less, becoming due and payable at that time.

48.     Upon information and belief, DB and BNP are the only parties holding outstanding short-term notes issued by Ocala Funding.

49.     Ocala Funding's operations were governed by a set of agreements called the "Facility Documents," under which TBW controlled all major decisions and actions for Ocala Funding's operation.[3]

---

[3]     The Facility Documents are comprised of that certain:  (i) Second Amended & Restated Mortgage Loan Purchase and Servicing Agreement, dated as of June 30, 2008, between Ocala Funding, as purchaser, and TBW, as seller and servicer, (ii) Second Amended and Restated Security Agreement, dated as of June 30, 2008, among Ocala Funding, Bank of America, as indenture trustee and Bank of America, as collateral agent, (iii) Second Amended and Restated Base Indenture, dated as of June 30, 2008, between Ocala Funding and Bank of America, as Indenture Trustee, (iv) Second Amended and Restated Custodial Agreement, dated as of June 30, 2008, among Ocala Funding, as issuer, TBW, as seller and servicer, Bank of America, as custodian and Bank of America, as collateral agent, (v) Series 2005-1 Amended and Restated Depositary Agreement, dated as of June 30, 2008, between Ocala Funding and Bank of America, as depositary, (vi) Series 2008-1 Depositary Agreement, dated as of June 30, 2008, between Ocala Funding and Bank of America, as depositary, (vii) Second Amended and Restated Series 2005-1 Supplement, dated as of June 30, 2008, between Ocala Funding, as issuer, and Bank of America, as indenture trustee and paying agent, (viii) Series 2008-1 Supplement, dated as of June 30, 2008, between Ocala Funding, as issuer, and Bank of America, as indenture trustee and paying agent, (ix) Second Amended and Restated Confirmation, dated as of June 30, 2008, between Ocala Funding and BNP, (x) Second Amended and Restated Schedule to the Master Agreement between Ocala Funding and BNP, (xi) Confirmation, dated as of June 30, 2008, between Ocala Funding and DB, (xii) Master Agreement, dated as of June 30, 2008, between Ocala Funding and DB, (xiii)  Schedule to the Master Agreement, dated as of June 30, 2008, between DB and Ocala Funding LLC, (xiv) Second Amended and Restated Confirmation for U.S. Dollar Rate Swap Transaction Under 1992 Master Agreement, between TBW and BNP, (xv) Second Amended and Restated Schedule to the Master Agreement, dated as of March 27, 2006, between BNP and TBW, (xvi) Second Amended and Restated Credit Support Annex, between BNP and Taylor, Bean & Whitaker Mortgage Corp., and (xvii) Confirmation for U.S. Dollar Rate Swap Transaction Under 1992 Master Agreement, dated June 30, 2008, between TBW and DB, and are incorporated herein by reference.

50.     TBW was Ocala Funding's sole manager and agent, and expressly undertook to carry out and perform, as agent on behalf of Ocala Funding, the daily business activities of Ocala Funding and the obligations of Ocala Funding under the Facility Documents, as well as TBW's own obligations under those Documents.

51.     TBW was Ocala Funding's 100% owner, its only member with an economic interest, and the servicer of all loans sold to Ocala Funding.  Notices provided to Ocala Funding were to be sent to TBW.

52.     TBW signed the Facility Documents on Ocala Funding's behalf.

53.     Under the Purchase Agreement, TBW sold mortgages it originated to Ocala Funding, and controlled the purchase of the mortgages by Ocala Funding.

54.     The Purchase Agreement required that TBW sell to Ocala Funding, and that Ocala Funding buy from TBW, "dry"–funded mortgages that met Freddie Mac guidelines.  The Purchase Agreement precluded the purchase of "wet"-funded mortgages.

55.     Under the Purchase Agreement, TBW also controlled the sale of mortgages from Ocala Funding to third parties, principally Freddie Mac, as well as the transfer of resulting proceeds back to the relevant Ocala Funding accounts at Bank of America.

56.     Colonial "wet-funded" TBW's loans before they were purchased by Ocala Funding, and in this capacity was the primary recipient of the funds Ocala Funding paid for the purchased mortgages.  Additionally, Colonial acted as custodian for Freddie Mac when Ocala Funding's mortgages were sold to Freddie Mac.  Thus, Ocala Funding, in different capacities, would receive mortgages from Colonial and soon afterward deliver

them back to Colonial.  All of these activities were directed by TBW and, upon information and belief, in concert with Colonial.

The Fraud

57.     As early as 2002, TBW began to experience significant liquidity problems and was unable to cover its ongoing operating expenses.  In order to cover these cash shortfalls, executives at TBW — in concert with executives at Colonial — conspired to divert funds from TBW's various borrowing facilities, including Ocala Funding, and to paper over shortfalls they allowed to develop in these facilities.

58.     Between 2002 to 2009, when the fraudulent scheme was uncovered, TBW and Colonial developed and executed multiple schemes to steal from TBW's borrowing facilities and conceal the true nature of TBW's financial condition.  Among other schemes, TBW and Colonial:

  a.  covered up overdrafts in TBW's master bank account at Colonial (the "Master Account") by transferring or "sweeping" overnight money from other TBW accounts at Colonial into the Master Account, which gave the false appearance that TBW was not overdrawn.  The day after funds were swept into the Master Account, conspirators at TBW and Colonial would sweep the same funds back out of the Master Account;

  b.  disguised the growing Master Account deficit as payments related to Colonial's purchase of legitimate mortgages through COLB.  TBW and Colonial created false mortgage loan data in order to create the appearance that such loans had been pledged to COLB, which, in turn, allowed funds

to be drawn off of COLB.  This false data included descriptions of

mortgages already sold or pledged to other borrowing facilities;

c.  disguised the existence of false loan data used to back COLB by recycling

loan data, which created the false appearance that mortgages on COLB

had been sold to Takeout Investors and that Colonial, in turn, had

purchased interests in new mortgages in their place;

d.  transferred the deficit created on COLB to AOT.  TBW and Colonial

transferred the deficit, in part, because the accounting records for AOT

generally did not track loan-level data for pools of loans ("Trades") it

purchased.  TBW and Colonial accomplished these transfers by causing

TBW to sell to Colonial Trades that were not backed by actual mortgages.

During the relevant period, TBW and Colonial conspired to sell hundreds

of millions of dollars of fictitious Trades to AOT;[4]

e.  hid real estate owned ("REO") properties (typically bank-repossessed

properties associated with foreclosed mortgages) and impaired-value

mortgages (loans in default, and significantly aged loans that TBW was

unable to sell to Takeout Investors) as collateral for Trades sold to AOT;

f.  engaged in sham sales to hide the fact that there were no commitments by

third parties to purchase from AOT most if not all of the assets backing the

facility.  These sham sales included round-trip transfers of funds from

---

[4]      Co-conspirators at TBW and Colonial Bank created and exchanged fictitious
schedules supporting the Trades, which included unique identifying numbers that TBW
co-conspirators reused from Trades previously sold or pledged to other investors.

AOT to Ocala Funding bank accounts controlled by TBW and back to

Colonial;

g.  fraudulently concealed these facts from TBW's and Colonial's regulators

to avoid bankruptcy and/or receivership for almost seven years.  This

concealment also allowed TBW and Colonial to defraud numerous third

party lenders and creditors of billions of dollars, including Ocala Funding;

h.  diverted virtually all of the assets of Ocala Funding to pay down TBW's

operating expenses, including mortgages servicing payments owed to

Takeout Investors; and

i.  fraudulently concealed these diversions from the Trustee by, *inter alia*,

providing the Trustee with falsified collateral lists that misrepresented the

status of loans in which Ocala Funding should have held a security

interest.[5]

59.     Between June 30, 2008 and August 3, 2009, approximately $675 million

was transferred from Ocala Funding accounts at Bank of America to the CFCA (the

"CFCA Funds").  The transfer of these funds to the CFCA was unauthorized and

improper, and constituted the theft of Ocala Funding's assets.

60.     Between June 30, 2008 and August 3, 2009, approximately $451 million

was transferred from Ocala Funding accounts at Bank of America to the MAA (the

---

[5]      The facts set forth in paragraphs 58, 62-67, and 75 of this Complaint are taken
from the June 15, 2010 indictment of Lee Bentley Farkas (*see United States v. Lee
Bentley Farkas*, Docket No. 1:10-cr-00200-LMB (E.D. Va.)), and the Government's June
16, 2010 Motion for Pre-Trial Detention of Lee Bentley Farkas (*see United States v. Lee
Bentley Farkas*, Docket No. 5:10-mj-1028-GRJ (M.D. Fla.)) which are incorporated
herein by reference.

"MAA Funds").  The transfer of these funds to the MAA was unauthorized and improper, and constituted the theft of Ocala assets.

61.     Between June 30, 2008 and August 3, 2009, billions of dollars were transferred from the Ocala accounts to the IFA for the purchase of mortgages.  Some of these funds were not used for the purchase of mortgages.  To the extent that these funds were not used for the purchase of mortgages, the transfer of these funds (the "IFA Funds") to the IFA was unauthorized and improper, and constituted the theft of Ocala assets.[6]

62.     In October 2008, Colonial BancGroup applied to FDIC for $570 million in funding from the Troubled Asset Relief Program ("TARP").  Upon information and belief, Colonial sought these funds in order to avoid insolvency and to further conceal the fraud it perpetrated with TBW.

63.     As part of its application for TARP funds, Colonial provided materially false information to FDIC and other regulators in an effort to conceal evidence of Colonial's fraudulent activity with TBW.

64.     In December 2008, the United States Treasury conditionally approved $533 million in TARP funding to Colonial BancGroup.  In order to receive the funds, however, Colonial BancGroup first was required to raise $300 million in private capital.

65.     In March 2009, TBW and Colonial fraudulently represented that (i) TBW would invest $150 million in Colonial BancGroup; and (ii) that unnamed investors would invest an additional $100 million.

---

[6]     Upon information and belief, the amount of funds improperly transferred into accounts at Colonial and the identity of accounts into which funds improperly were transferred may change based upon discovery from Defendant or other third parties.

66.     On April 1, 2009, TBW and Colonial caused Colonial BancGroup to file an 8K with the Securities and Exchange Commission that fraudulently represented that 10% of the Colonial BancGroup private investment had been deposited into an escrow account.

67.     TBW, Colonial, and Platinum then caused a total of $50 million to be deposited into an escrow account at Platinum, an affiliate of TBW, purportedly to evidence escrow deposits made as part of the Colonial BancGroup private investment.  In fact, TBW, Colonial, and Platinum had diverted all $50 million from an Ocala Funding account at Bank of America.

68.     Specifically, on March 30, 2009, $25,000,000 was wired from the Ocala Funding Collateral Account (Account #722493.4) at Bank of America to an unnamed account (Account #0030270065) at Platinum.

69.     On April 3, 2009, $25,000,000 was wired from the Ocala Funding Collateral Account (Account #722493.4) at Bank of America to an unnamed account (Account #0030270065) at Platinum.

70.     Upon information and belief, account number 0030270065 is an escrow account established by co-conspirators at TBW, Colonial, and Platinum as part of their fraudulent scheme to obtain TARP funds.

71.     In addition to the $50 million fraudulently diverted from Ocala Funding in March and April of 2009, on information and belief, on October 3, 2008, $12,239,697.21 was wired from the Ocala Funding Collateral Account (Account #722493.4) at Bank of America and ultimately was deposited at Platinum.  This deposit was used by TBW and/or Colonial to purchase mortgages from Platinum for TBW's benefit.

72.     The transfers were inconsistent with the structure and purpose of Ocala Funding.

73.     Colonial BancGroup never received the TARP funds and the $300 million private investment was never completed.

74.     Upon information and belief, Platinum knew of or recklessly disregarded the fraud described herein.  As such, Platinum's misstatements or omission actively concealed the theft of assets from Ocala Funding.

75.     TBW and Colonial caused TBW and Colonial BancGroup to make numerous other fraudulent misrepresentations to regulators, including materially false filings with the Securities and Exchange Commission that concealed (i) the cash shortfalls at TBW; (ii) the fraudulent use of COLB; (iii) the fraudulent use of AOT; and (iv) the theft of assets from Ocala Funding.

76.     The fraudulent acts described herein could not have been accomplished without the active participation of TBW, Colonial, and Platinum.

77.     At all relevant time, Platinum was controlled by TBW and acted at its direction.

78.     TBW participated in the fraud in order to cover up growing cash shortfalls within the company.  Upon information and belief, TBW actually lost money every year from 2002 until 2009.

79.     Colonial participated in the fraud in order to (i) maintain its commercial relationship with TBW, one of Colonial's largest clients; and (ii) conceal the fact that AOT, COLB, and Overline were backed by ineligible and/or non-existent collateral.

80.     Colonial executives who participated in these fraudulent schemes included, but were not limited to, (i) Catherine L. Kissick, Senior Vice President/Director, Colonial, Institutional Services Division and Mortgage Warehouse Lending Division; and (ii) Teresa Carrier, also an executive within Colonial's MWLD.

81.     Upon information and belief, Kissick and Carrier are identified as unnamed co-conspirators in the United States Government's June 16, 2010 Motion for Pre-Trial Detention of Lee Bentley Farkas (*see United States v. Lee Bentley Farkas*, Docket No. 5:10-mj-1028-GRJ (M.D. Fla.)).

82.     Upon information and belief Kissick participated in the fraudulent schemes by:

> a.  knowingly accepting approximately $150 million in non-existent loans from TBW as collateral for COLB;
>
> b.  knowingly purchasing Trades that included REO properties and impaired value mortgages from TBW as collateral for AOT; and
>
> c.  knowingly fabricating Colonial's accounting records (i) to reflect false or incorrect dates when Trades sold to AOT would be purchased by Takeout Investors; (ii) to reflect the purchase of Trades by AOT after the same Trades had been sold to other investors; and (iii) to reflect a higher number of Trades sold to AOT than actually had been sold.

83.     Communications made available to plaintiff by TBW evidence Kissick's and other Colonial executives' active participation in the fraud, including:

> a.  In September 2003, Kissick and other Colonial employees explicitly referred to the growing deficit they were attempting to cover up as "the

hole."  Upon information and belief, "hole loans" were loans that were ineligible for AOT (*i.e.*, missing notes), that nonetheless appeared on Colonial's financial records to give the appearance that there was sufficient collateral supporting AOT.

b.  In April 2005, shortly after Ocala Funding began funding new mortgage loan purchases, Farkas informed Kissick that Ocala Funding had funded $200MM, to which Kissick replied: "That's Great News!!!! Can we fund 325MM more?", which referenced, upon information and belief, what Kissick believed to be a total of $325 million in ineligible loans pledged or sold to COLB and/or AOT.

c.  In November 2005, Farkas inquired of Desiree Brown, a TBW officer, whether TBW "[paid] OF [Ocala Funding] back from the pairoffs."  In December 2005, Brown then wrote to Kissick that "Lee [Farkas] said that I need to make sure that we schedule some time with you next week to continue my education....  When is convenient for you?"  Kissick replied, "I'm copying Teresa [Carrier] on this so I can make sure that she's in too. Teresa - we're going to work with [Brown] and show her how a cash sublimit works....  If they are allowed to sweep money from Ocala Funding against maybe COLB, then it would help reduce their interest costs SUBSTANTIALLY" (emphasis in original).

d.  At one point in September of 2007, Colonial refused to advance funds to TBW because, according to Kissick, Colonial already had about $800MM worth of unsalable bulk loans on the AOT and was "not going to add more

crap."  Farkas responded to Kissick that Colonial's refusal to provide more funding, "…will kill us [TBW]."

e.  In June 2008, Kissick sought a means for Colonial to ship loans to Ocala Funding "for them to pay us off and then they could be shipped right back, and paid off via Ocala Funding."  Once Kissick understood the process necessary to effectuate the fraud, she asked Farkas if the transaction might also help TBW "resolve [its] billion dollar/800MM issue?" as well.

f.  On September 23, 2008, Kissick explained to another Colonial executive, "TBW will be funding back up today, but not the $200MM they reduced....and we might even get another $100MM paid down.  The problem is - they're moving everything around from various lenders so we get paid down at quarter-end."

g.  And, in an effort to shore up Colonial's balance sheet at the end of each fiscal quarter:

    i.  At the end of Q3 2008, Kissick sent an email to Colonial employee, Teresa Kelly, and to Farkas and Brown, noting: "[w]e have to pay down the balances tomorrow night – but it can be on AOT level, not loan level, as I believe all of the loans are all on AOT anyways, and not on COLB.  (Doc Custody has been working their fingers to the bone to get the pools certified and on AOT).  That should make things a lot easier for quarter end."

    ii.  At the end of Q4 2008, Kissick wrote to Kelly, Farkas, and Brown, instructing them to ensure that aged COLB loans were "as cleaned

up as possible," and that all AOT private label trades were updated if the current commitment to purchase the trade had expired, because Colonial made this a "#1 priority, since it's such a sensitive subject."

iii.  At the end of Q1 2009, Kissick wrote to Kelly, copying Brown, "Just an FYI – quarter end is coming soon.  I was reminded that we have to focus on agings [sic] to give to regulators.  Please – make sure nothing is out of whack – and that numbers are DOWN…."

iv.  On the same day, Kissick forwarded the email exchange to Farkas: "With everything that is going on, we can't take the chance on you guys having loans over 90 days.  The total is only 14MM, which is good, but it will create all sorts of unneeded questions.  Please make sure [Donna Skuhrovec, a TBW employee, and Brown] get to the bottom of why they haven't gone yet."

84.    Colonial also actively sought to manipulate TBW's financial statements. In October 2008, for example, TBW considered changing its accounting treatment of REO properties used to collateralize AOT, treating funds drawn off of AOT as debt to be carried on TBW's balance sheet.  When Rodney Lewis**,** a Colonial officer, learned of the potential accounting treatment, he objected because, based upon information and belief, Colonial was concerned about the impact this disclosure could have on Colonial's capital requirements and trigger regulatory scrutiny of the Bank.  Accordingly, Lewis told Brian Callahan, a TBW executive, to revise and re-issue TBW's monthly financial statements.

85.     Ultimately, on January 13, 2009, Callahan sent the "revised" November financial statements to Lewis and Kissick, and copied several TBW officers, including Farkas, Paul Allen, Ray Bowman, and Delton De Armas and noted, "[p]er our phone conversation, attached are the November statements and covenants you requested."  The revised financial statement treated TBW's REO properties as true sales to AOT, thus keeping them off of TBW's balance sheet as liabilities attributable to "warehouse facilities and other borrowings".

86.     In August 2009, as TBW was collapsing, Kissick and Farkas scrambled to allocate available mortgages between COLB and Ocala Funding, or, as Kissick phrased it, "get the OF [Ocala Funding]/Colb thing figured out."  Kissick indicated that some mortgages were not registered on the Mortgage Electronic Registration System ("MERS").  Upon information and belief, Kissick instructed employees at TBW to alter MERS records in a last minute attempt to establish collateral sufficient to support COLB.

<u>The Fraud is Discovered</u>

87.     Pursuant to certain HUD regulations, as well as agreements with Ginnie Mae, Freddie Mac and various lenders, TBW was required to deliver year-end audited financial statements to these agencies and lenders.  Deloitte LLP served as TBW's auditor.

88.     On June 16, 2009, members of Deloitte's team expressed concerns that they were encountering delays in obtaining information and documentation from TBW regarding certain assets on TBW's balance sheet.  Deloitte refused to issue a clean audit of TBW's financial statements.

89.     On August 3, 2009, federal investigators, including agents of the United States Federal Bureau of Investigation, raided TBW's headquarters in Ocala, Florida.

90.     On the same day, Colonial's offices in Orlando, Florida were raided, and it announced that it was the target of a criminal investigation by the Department of Justice relating to its mortgage lending unit and related accounting irregularities.

91.     On August 4, 2009, HUD suspended TBW's HUD/FHA origination and underwriting approval.  In a press release announcing this suspension, HUD stated that this action was taken as a result of, among other things, its discovery that TBW's auditor ceased its financial examination after discovering certain irregular transactions that raised concerns of fraud, and that TBW failed to disclose, and falsely concealed, that it was the subject of two examinations into its business practices in the past year.

92.     In addition, Freddie Mac and Ginnie Mae terminated TBW's rights to issue and service loans for them.

93.     On August 5, 2009, TBW laid off approximately 2,000 employees, or approximately 80% of its workforce, and significantly reduced its business operations.

94.     Also on August 5, 2009, DB and BNP, in their capacities as Swap Counterparties to Ocala Funding and TBW, provided formal written notices to Bank of America — as well as to TBW, Ocala Funding, and others — that an "Indenture Event of Default" under Section 9.1 of the Indenture, and a "Termination Event" under the Purchase Agreement, had occurred.

95.     In addition, DB's letter instructed Bank of America, as indenture trustee, to declare the notes to be due, instructed Ocala Funding to cease purchasing mortgages, and notified TBW that such Events of Default had occurred.

96.     On August 10, 2009, the Trustee sent Ocala Funding, TBW, the Swap Counterparties, and others a Notice of Potential Indenture Event of Default, Indenture Event of Default, and Acceleration that implemented DB's instructions.

97.     On August 12, 2009, the Trustee commenced suit in the United States District Court for the Southern District of Florida, Miami Division, against Colonial and others to recover mortgages and other assets belonging to Ocala Funding.

98.     On August 14, 2009, the State of Alabama Department of Banking Regulation appointed FDIC as receiver of Colonial.[7]

99.     As a result of TBW, Platinum, Colonial's fraud, Ocala Funding lacks sufficient assets (either mortgages or cash) to pay off short-term notes it issued on July 20, 2009 and subordinated notes.

100.    On August 24, 2009, TBW filed a voluntary petition under chapter 11 of the Bankruptcy Code, 11 U.S.C. § 101 et seq. in the United States Bankruptcy Court for the Middle District of Florida. Prior to the filing of the bankruptcy petition, TBW's board of directors resigned and a new board, comprised of two restructuring professionals, was put in place.

101.    On Friday, September 4, 2009, Platinum was closed by the Office of Thrift Supervision, and the FDIC was named Receiver.

102.    FDIC-Receiver estimates the cost of the Platinum failure to its Deposit Insurance Fund to be approximately $114.3 million.

---

[7]     On August 25, 2009, Colonial BancGroup Inc., the bank holding company that owned Colonial Bank, filed a voluntary petition in United States Bankruptcy Court for the Middle District of Alabama under chapter 11 of the Bankruptcy Code.

103.     Upon information and belief, Platinum failed and was placed into FDIC Receivership, in part, due to the fraudulent scheme described herein.

104.     On September 10, 2009, TBW and FDIC-Receiver for Colonial entered into a Stipulation that allowed TBW to perform (i) a reconciliation of the borrower funds and other servicing-related monies that had been affected by the failure of TBW and Colonial and (ii) an analysis of the mortgages that passed through TBW and were the subject of competing claims of ownership.

105.     In September 2009, upon information and belief, TBW transferred mortgage loans and/or rights to service mortgage loans that it was servicing to subsequent servicers.

106.     Upon information and belief, TBW transferred mortgage loans and/or rights to service mortgage loans based upon title assigned to such loans in TBW's mortgage servicing system.

107.     Upon information and belief, approximately 153 mortgage loans titled to Ocala Funding (hereinafter, the "Roundpoint Loans")[8] were transferred to Roundpoint Mortgage Servicing Corporation, as subsequent servicer for Ocala Funding.

108.     Notwithstanding Ocala Funding's ownership of Roundpoint Loans, FDIC-Receiver has control of the Roundpoint Loans and instructed Roundpoint to refuse to grant the Trustee access to, or the ability to transfer from Roundpoint, the Roundpoint Loans.

---

[8]     A non-exhaustive list identifying the Roundpoint Loans is attached hereto as Exhibit E.  Upon information and belief, the number and identity of the Roundpoint Loans may change based discovery from Defendant or other third parties.

109.    Upon information and belief, FDIC-Receiver has accepted advances of P&I payments on the Roundpoint Loans from Roundpoint.

110.    Despite repeated requests that the Roundpoint Loans be returned to the Trustee, FDIC-Receiver has refused to allow Roundpoint to release the Roundpoint Loans.

111.    On July 1, 2010, TBW filed with the TBW bankruptcy court its asset reconciliation report, which purported to identify facts related to the collapse of TBW and competing claims of ownership to assets that passed through TBW (the "Asset Reconciliation Report").[9]

112.    FDIC-Receiver reviewed and, in open court, endorsed the findings set forth in the Asset Reconciliation Report.

113.    Based, in part, upon facts identified in the Asset Reconciliation Report, the Trustee has identified approximately 45 mortgage loans that Ocala Funding purchased from COLB, which subsequently were transferred to Colonial Bank (hereinafter, the "Ocala Loans").[10]

114.    Upon information and belief, the Ocala Loans have not been sold to any Takeout Investor.

115.    Upon information and belief, Colonial Bank did not purchase the Ocala Loans from Ocala Funding and Ocala Funding has not otherwise received value for the Ocala Loans.

---

[9]     Plaintiff incorporates by reference only those portions of the Asset Reconciliation Report related to Colonial Bank's participation in and knowledge of the fraud.

[10]    A non-exhaustive list identifying the Ocala Loans is attached hereto as Exhibit F. Upon information and belief, the number and identity of the Ocala Loans may change based upon discovery from Defendant or other third parties.

Colonial Bank Proof of Claim

116.    On November 19, 2009, the Trustee timely filed with FDIC-Receiver for Colonial a proof of claim, a copy of which is attached hereto as Exhibit A.

117.    In its Colonial proof of claim, the Trustee sought allowance of a general unsecured claim against Colonial insofar as it was complicit in the fraud that resulted in losses to Ocala Funding.

118.    The amounts of the Trustee's claims currently are unliquidated and cannot be determined at this time.  However, upon information and belief, the sum of each such claim is up to $1.75 billion plus accrued and unpaid interest through the filing of this complaint and other charges (including attorney's fees and legal costs), but the Trustee seeks only a single recovery of such sum.

119.    The Trustee lacks access to the records of TBW, Colonial, and other third parties, which may include information that supports the Trustee's claims.

120.    Pursuant to 12 U.S.C. § 1821(d)(5)(A)(i), the FDIC-Receiver should have determined whether to allow or disallow the Trustee's Colonial proof of claim within 180 days of November 19, 2009.

121.    On May 17, 2010, the FDIC-Receiver and the Trustee agreed to a 90-day extension of the FDIC-Receiver's time to allow or disallow the Trustee's Colonial proof of claim, through August 6, 2010.

122.    Pursuant to 12 U.S.C. § 1821(d)(5)(A)(iv), FDIC-Receiver was further required to give the Trustee notice of disallowance of its claims, which notice was required to contain "a statement of each reason for the disallowance" and "the procedures

available for obtaining agency review of the determination to disallow the claim or judicial determination of the claim."

123.    In a letter dated August 4, 2010, FDIC-Receiver notified the Trustee that its claims were disallowed.  A copy of FDIC-Receiver's notice is attached as Exhibit B.

124.    FDIC-Receiver's notice stated that the claims were disallowed because "[t]he claim has not been proven to the satisfaction of the Receiver."

125.    The notice provides no additional detail or explanation regarding FDIC's decision.

126.    Section 11(d)(2)(H) of the FDI Act states that FDIC "shall pay all valid obligations of the insured depository institution in accordance with the prescriptions and limitations of this chapter."  12 U.S.C. § 1821(d)(2)(H).

127.    FDIC-Receiver's disallowance of the Trustee's claims violated FDIC-Receiver's statutory duty to pay all valid claims in accordance with the FDI Act.

128.    The FDI Act further provides that when FDIC-Receiver has disallowed a claim, the claimant may "file suit on such claim …in the district or territorial court for the United States for the district within which the depository institution's principal place of business is located or the United States District Court for the District of Columbia (and such court shall have jurisdiction to hear such claim)."  12 U.S.C. § 1821(d)(6)(A).

129.    FDIC Receiver's notice directs the Trustee to file a lawsuit if it disagrees with the disallowance of its claims.

Platinum Community Bank Proof of Claim

130.    On December 9, 2009, the Trustee timely filed with FDIC-Receiver for Platinum a proof of claim, a copy of which is attached hereto as Exhibit C.

131.     In its Platinum proof of claim, the Trustee sought recovery for, *inter alia*, trust or preferred claims, claims for stolen property, and senior unsecured claims against Platinum insofar as it was complicit in the fraud that resulted in approximately $1.75 billion of losses to Ocala Funding.

132.     The amounts of the Trustee's claims currently are unliquidated and cannot be determined at this time.  However, upon information and belief, the sum of each such claim is up to $1.75 billion plus accrued and unpaid interest through the filing of this complaint and other charges (including attorney's fees and legal costs), but the Trustee seeks only a single recovery of such sum.

133.     The Trustee lacks access to the records of TBW, Platinum, and other third parties, which may include information that supports the Trustee's claims.

134.     Pursuant to 12 U.S.C. § 1821(d)(5)(A)(i), the FDIC should have determined whether to allow or disallow the Trustee's Platinum proof of claim within 180 days of December 10, 2009.

135.     On May 17, 2010, the FDIC and the Trustee agreed to a 90-day extension of the FDIC-Receiver's time to allow or disallow the Trustee's proof of claim, through August 6, 2010.

136.     Pursuant to 12 U.S.C. § 1821(d)(5)(A)(iv), the FDIC was further required to give the Trustee notice of disallowance of its claims, which notice was required to contain "a statement of each reason for the disallowance" and "the procedures available for obtaining agency review of the determination to disallow the claim or judicial determination of the claim."

137.    In a letter dated August 5, 2010, FDIC-Receiver notified the Trustee that its claims were disallowed.  A copy of FDIC-Receiver's notice is attached as Exhibit D.

138.    FDIC-Receiver's notice stated that the claims were disallowed because "[c]laim in the amount of $1,750,000 [sic] is not proven to the satisfaction of the Receiver."

139.    The notice provides no additional detail or explanation regarding FDIC's decision.

140.    Section 11(d)(2)(H) of the FDI Act states that FDIC "shall pay all valid obligations of the insured depository institution in accordance with the prescriptions and limitations of this chapter."  12 U.S.C. § 1821(d)(2)(H).

141.    FDIC-Receiver's disallowance of the Trustee's Claims violated FDIC-Receiver's statutory duty to pay all valid claims in accordance with the FDI Act.

142.    The FDI Act further provides that when FDIC-Receiver has disallowed a claim, the claimant may "file suit on such claim …in the district or territorial court for the United States for the district within which the depository institution's principal place of business is located or the United States District Court for the District of Columbia (and such court shall have jurisdiction to hear such claim)."  12 U.S.C. § 1821(d)(6)(A).

143.    FDIC Receiver's notice directs the Trustee to file a lawsuit if it disagrees with the disallowance of its claims.

144.    As such, the Trustee brought this action.

### FIRST CAUSE OF ACTION
**(Determination of the Trustee's Colonial Proof of Claim)**

145.    The Trustee repeats and realleges the allegations contained above, as if fully set forth herein.

146.     Under 12 U.S.C. § 1821(d)(6)(A), this Court has *de novo* jurisdiction to consider the Trustee's claims as set forth in its Colonial proof of claim.

147.     But for Colonial's negligent, intentional, and/or fraudulent acts, Ocala Funding would not have been defrauded of approximately $1.75 billion and would be able meet its obligation to existing short term and subordinated noteholders.

148.     Each of the Trustee's claims described herein is a valid and proven claim against the Colonial receivership, and FDIC-Receiver is obligated to pay such claims (subject to, and in accordance with, 12 U.S.C. § 1821(d)(11)).

## SECOND CAUSE OF ACTION
### (Declaration that Disallowance of the Trustee's Colonial Prof of Claim is Void)

149.     The Trustee repeats and realleges the allegations contained above, as if fully set forth herein.

150.     FDIC-Receiver's summary disallowance of the Colonial proof of claim is without any meaningful explanation and abrogated FDIC-Receiver's statutory duties.

151.     A justiciable controversy exists as to a determination of the rights of the Trustee and Ocala Funding's investors.

152.     As such, FDIC-Receiver's disallowance should be declared void and FDIC should be required to reconsider the those portions of Trustee's Colonial proof of claim described herein as if FDIC-Receiver's August 4, 2010 disallowance never occurred.

## THIRD CAUSE OF ACTION
### (Determination of the Trustee's Platinum Proof of Claim)

153.     The Trustee repeats and realleges the allegations contained above, as if fully set forth herein.

154.    Under 12 U.S.C. § 1821(d)(6)(A), this Court has *de novo* jurisdiction to consider the Trustee's claims as set forth in its Platinum proof of claim.

155.    But for Platinum's negligent, intentional, and/or fraudulent acts, Ocala Funding would not have been defrauded of approximately $1.75 billion and would be able meet its obligation to existing short term and subordinated noteholders.

156.    Further, the Trustee has a valid priority claim for up to $62 million deposited in Platinum account number 0030270065 or other escrow accounts at Platinum.

157.    Each of the Trustee's claims described herein is a valid and proven claim against the Platinum receivership, and FDIC-Receiver is obligated to pay such claims (subject to, and in accordance with, 12 U.S.C. § 1821(d)(11)).

## FOURTH CAUSE OF ACTION
### (Declaration that Disallowance of the Trustee's Platinum Proof of Claim is Void)

158.    The Trustee repeats and realleges the allegations contained above, as if fully set forth herein.

159.    FDIC-Receiver's summary disallowance of the proof of claim is without any meaningful explanation and abrogated FDIC-Receiver's statutory duties.

160.    A justiciable controversy exists as to a determination of the rights of the Trustee and Ocala Funding's investors.

161.    As such, FDIC-Receiver's disallowance should be declared void and FDIC should be required to reconsider those portions of the Trustee's Platinum proof of claim described herein as if FDIC-Receiver's disallowance never occurred.

## FIFTH CAUSE OF ACTION
### (Fraud by Colonial)

162.    The Trustee repeats and realleges the allegations contained above, as if fully set forth herein.

163.    As described above, Colonial actively concealed the true nature of (i) TBW's financial condition; (ii) Colonial's financial condition; and (iii) Ocala Funding's financial condition.

164.    In its capacity as indenture trustee, custodian, and collateral agent, the Trustee reasonably relied on Colonial's misstatements and omissions concerning the true nature of (i) TBW's financial condition; (ii) Colonial's financial condition; and (iii) Ocala Funding's financial condition.

165.    Upon information and belief, executives at Colonial actively participated in the creation of false records, including records related to Ocala Funding, which allowed the fraudulent scheme to continue without detection for seven years.

166.    Upon information and belief, executives at Colonial actively participated in the fraudulent transfer of funds out of Ocala Funding bank accounts.

167.    Upon information and belief, executives at Colonial actively participated in the transfer of $50 million from Ocala Funding's bank accounts to an escrow account at Platinum for the purpose of fraudulently obtaining TARP funds.

168.    Upon information and belief, executives at Colonial actively participated in the double- and triple-pledging of mortgages to, among others, Ocala Funding.

169.    But for Colonial's acts, Ocala Funding would not have issued short terms notes and subordinated debt to investors and allowed TBW and Colonial to steal the proceeds from the issuance of those notes.  As such, Colonial proximately caused Ocala Funding to lose approximately $1.75 billion and be unable to meet its obligation to existing short term and subordinated noteholders.

## SIXTH CAUSE OF ACTION
### (Civil Conspiracy by Colonial and Platinum)

170.    The Trustee repeats and realleges the allegations contained above, as if fully set forth herein.

171.    As described herein, principals at TBW (including Farkas, Desiree Brown, and Delton De Armas) and Colonial (including Catherine Kissick and Teresa Carrier) knowingly participated in a concerted scheme to defraud Ocala Funding.

172.    Upon information and belief, principals at Platinum knew of or recklessly disregarded the conspiracy to steal funds from Ocala Funding.

173.    But for the conspiracy by TBW, Platinum, and Colonial, Ocala Funding would not have issued short terms notes and subordinated debt to investors and allowed TBW, Platinum, and Colonial to steal the proceeds from the issuance of those notes.

174.    As such, Colonial proximately caused Ocala Funding to lose approximately $1.75 billion and be unable to meet its obligation to existing short term and subordinated noteholders.

175.    As such, Platinum proximately caused Ocala Funding to lose approximately $1.75 billion and be unable to meet its obligation to existing short term and subordinated noteholders.

176.    As described above, Ocala Funding's losses were the result of a common scheme by TBW, Colonial, and Platinum to conceal losses and avoid bankruptcy and/or receivership.

## SEVENTH CAUSE OF ACTION
### (Unjust Enrichment/Constructive Trust by Colonial and Platinum)

177.    The Trustee repeats and realleges the allegations contained above, as if fully set forth herein.

178.    Colonial has been enriched through its improper retention of funds fraudulently transferred to Colonial from Ocala Funding.

179.    Funds fraudulently transferred from Ocala Funding to Colonial include the CFCA Funds, the MAA Funds, and the IFA Funds.

180.    At the time the FDIC placed Colonial in receivership, each of the CFCA, MAA and IFA still contained some portion of the CFCA Funds, MAA Funds and IFA Funds, respectively.

181.    Upon information and belief, Colonial has no equitable or legal right to funds fraudulently transferred to Colonial from Ocala Funding.

182.    Under the circumstances, equity and good conscience require that the funds be returned to the Trustee.

183.    FDIC-Receiver has been enriched through its improper assertion of control over the Roundpoint Loans and through its acceptance of P&I advances generated by the Roundpoint Loans.

184.    Upon information and belief, FDIC-Receiver has no equitable or legal right to the Roundpoint Loans.

185.    Under the circumstances, equity and good conscience require that the Roundpoint Loans be subject to a constructive trust and returned to the Trustee.

186.    Colonial has been enriched through its improper retention of the Ocala Loans.

187.    Upon information and belief, Colonial has no equitable or legal right to the Ocala Loans.

188.    Under the circumstances, equity and good conscience require that the Ocala Loans be subject to a constructive trust and returned to the Trustee.

189.    Platinum has been enriched through its improper retention of approximately $62 million fraudulently transferred to Platinum from Ocala Funding.

190.    At the time the FDIC placed Platinum in receivership, some portion of the $62 million fraudulently transferred to Platinum from Ocala Funding remained in Platinum account number 0030270065, or, upon information and belief, other accounts at Platinum.

191.    Platinum has no equitable or legal right to the $62 million fraudulently transferred to Platinum from Ocala Funding.

192.    Under the circumstances, equity and good conscience require that the funds be subject to a constructive trust and returned to the Trustee.

193.    By reason of the foregoing, the Trustee has been damaged in an amount to be determined at the trial of this action.

### EIGHTH CAUSE OF ACTION
**(Conversion by Colonial and Platinum )**

194.    The Trustee repeats and realleges the allegations contained above, as if fully set forth herein.

195.    As described herein, Colonial unlawfully exercised dominion and control over funds and/or mortgage loans in which Ocala Funding maintained rights, including without limitation the CFCA Funds, MAA Funds and IFA Funds (the "Converted Funds").

196.    Colonial's unlawful conversion of the Converted Funds directly interfered with the Trustee's obligation to existing short term and subordinated noteholders.

197.    By its disallowance of the Trustee's Colonial proof of claim, FDIC-Receiver has denied and/or repudiated the Trustee's rights in the Converted Funds.

198.    As a result of Colonial's conversion, the Trustee is entitled to the full value of the Converted Funds.

199.    As described herein, FDIC-Receiver unlawfully exercised dominion and control over the Roundpoint Loans.

200.    Despite repeated request that the Roundpoint Loans be released to the Trustee, FDIC-Receiver has denied and/or repudiated the Trustee's rights in the Roundpoint Loans.

201.    FDIC-Receiver's unlawful conversion of the Roundpoint Loans directly interfered with the Trustee's obligation to existing short term and subordinated noteholders.

202.    As a result of FDIC-Receiver's conversion, the Trustee is entitled to the full value of the Roundpoint Loans.

203.    As described herein, Colonial unlawfully exercised dominion and control over the Ocala Loans.

204.    Colonial's unlawful conversion of the Ocala Loans directly interfered with the Trustee's obligation to existing short term and subordinated noteholders.

205.    By its disallowance of the Trustee's Colonial proof of claim, FDIC-Receiver has denied and/or repudiated the Trustee's rights in the Ocala Loans.

206.    As a result of Colonial's conversion, the Trustee is entitled to the full value of the Ocala Loans unlawfully converted by Colonial.

207.     As described herein, Platinum unlawfully exercised dominion and control over $62 million unlawfully transferred from Ocala Funding to Platinum.

208.     Colonial's unlawful conversion of $62 million directly interfered with the Trustee's obligation to existing short term and subordinated noteholders.

209.     By its refusal to allow or disallow the Trustee's Platinum proof of claim, FDIC-Receiver has denied and/or repudiated the Trustee's rights to $62 million converted by Platinum Bank.

210.     As a result of Colonial's conversion, the Trustee is entitled to the full value of the $62 million converted by Platinum Bank.

## NINTH CAUSE OF ACTION
### (Actual Fraudulent Transfers by Colonial and Platinum)

211.     The Trustee repeats and realleges the allegations contained above, as if fully set forth herein.

212.     TBW, Colonial, and, upon information and belief, Platinum made fraudulent transfers from Ocala Funding accounts at Bank of America within four years of the discovery of the fraud described herein.

213.     TBW and Colonial fraudulently transferred the CFCA Funds, MAA Funds, and IFA Funds.

214.     TBW and Colonial made these transfers as part of the conspiracy described herein and with the actual intent to hinder, delay, and defraud Ocala Funding and its investors.

215.     Neither Ocala Funding nor its investors received reasonably equivalent value in exchange for the fraudulent transfers described herein.

216.     TBW, Colonial, and, upon information and belief, Platinum transferred approximately $62 million to Platinum account number 0030270065, or, upon information and belief, other accounts at Platinum.

217.     TBW, Colonial, and, upon information and belief, Platinum made these transfers to Platinum as part of the conspiracy described herein and with the actual intent to hinder, delay, and defraud Ocala Funding and its investors.

218.     Neither Ocala Funding nor its investors received reasonably equivalent value in exchange for the fraudulent transfers to Platinum.

## TENTH CAUSE OF ACTION
### (Constructive Fraudulent Transfers by Colonial and Platinum)

219.     The Trustee repeats and realleges the allegations contained above, as if fully set forth herein.

220.     TBW, Colonial, and, upon information and belief, Platinum made fraudulent transfers from Ocala Funding accounts at Bank of America within four years of the discovery of the fraud described herein.

221.     TBW and Colonial fraudulently transferred the CFCA Funds, MAA Funds and IFA Funds.

222.     TBW, Colonial, and, upon information and belief, Platinum transferred the approximately $62 million to Platinum account number 0030270065, or, upon information and belief, other accounts at Platinum.

223.     TBW and Colonial made these transfers for less than fair consideration.

224.     Allegations have been made that Ocala Funding was insolvent at the time the transfers were made, or became insolvent as a result of the transfers.  Insofar as these

allegations are proven, upon information and belief, Ocala Funding was insolvent at the time these transfers were made, or became insolvent as a result of the transfers.

225.    TBW, Colonial, and, upon information and belief, Platinum knew that Ocala Funding was insolvent at the time these transfers were made, or became insolvent as a result of these transfers.

**Prayer for Relief**

WHEREFORE, the Trustee respectfully requests the Court to grant the following relief:

1. An order declaring the Trustee's claims described herein to be valid and proven against the Colonial receivership;

2. An order directing FDIC-Receiver to pay the claims described herein from the assets of the Colonial receivership in accordance with 12 U.S.C. § 1821(d)(11);

3. An order declaring that FDIC-Receiver's August 4, 2010 disallowance to be void, and that the parties should proceed as if such disallowance never occurred, as such disallowance relates to those claims described herein and asserted in the Colonial proof of claim;

4. An order declaring Colonial liable for fraud, civil conspiracy, unjust enrichment, conversion, and actual fraudulent transfers and awarding the Trustee damages to be proven at trial;

5. An order declaring the Trustee's claims described herein to be valid and proven against the Platinum receivership;

6. An order directing FDIC-Receiver to pay the claims described herein from the assets of the Platinum receivership in accordance with 12 U.S.C. § 1821(d)(11);

7. An order declaring that FDIC-Receiver's disallowance to be void, and that the parties should proceed as if such disallowance never occurred, as such disallowance relates to the claims described herein and asserted in the Platinum proof of claim;

8. An order declaring Platinum liable for civil conspiracy, unjust enrichment, conversion, and actual fraudulent transfers awarding the Trustee damages to be proven at trial;

9. An order imposing a constructive trust over:  (i) the Roundpoint Loans, (ii) the Ocala Loans; and (ii) the $62 million transferred to Platinum.

10. Award the Trustee costs and attorneys fees as may be permitted by law; and

11. Award the Trustee such other relief as may be just.

## Demand for Jury Trial

The Trustee, by and through its attorneys, hereby demand a trial by jury on all claims otherwise triable by jury asserted in this complaint.

Dated: Charlotte, North Carolina
       October 1, 2010

                                        Respectfully submitted,


                                        By: ___/s/Frank E. Emory, Jr._____
                                            Frank E. Emory, Jr.  (Bar No. 975713)
                                            Patrick L. Robson*

                                        HUNTON & WILLIAMS LLP
                                        Bank of America Plaza, Suite 3500
                                        101 South Tryon Street
                                        Charlotte, North Carolina 28280
                                        Tel.  704 378 4700
                                        Fax: 704 378 4890
                                        femory@hunton.com
                                        probson@hunton.com

                                        - and -

                                        Bonnie K. Arthur  (Bar No. 463687)
                                        HUNTON & WILLIAMS LLP
                                        1900 K Street, N.W.
                                        Washington, DC  20006
                                        Tel.  202 419 2063
                                        Fax: 202 862 3619
                                        barthur@hunton.com

                                        *Attorneys for Plaintiff Bank of America,
                                        National Association, as indenture trustee,
                                        custodian, and collateral agent to Ocala
                                        Funding, LLC*

                                        *To be Admitted Pro Hac Vice*