UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| BANK OF AMERICA, | ) | |
| NATIONAL ASSOCIATION, | ) | |
| as indenture trustee, custodian, | ) | |
| and collateral agent for | ) | |
| OCALA FUNDING, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No.:  1:10-cv-01681-JEB |
| -against- | ) | |
| | ) | |
| FEDERAL DEPOSIT INSURANCE | ) | |
| CORPORATION, in its capacity as | ) | |
| receiver for COLONIAL BANK, and | ) | |
| in its capacity as receiver for | ) | |
| PLATINUM COMMUNITY BANK, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**FIRST AMENDED COMPLAINT**

Plaintiff Bank of America, National Association, successor by merger to LaSalle

Bank National Association ("Bank of America"), acts as indenture trustee, collateral

agent and custodian and in other capacities (in any and all such capacities, the "Trustee")

with respect to the short term notes and the subordinated notes issued by Ocala Funding,

LLC ("Ocala Funding") for its complaint against defendant:  (i) Federal Deposit

Insurance Corporation ("FDIC") as receiver for Colonial Bank; and (ii) FDIC as receiver

for Platinum Community Bank (hereinafter, collectively or individually, "FDIC-

Receiver" or "Defendant"):

## Nature of the Case

1.      Having exhausted its administrative remedies before the FDIC, the Trustee[1] now brings this action to recover losses incurred by Ocala Funding at the hands of Colonial Bank ("Colonial") and Platinum Community Bank ("Platinum") and ultimately borne by holders of beneficial interests.  As the primary lender to and co-conspirator with Taylor, Bean & Whitaker Mortgage Corp. ("TBW"), a home mortgage originator and servicer, Colonial actively participated in a multi-year, multi-billion dollar fraud, which directly contributed to approximately $1.75 billion or more in losses.  As an affiliate of and co-conspirator with TBW, Platinum also participated in the fraud and contributed directly to those losses.  Although now under FDIC receivership, Colonial and Platinum remain responsible for those losses and, as such, the Trustee's respective proofs of claim filed in the Colonial and Platinum receiverships should be allowed by FDIC-Receiver.

2.      Although many details remain obscure — the Trustee has not yet obtained any documents or other evidence from Colonial or Platinum — statements made to the United States Department of Justice by Desiree Brown, former Vice-President of Special Projects, Controller, and Treasurer of TBW, by Catherine Kissick, former Senior Vice President of Colonial Bank and head of Colonial's Mortgage Warehouse Lending Division ("MWLD"), and by Teresa Kelly, former Operations Supervisor at Colonial's MWLD, show that TBW's, Colonial's, and Platinum's fraud on the Trustee, Ocala

---

[1]      The Trustee is authorized pursuant to the terms of the Facility Documents (defined in FN 5 below) to pursue recovery of losses incurred by Ocala Funding, LLC, including losses incurred by all investors in the Ocala Funding commercial paper facility and by the Trustee itself.

Funding, and the holders of beneficial interests in Ocala Funding were part of a complex

fraudulent scheme in which executives at TBW, Colonial, and, upon information and

belief, Platinum contrived ways to double- and triple-pledge mortgages and steal assets in

order to conceal their declining financial condition following the implosion of the real

estate markets.

3.      TBW, Colonial, and Platinum accomplished this fraud through, among

other vehicles, Ocala Funding, a wholly-owned subsidiary of TBW formed for the sole

purpose of financing TBW's mortgage originations.  Ocala Funding issued short-term

notes and used the proceeds to purchase TBW-originated mortgages; Ocala Funding then

sold the mortgages to pay off the notes as they came due or to purchase additional

mortgages from TBW.  Deutsche Bank AG ("DB") and BNP Paribas Mortgage

Corporation ("BNP") were purchasers of the notes.  In the wake of TBW's, Colonial's,

and Platinum's respective failures, it now is clear that Ocala Funding cannot repay the

notes issued in July 2009 in full because of the fraudulent scheme perpetrated by TBW,

Colonial, and Platinum.

4.      On November 19, 2009, the Trustee timely filed a proof of claim in the

Colonial receivership, which sought, *inter alia*, allowance of a general unsecured claim

against Colonial insofar as it was complicit in the fraud that resulted in losses to Ocala

Funding.  On December 9, 2009, the Trustee timely filed a proof of claim in the Platinum

receivership, which sought, *inter alia*, approximately $62 million fraudulently transferred

from Ocala Funding accounts at Bank of America.

5.      The Trustee maintains valid claims to recover from Colonial and Platinum

losses incurred by Ocala Funding.  Yet, on August 4, 2010, FDIC-Receiver disallowed

the Trustee's Colonial proof of claim in its entirety.  FDIC-Receiver's only explanation

for its disallowance of the Trustee's Colonial claim was that "[t]he claim has not been

proven to the satisfaction of the Receiver."  And with respect to the Platinum proof of

claim, on August 5, 2010, FDIC-Receiver disallowed the Trustee's Platinum proof of

claim in its entirety.  FDIC-Receiver's only explanation for its disallowance of the

Trustee's Platinum claim was that the claim "is not proven to the satisfaction of the

Receiver."

　　　　6.　　　The Trustee filed the proofs of claim in the Colonial and Platinum

receiverships, and brings this civil action, pursuant to the Trustee's rights and obligations

set forth in the Facility Documents, defined below.

　　　　7.　　　Pursuant to Section 10.06 of the Security Agreement, Ocala Funding

appointed the Trustee, in its capacity as Collateral Agent, as Ocala Funding's attorney-in-

fact, for the purpose of taking such action and executing agreements, instruments and

other documents, in the name of Ocala Funding as the Trustee or Secured Parties may

deem necessary or advisable.

　　　　8.　　　The Trustee has a security interest in, among other things, all Ocala

Funding accounts, loans, cash, and proceeds that were perfected under the Security

Agreement and Control Agreement and by virtue of the Trustee's possession and/or

control of such "Assigned Collateral."  Ocala Funding granted and warranted that

security interest "for the benefit of the Collateral Agent and the Secured Parties and the

income, distributions and proceeds thereof against the claims and demands of all Persons

whomsoever," and "[i]n order to secure and to provide for the full and timely repayment

. . . and performance of all liabilities and obligations owed or owing by [Ocala Funding] to the Secured Parties."

9.      Under Article 9, Part 6 of the Uniform Commercial Code ("UCC"), the Trustee may pursue all rights and remedies set forth in the Security Agreement and in Article 9 of the UCC.[2]

10.      The Trustee, therefore, continues to act in all its representative capacities, including that of indenture trustee, collateral agent, custodian, and duly appointed attorney-in-fact for Ocala Funding, and pursuant to Article 9 of the UCC, brings this action to obtain a declaratory judgment that the Trustee's claims should be allowed and Ocala Funding and the holders of beneficial interests in Ocala Funding are entitled to their equitable share of assets distributed by the Colonial and Platinum receivership estates.

**The Parties**

11.      Bank of America is a national banking association with its principal place of business located in Charlotte, North Carolina.  Pursuant to a Second Amended and Restated Base Indenture ("Indenture"), dated as of June 30, 2008, Bank of America is the trustee for Ocala Funding.

12.      Colonial was a state-chartered, non-member bank organized and existing under the laws of the State of Alabama with a principal place of business located in

---

[2]      *See* UCC 9-607(a)(3) ("A secured party . . . may enforce the obligations of an account debtor or other person obligated on collateral and exercise the rights of the debtor with respect to the obligation of the account debtor or other person obligated on collateral to make payment or otherwise render performance to the debtor, and with respect to any property that secures the obligations of the account debtor or other person obligated on the collateral").

Montgomery, Alabama.  At all relevant times, Colonial was a wholly owned subsidiary of Colonial BancGroup Inc.

13.     Platinum Community Bank was a federally chartered savings association owned by Platinum Bancshares, Inc. ("Bancshares").  Platinum's principal place of business was Rolling Meadows, Illinois.  TBW owned a controlling interest in Bancshares.

14.     The FDIC is the federal agency charged by law with, among other duties, administering the Federal Deposit Insurance Act (the "FDI Act") and the federal bank deposit insurance system.  Defendant FDIC-Receiver is the receiver appointed to administer the receivership estates of Colonial and Platinum.

## Jurisdiction

15.     This action arises under the laws of the United States including the FDI Act, 12 U.S.C. § 1811 et seq., as amended.  This Court has jurisdiction over the subject matter pursuant to 12 U.S.C. §§ 1819(b)(2)(A) and 1821(d)(6), and 28 U.S.C. § 1331.  This Court also has original subject matter jurisdiction, pursuant to 28 U.S.C. § 1332, because the parties are of diverse citizenship and the amount in controversy is over $75,000, exclusive of interest and costs.

16.     Venue is proper in the District of Columbia, pursuant to 12 U.S.C. § 1821(d)(6) and 28 U.S.C. § 1391(e).

**Facts Common to All Causes of Action**

Colonial Bank

17.     Colonial was primarily a retail and commercial bank.  Prior to receivership, Colonial held approximately $26 billion in assets and maintained approximately 350 branches located in Florida, Alabama, Georgia, Nevada, and Texas.

18.     Colonial's Mortgage Warehouse Lending Division ("MWLD") was headquartered in Orlando, Florida and principally provided short-term, secured funding to mortgage lending companies.  TBW was MWLD's largest customer.  Revenue generated by MWLD accounted for approximately 20% of Colonial's pre-tax income and, in 2008 and 2009, MWLD was one of Colonial's few banking segments that reported a profit.

19.     On June 15, 2009, Colonial consented to the entry of a cease and desist order by FDIC and the Alabama Superintendent of Banks under which Colonial agreed to raise its Tier 1 Leverage Capital Ratio to not less than 8 percent and its Total Risk-Based Capital Ratio to not less than 12 percent.

20.     As of June 30, 2009, Colonial's Tier I Leverage Capital Ratio was 4.18%, below the 8% required by the FDIC and the State of Alabama.

21.     In a press release dated July 31, 2009, Colonial's parent Colonial BancGroup, Inc. disclosed that as of June 30, 2009, it was not in compliance with capital requirements for Tier I Leverage Ratio and Total Risk-Based Capital Ratio as required by orders with the Federal Reserve, the FDIC and the State of Alabama.  The release further stated "management has concluded that there is substantial doubt about Colonial's ability to continue as a going concern."

22.     On August 4, 2009, the New York Times reported that the FBI and the Special Inspector General of the Treasury Department's Troubled Asset Relief Program had raided Colonial and TBW.  The New York Times further identified "the viability of Colonial" as an "urgent concern," and reported that Colonial's failure to secure a cash infusion from either TBW or the Treasury Department "suggests that neither side believes the bank can survive."

23.     On August 7, 2009, Colonial BancGroup disclosed that it was the target of a criminal investigation by the U.S. Department of Justice relating to accounting irregularities in its mortgage lending unit, and that it might be put into receivership.

Platinum Community Bank

24.     Platinum was a federally chartered savings association with its main office located in Rolling Meadows, Illinois.

25.     In July 2008, TBW acquired the controlling interest in Platinum Bankshares Inc., Platinum's holding company.  At the time, TBW's chairman stated that the acquisition of "Platinum Community Bank is an opportunity for TB&W to participate in the community bank process and essentially pilot the offerings we ask our community bank customers to adopt."

26.     As of August 29, 2009, Platinum had total assets of $345.6 million and total deposits of $305.0 million.

Taylor Bean & Whitaker Mortgage Corp.

27.     TBW, based in Ocala, Florida, was founded in 1982 and, before its collapse, was one of the largest privately held mortgage lending companies in the United States.

28.     Lee Bentley Farkas ("Farkas") was the chief executive officer of TBW until July 2003 and the chairman of its board of directors until August 2009.  Farkas was also the majority shareholder of TBW.

29.     TBW's core businesses were (i) originating, underwriting, processing and funding conforming and non-conforming,[3] conventional, government-insured residential mortgages; (ii) the sale of mortgages into the secondary market to government-sponsored enterprises such as the Federal Home Loan Mortgage Corporation ("Freddie Mac"); and (iii) mortgage payment processing and loan servicing.

30.     In 2008, TBW was responsible for originating approximately $30 billion in mortgages.  By July 2009, TBW was servicing more than 512,000 mortgages having an unpaid principal balance in excess of $80 billion.

31.     TBW generally sold mortgages it purchased or originated to investors in the secondary market ("Takeout Investors").  The mortgages were sold either individually, in pools of mortgages, or as part of mortgaged-backed securities, which obligations were guaranteed, in part, by Freddie Mac or the Government National Mortgage Association ("Ginnie Mae").

32.     At all relevant times, TBW retained the right to service substantially all of the mortgages it sold into the secondary market.

33.     As a servicer of mortgages, TBW generally was required to:  (i) collect principal and interest ("P&I") payments from individual borrowers; (ii) collect and hold in escrow tax and insurance ("T&I") payments from individual borrowers; (iii) disburse

P&I payments to the owners of each mortgage loan; and (iv) disburse T&I payments to the appropriate taxing authority and insurance provider.

34.     After July 2008, TBW processed payments of T&I, as well as other escrow related payments, through Escrow Disbursement Clearing Accounts ("EDCA") at Platinum.  In addition, refunds of excess T&I monies were paid to borrowers from the Platinum EDCA account.

35.     TBW's principal banking relationship was with Colonial where it maintained more than 116 bank accounts, 110 of which were used in TBW's mortgage servicing operations.

36.     TBW maintained an account at Colonial called the Custodial Funds Clearing Account (Account #8037152645) ("CFCA").

37.     TBW maintained an account at Colonial called the Master Advance Account (Account #8026069362) ("MAA").

38.     TBW maintained an account at Colonial called the Investor Funding Account (Account #8026069354) ("IFA").

39.     TBW funded its purchase and origination of mortgages through various purchase and credit facilities.

40.     A key component of TBW's financing and continued operation was its long-standing relationship with Colonial.

41.     Beginning in September of 1999, Colonial provided TBW with a traditional mortgage warehouse lending facility (the "Mortgage Warehouse Facility"),

---

[3]     Conforming loans generally are loans that meet the normal Freddie Mac or Ginnie Mae guidelines.  Non-conforming loans generally are all other loans, which include Alt-

which continued in various forms until a hold was placed on all of TBW's accounts in August 2009.

42.     Included in the Mortgage Warehouse Facility was an overline facility (the "Overline"), which provided certain additional funding capacity for TBW.

43.     Starting in 2002, Colonial began providing TBW with additional funding options through various participation facilities.  Under the terms of these facilities, which in recent years were referred to as COLB facilities ("COLB"), TBW sold to Colonial a participation interest (usually 99%) in mortgages, which were then sold to Takeout Investors or allocated to a particular mortgage security for which other financing was available.

44.     Although at one time TBW maintained multiple sources of "wet funding," over time all but one of those sources diminished or disappeared completely.[4]  Upon information and belief, by August 2008, TBW's only source of wet funding was COLB at Colonial.

45.     TBW also entered into additional borrowing facilities with Colonial, known as assignment of trade participation facilities ("AOT") under which Colonial would purchase participation interests (typically 99%) in trades held by TBW with respect to agency securities (both Freddie Mac and Ginnie Mae) and securities issued by private label issuers.

---

A loans, jumbo loans, second-lien mortgages, and subprime loans.

[4]     In general, "wet funding" is the provision of money to an individual borrower at the time of the closing of the mortgage loan before the delivery of original loan documents to the lender.  Because of the risk that there could be some issue with respect to the perfection of a security interest after funds have been provided, there historically have been fewer sources of "wet funding" than there are for other types of financing.

46.     Once TBW allocated a loan to an agency or private label securitization (through a trade with a Takeout Investor), the loan — which had been funded by COLB (or other facilities) — could be moved to the AOT until the ultimate settlement of the underlying trades with a Takeout Investor.

47.     Collectively, Colonial, through the COLB and AOT facilities, provided TBW with funding capacity in excess of $3 billion for the origination, purchase, and ultimate sale of loans.

48.     TBW's secondary marketing group was principally responsible for the sale of loans to investors, and TBW's treasury group, in conjunction with members of senior management, were responsible for administering the various funding sources.

<u>Ocala Funding, LLC</u>

49.     TBW established Ocala Funding in 2005 as a special purpose, bankruptcy-remote subsidiary to provide liquidity to TBW's mortgage origination business.  Ocala Funding purchased mortgages from TBW and held them pending the ultimate sale to Freddie Mac, thereby allowing TBW to use the immediate sale proceeds to originate more mortgages.

50.     Ocala Funding funded its operations by issuing debt, including short-term notes, secured by the underlying mortgages and other facility assets.

51.     Between December 2007 and July 2009, DB and BNP purchased all of the outstanding short-term notes issued by Ocala Funding.  These notes each matured in 30 days or less, becoming due and payable at that time.

52.     Upon information and belief, DB and BNP are the only parties holding outstanding short-term notes issued by Ocala Funding.

53.     Ocala Funding's operations were governed by a set of agreements called

the "Facility Documents," under which TBW controlled all major decisions and actions

for Ocala Funding's operation.[5]

54.     FDIC-Receiver was provided copies of the Facility Documents, among

other materials relating to Ocala Funding, in the Fall of 2009.  As such, at all relevant

times, Defendant has been aware of:  (i) the structure and purpose of Ocala Funding; (ii)

the Trustee's rights and obligations in connection with Ocala Funding; and (iii) the

Trustee's right to pursue recovery of losses incurred in connection with Ocala Funding,

---

[5]     The Facility Documents are comprised of that certain:  (i) Second Amended & Restated Mortgage Loan Purchase and Servicing Agreement, dated as of June 30, 2008, between Ocala Funding, as purchaser, and TBW, as seller and servicer, (ii) Second Amended and Restated Security Agreement, dated as of June 30, 2008, among Ocala Funding, Bank of America, as indenture trustee and Bank of America, as collateral agent, (iii) Second Amended and Restated Base Indenture, dated as of June 30, 2008, between Ocala Funding and Bank of America, as Indenture Trustee, (iv) Second Amended and Restated Custodial Agreement, dated as of June 30, 2008, among Ocala Funding, as issuer, TBW, as seller and servicer, Bank of America, as custodian and Bank of America, as collateral agent, (v) Series 2005-1 Amended and Restated Depositary Agreement, dated as of June 30, 2008, between Ocala Funding and Bank of America, as depositary, (vi) Series 2008-1 Depositary Agreement, dated as of June 30, 2008, between Ocala Funding and Bank of America, as depositary, (vii) Second Amended and Restated Series 2005-1 Supplement, dated as of June 30, 2008, between Ocala Funding, as issuer, and Bank of America, as indenture trustee and paying agent, (viii) Series 2008-1 Supplement, dated as of June 30, 2008, between Ocala Funding, as issuer, and Bank of America, as indenture trustee and paying agent, (ix) Second Amended and Restated Confirmation, dated as of June 30, 2008, between Ocala Funding and BNP, (x) Second Amended and Restated Schedule to the Master Agreement between Ocala Funding and BNP, (xi) Confirmation, dated as of June 30, 2008, between Ocala Funding and DB, (xii) Master Agreement, dated as of June 30, 2008, between Ocala Funding and DB, (xiii)  Schedule to the Master Agreement, dated as of June 30, 2008, between DB and Ocala Funding LLC, (xiv) Second Amended and Restated Confirmation for U.S. Dollar Rate Swap Transaction Under 1992 Master Agreement, between TBW and BNP, (xv) Second Amended and Restated Schedule to the Master Agreement, dated as of March 27, 2006, between BNP and TBW, (xvi) Second Amended and Restated Credit Support Annex, between BNP and Taylor, Bean & Whitaker Mortgage Corp., and (xvii) Confirmation for

including losses sought to be recovered through proofs of claim filed with the Colonial and Platinum Receiverships and this subsequent civil action.

55.     TBW was Ocala Funding's sole manager and agent, and expressly undertook to carry out and perform the daily business activities and obligations of Ocala Funding under the Facility Documents, as well as TBW's own obligations under those Documents.

56.     TBW was Ocala Funding's 100% owner, its only member with an economic interest, and the servicer of all loans sold to Ocala Funding.

57.     Notices provided to Ocala Funding were to be sent to TBW.

58.     TBW signed the Facility Documents on Ocala Funding's behalf.

59.     Under the Purchase Agreement, TBW sold mortgages it originated to Ocala Funding, and controlled the purchase of the mortgages by Ocala Funding.

60.     The Purchase Agreement required that TBW sell to Ocala Funding, and that Ocala Funding buy from TBW, "dry–funded" mortgages that met Freddie Mac guidelines.  The Purchase Agreement precluded the purchase of "wet-funded" mortgages.

61.     Under the Purchase Agreement, TBW also controlled the sale of mortgages from Ocala Funding to third parties, principally Freddie Mac, as well as the transfer of resulting proceeds back to the relevant Ocala Funding accounts at Bank of America.

62.     Colonial "wet-funded" TBW's loans and received payment for those loans from Ocala Funding for the mortgages it purchased.  Additionally, Colonial acted as

U.S. Dollar Rate Swap Transaction Under 1992 Master Agreement, dated June 30, 2008, between TBW and DB, and are incorporated herein by reference.

custodian for Freddie Mac when Ocala Funding's mortgages were sold to Freddie Mac. Thus, Ocala Funding would receive mortgages from Colonial and soon afterward deliver them back to Colonial.  All of these activities were directed by TBW and, upon information and belief, in concert with Colonial.

The Fraud

63.     As early as 2002, TBW began to experience significant liquidity problems and was unable to cover its ongoing operating expenses.  In order to cover these cash shortfalls, executives at TBW — in concert with executives at Colonial — conspired to divert funds from TBW's various borrowing facilities, including Ocala Funding, and to cover the shortfalls they allowed to develop in these facilities.

64.     Desiree Brown, former Vice-President of Special Projects, Controller, and Treasurer of TBW, Catherine Kissick, former Senior Vice President of Colonial Bank and head of Colonial's Mortgage Warehouse Lending Division ("MWLD"), and Teresa Kelly, former operations supervisor in Colonial's MWLD, have each stated that from late 2003 through August 2009, TBW and Colonial engaged in a scheme to defraud various entities and individuals, including investors in Ocala Funding.  Until the fraudulent scheme was uncovered in August 2009, TBW and Colonial developed and executed multiple schemes to steal from TBW's borrowing facilities and conceal the true nature of TBW's financial condition.  In connection with those frauds, Brown "knowingly and intentionally" caused Colonial to purchase purported assets from TBW worth more than $400 million but that in fact had no value and were held on Colonial's books as if they had actual value.  Brown, along with other co-conspirators, "caused TBW to

misappropriate over $1 billion in collateral from Ocala Funding and to cover up this aspect of the fraud scheme."[6]

       65.    Among other schemes, TBW and Colonial:

      a.  covered up overdrafts in TBW's master bank account at Colonial (the "Master Account") by transferring or "sweeping" overnight money from other TBW accounts at Colonial into the Master Account, which gave the false appearance that TBW was not overdrawn.  The day after funds were swept into the Master Account, conspirators at TBW and Colonial would sweep the same funds back out of the Master Account;

      b.  disguised the growing Master Account deficit as payments related to Colonial's purchase of legitimate mortgages through COLB.  Kelly has stated that she and other co-conspirators, including Farkas, caused TBW to provide false mortgage loan data to Colonial Bank under the pretense that it was selling Colonial Bank interests in mortgage loans.  Kelly, Farkas, and other co-conspirators knew that those data included data for loans that did not exist or that TBW had already committed or sold to other third-party investors.  Kelly "intentional[ly] and deliberate[ly]," along with co-

---

[6]     The facts set forth in paragraphs 64-65, 69-74, 82 of this Complaint are taken from the June 15, 2010 indictment of Lee Bentley Farkas (*see United States v. Lee Bentley Farkas*, Docket No. 1:10-cr-00200-LMB (E.D. Va.)), the Government's June 16, 2010 Motion for Pre-Trial Detention of Lee Bentley Farkas (*see United States v. Lee Bentley Farkas*, Docket No. 5:10-mj-1028-GRJ (M.D. Fla.)), the Statement of Facts by Desiree Brown (*see United States v. Desiree Brown*, Docket No. 1:11-cr-00084-LMB (E.D. Va.)), the Statement of Facts by Teresa Kelly (*see United States v. Teresa Kelly*, Docket No. 1:11-cr-00119-LMB (E.D. Va.)), and the Statement of Facts by Catherine Kissick (*see United States v. Catherine Kissick*, Docket No. 1:11-cr-00088-LMB (E.D. Va.)), each of which is incorporated herein by reference.

conspirators, caused the data to be recorded in Colonial Bank's books and records to "give the false appearance that Colonial Bank had purchased legitimate interests in mortgage loans from TBW through COLB."  The false mortgage loan data was created to create the appearance that such loans had been pledged to COLB, which, in turn, allowed funds to be drawn off of COLB;

c.  disguised the existence of false loan data used to back COLB by recycling loan data, which created the false appearance that mortgages on COLB had been sold to Takeout Investors and that Colonial, in turn, had purchased interests in new mortgages in their place;

d.  transferred the deficit created on COLB to AOT.  As Kelly, Brown, and Kissick have each stated, beginning in 2005, TBW and Colonial transferred the deficit on COLB to AOT, in part to avoid detection of the scheme by regulators, auditors, Colonial Bank management, and others, because the accounting records for AOT generally did not track loan-level data for pools of loans ("Trades") it purchased.  TBW and Colonial accomplished these transfers by causing TBW to sell to Colonial Trades that were not backed by actual mortgages.  During the relevant period, TBW and Colonial conspired to sell hundreds of millions of dollars of fictitious Trades to AOT;[7]

---

[7]     Co-conspirators at TBW and Colonial Bank created and exchanged fictitious schedules supporting the Trades, which included unique identifying numbers that TBW co-conspirators reused from Trades previously sold or pledged to other investors.

e.   hid real estate owned ("REO") properties (typically bank-repossessed
properties associated with foreclosed mortgages) and impaired-value
mortgages (loans in default, and significantly aged loans that TBW was
unable to sell to Takeout Investors) as collateral for Trades sold to AOT.
Kelly has stated that the conspirators caused the creation of false
documents to reflect agreements, as required under the AOT facility, for
third-party investors to purchase these impaired Trades;

f.   engaged in sham sales to hide the fact that there were no commitments by
third parties to purchase from AOT most if not all of the assets backing the
facility.  Kelly has stated that she and the other conspirators intentionally
and deliberately engaged in these sham sales to hide the fact that the vast
majority of assets backing the AOT Trades could not be resold because the
assets were either wholly fictitious or consisted of, among other things,
impaired-value loans and REO and, had no corresponding, legitimate
commitment to be purchased by third parties, and that they did so to
deceive regulators, auditors, and certain Colonial Bank management.
Kissick has stated that this fraudulent AOT funding was typically provided
on requests from Farkas or other conspirators at TBW for funding
servicing obligations, operational expenses, or covering overdrafts.  One
such sham sale involved a January 6, 2009 request to Kelly from a co-
conspirator at TBW consisting of three "trade assignment agreements"
purporting to represent that TBW had arranged with a third party to
purchase the Trades.  Kelly has stated that she knew the transaction "was

part of an effort by the co-conspirators to periodically 'recycle' the Trades

held on the AOT facility by making it appear that Trades had been sold

and replaced by newly purchased Trades."  Kelly has also stated that she

knew "the three Trades 'purchased' by Colonial Bank had no loans

assigned to them, and thus no actual value, and the trade assignment

agreements were false as there was no third-party purchaser for the

Trades."  Kelly has further stated that she knew "the vast majority of the

securities held on AOT [in May 2009] were fictitious or impaired and

were not under legitimate agreements to be resold to third-party

investors."  These sham sales included "round-trip" transfers of funds

from AOT to Ocala Funding bank accounts controlled by TBW and back

to Colonial;

g.  fraudulently concealed these facts from TBW's and Colonial's regulators

to avoid bankruptcy and/or receivership for almost seven years.  Kissick

has stated that she knew that her actions were wrong, and that she and her

co-conspirators took steps to hide their scheme from regulators, auditors

and certain senior Colonial Bank management.  For instance, in May

2009, Kissick deleted electronic communications on her personal

Blackberry PDA, and instructed members of her staff to delete

communications on their Blackberry PDAs, to evade subpoenas for

documents from the Special Inspector General for the Troubled Asset

Relief Program ("TARP") that had been served on Colonial Bank and

TBW.  This concealment also allowed TBW and Colonial to defraud

numerous third party lenders and creditors of billions of dollars, including

Ocala Funding;

h.  diverted virtually all of the assets of Ocala Funding to pay down TBW's

operating expenses, including mortgages servicing payments owed to

Takeout Investors.  Brown has stated that she, along with Mr. Farkas and

co-conspirators at TBW, intentionally and deliberately diverted hundreds

of millions of dollars from Ocala Funding bank accounts to pay TBW

operating expenses, and that as a result Ocala Funding experienced

significant shortfalls in the amount of collateral it possessed to back its

obligations to DP and BNP; and

i.  fraudulently concealed these diversions from the Trustee by, *inter alia*,

providing the Trustee with falsified collateral lists that misrepresented the

status of loans in which Ocala Funding should have held a security

interest.  Brown has stated that TBW sent the Trustee falsified collateral

lists misrepresenting the ownership status of mortgage loans held by Ocala

Funding by more than $1 billion.

66.  Between June 30, 2008 and August 3, 2009, approximately $675 million
was transferred from Ocala Funding accounts at Bank of America to the CFCA (the
"CFCA Funds").  The transfer of these funds to the CFCA was unauthorized and
improper, and constituted the theft of Ocala Funding's assets.

67.  Between June 30, 2008 and August 3, 2009, approximately $451 million
was transferred from Ocala Funding accounts at Bank of America to the MAA (the

"MAA Funds"). The transfer of these funds to the MAA was unauthorized and improper, and constituted the theft of Ocala assets.

68.     Between June 30, 2008 and August 3, 2009, billions of dollars were transferred from the Ocala accounts to the IFA for the purchase of mortgages. Some of these funds were not used for the purchase of mortgages. To the extent that these funds were not used for the purchase of mortgages, the transfer of these funds (the "IFA Funds") to the IFA was unauthorized and improper, and constituted the theft of Ocala assets.[8]

69.     In October 2008, Colonial BancGroup applied to FDIC for $570 million in funding from the TARP. Upon information and belief, Colonial sought these funds in order to avoid insolvency and to further conceal the fraud it perpetrated with TBW.

70.     As part of its application for TARP funds, Colonial provided materially false information to the FDIC and other regulators in an effort to conceal evidence of Colonial's fraudulent activity with TBW.

71.     In December 2008, the United States Treasury conditionally approved $533 million in TARP funding to Colonial BancGroup. In order to receive the funds, however, Colonial BancGroup first was required to raise $300 million in private capital.

72.     In March 2009, TBW and Colonial fraudulently represented that (i) TBW would invest $150 million in Colonial BancGroup; and (ii) that unnamed investors would invest an additional $100 million.

---

[8]     Upon information and belief, the amount of funds improperly transferred into accounts at Colonial and the identity of accounts into which funds improperly were transferred may change based upon discovery from Defendant or other third parties.

73.     On April 1, 2009, TBW and Colonial caused Colonial BancGroup to file an 8K with the Securities and Exchange Commission that fraudulently represented that 10% of the Colonial BancGroup private investment had been deposited into an escrow account.

74.     TBW, Colonial, and Platinum then caused a total of $50 million to be deposited into an escrow account at Platinum, purportedly to evidence escrow deposits made as part of the Colonial BancGroup private investment.  In fact, TBW, Colonial, and Platinum had diverted all $50 million from an Ocala Funding account at Bank of America.

75.     Specifically, on March 30, 2009, $25,000,000 was wired from the Ocala Funding Collateral Account (Account #722493.4) at Bank of America to an unnamed account (Account #0030270065) at Platinum.

76.     On April 3, 2009, $25,000,000 was wired from the Ocala Funding Collateral Account (Account #722493.4) at Bank of America to an unnamed account (Account #0030270065) at Platinum.

77.     Upon information and belief, account number 0030270065 is an escrow account established by co-conspirators at TBW, Colonial, and Platinum as part of their fraudulent scheme to obtain TARP funds.

78.     In addition to the $50 million fraudulently diverted from Ocala Funding in March and April of 2009, upon information and belief, on October 3, 2008, $12,239,697.21 was wired from the Ocala Funding Collateral Account (Account #722493.4) at Bank of America and ultimately was deposited at Platinum.  This deposit

was used by TBW and/or Colonial to purchase mortgages from Platinum for TBW's benefit.

79.     The transfers were inconsistent with the structure and purpose of Ocala Funding.

80.     Colonial BancGroup never received the TARP funds and the $300 million private investment was never completed.

81.     Upon information and belief, Platinum knew of or recklessly disregarded the fraud described herein.  As such, Platinum's misstatements or omission actively concealed the theft of assets from Ocala Funding.

82.     TBW and Colonial caused TBW and Colonial BancGroup to make numerous other fraudulent misrepresentations to regulators, including materially false filings with the Securities and Exchange Commission that concealed (i) the cash shortfalls at TBW; (ii) the fraudulent use of COLB; (iii) the fraudulent use of AOT; and (iv) the theft of assets from Ocala Funding.

83.     The fraudulent acts described herein could not have been accomplished without the active participation of TBW, Colonial, and Platinum.

84.     At all relevant times, Platinum was controlled by TBW and acted at its direction.

85.     TBW participated in the fraud in order to cover up growing cash shortfalls within the company.  Upon information and belief, TBW actually lost money every year from 2002 until 2009.

86.     Colonial participated in the fraud in order to (i) maintain its commercial relationship with TBW, one of Colonial's largest clients; and (ii) conceal the fact that AOT, COLB, and Overline were backed by ineligible and/or non-existent collateral.

87.     Colonial executives who participated in these fraudulent schemes included, but were not limited to, (i) Catherine L. Kissick, Senior Vice President/Director, Colonial, Institutional Services Division and MWLD; and (ii) Teresa Kelly also an executive within Colonial's MWLD.

88.     Upon information and belief, Kissick and Kelly are identified as unnamed co-conspirators in the United States Government's June 16, 2010 Motion for Pre-Trial Detention of Lee Bentley Farkas (*see United States v. Lee Bentley Farkas*, Docket No. 5:10-mj-1028-GRJ (M.D. Fla.)).

89.     Kissick participated in the fraudulent schemes by:

   a.   upon information and belief, knowingly accepting approximately $150 million in non-existent loans from TBW as collateral for COLB;

   b.   knowingly purchasing Trades that included REO properties and impaired value mortgages from TBW as collateral for AOT; and

   c.   knowingly fabricating Colonial's accounting records (i) to reflect false or incorrect dates when Trades sold to AOT would be purchased by Takeout Investors; (ii) to reflect the purchase of Trades by AOT after the same Trades had been sold to other investors; and (iii) to reflect a higher number of Trades sold to AOT than actually had been sold.

90.     Communications made available to Plaintiff by TBW evidence Kissick's and other Colonial executives' active participation in the fraud, including:

a.  In September 2003, Kissick and other Colonial employees explicitly referred to the growing deficit they were attempting to cover up as "the hole."  Kissick has acknowledged that "hole loans" — loans that were ineligible for AOT (*i.e.*, missing notes) — nonetheless appeared on Colonial's financial records to give the appearance that there was sufficient collateral supporting AOT.

b.  In April 2005, shortly after Ocala Funding began funding new mortgage loan purchases, Farkas informed Kissick that Ocala Funding had funded $200MM, to which Kissick replied: "That's Great News!!!! Can we fund 325MM more?", which referenced, upon information and belief, what Kissick believed to be a total of $325 million in ineligible loans pledged or sold to COLB and/or AOT.

c.  In November 2005, Farkas inquired of Desiree Brown, a TBW officer, whether TBW "[paid] OF [Ocala Funding] back from the pairoffs."  In December 2005, Brown then wrote to Kissick that "Lee [Farkas] said that I need to make sure that we schedule some time with you next week to continue my education....  When is convenient for you?"  Kissick replied, "I'm copying Teresa [Kelly] on this so I can make sure that she's in too.  Teresa - we're going to work with [Brown] and show her how a cash sublimit works....  If they are allowed to sweep money from Ocala Funding against maybe COLB, then it would help reduce their interest costs SUBSTANTIALLY" (emphasis in original).

d.  At one point in September of 2007, Colonial refused to advance funds to
    TBW because, according to Kissick, Colonial already had about $800MM
    worth of unsalable bulk loans on the AOT and was "not going to add more
    crap."  Farkas responded to Kissick that Colonial's refusal to provide more
    funding, "…will kill us [TBW]."

e.  In June 2008, Kissick sought a means for Colonial to ship loans to Ocala
    Funding "for them to pay us off and then they could be shipped right back,
    and paid off via Ocala Funding."  Once Kissick understood the process
    necessary to effectuate the fraud, she asked Farkas if the transaction might
    also help TBW "resolve [its] billion dollar/800MM issue?" as well.

f.  On September 23, 2008, Kissick explained to another Colonial executive,
    "TBW will be funding back up today, but not the $200MM they
    reduced....and we might even get another $100MM paid down.  The
    problem is - they're moving everything around from various lenders so we
    get paid down at quarter-end."

g.  And, in an effort to shore up Colonial's balance sheet at the end of each
    fiscal quarter:

    i.  At the end of the third quarter of 2008, Kissick sent an email to
        Colonial employee Teresa Kelly, and to Farkas and Brown, noting:
        "[w]e have to pay down the balances tomorrow night – but it can
        be on AOT level, not loan level, as I believe all of the loans are all
        on AOT anyways, and not on COLB.  (Doc Custody has been

working their fingers to the bone to get the pools certified and on

AOT).  That should make things a lot easier for quarter end."

    ii.  At the end of the first quarter of 2008, Kissick wrote to Kelly,

Farkas, and Brown, instructing them to ensure that aged COLB

loans were "as cleaned up as possible," and that all AOT private

label trades were updated if the current commitment to purchase

the trade had expired, because Colonial made this a "#1 priority,

since it's such a sensitive subject."

    iii.  At the end of the first quarter of 2009, Kissick wrote to Kelly,

copying Brown, "Just an FYI – quarter end is coming soon.  I was

reminded that we have to focus on agings [sic] to give to

regulators.  Please – make sure nothing is out of whack – and that

numbers are DOWN…."

    iv.  On the same day, Kissick forwarded the email exchange to Farkas:

"With everything that is going on, we can't take the chance on you

guys having loans over 90 days.  The total is only 14MM, which is

good, but it will create all sorts of unneeded questions.  Please

make sure [Donna Skuhrovec, a TBW employee, and Brown] gets

to the bottom of why they haven't gone yet."

91.    Colonial also actively sought to manipulate TBW's financial statements.

In October 2008, for example, TBW considered changing its accounting treatment of

REO properties used to collateralize AOT, treating funds drawn off of AOT as debt to be

carried on TBW's balance sheet.  When Rodney Lewis, a Colonial officer, learned of the

potential accounting treatment, he objected because, based upon information and belief, Colonial was concerned about the impact this disclosure could have on Colonial's capital requirements and trigger regulatory scrutiny of the Bank.  Accordingly, Lewis told Brian Callahan, a TBW executive, to revise and reissue TBW's monthly financial statements.

92.     Ultimately, on January 13, 2009, Callahan sent the "revised" November financial statements to Lewis and Kissick, and copied several TBW officers, including Farkas, Paul Allen, Ray Bowman, and Delton De Armas and noted, "[p]er our phone conversation, attached are the November statements and covenants you requested."  The revised financial statement treated TBW's REO properties as true sales to AOT, thus keeping them off of TBW's balance sheet as liabilities attributable to "warehouse facilities and other borrowings."

93.     In August 2009, as TBW was collapsing, Kissick and Farkas scrambled to allocate available mortgages between COLB and Ocala Funding, or, as Kissick phrased it, "get the OF [Ocala Funding]/Colb thing figured out."  Kissick indicated that some mortgages were not registered on the Mortgage Electronic Registration System ("MERS").  Upon information and belief, Kissick instructed employees at TBW to alter MERS records in a last minute attempt to establish collateral sufficient to support COLB.

<u>The Fraud is Discovered</u>

94.     Pursuant to certain HUD regulations, as well as agreements with Ginnie Mae, Freddie Mac and various lenders, TBW was required to deliver year-end audited financial statements to these agencies and lenders.  Deloitte LLP served as TBW's auditor.

95.     On June 16, 2009, members of Deloitte's team expressed concerns that they were encountering delays in obtaining information and documentation from TBW regarding certain assets on TBW's balance sheet.  Deloitte refused to issue a clean audit of TBW's financial statements.

96.     On August 3, 2009, federal investigators, including agents of the United States Federal Bureau of Investigation, raided TBW's headquarters in Ocala, Florida.

97.     On the same day, Colonial's offices in Orlando, Florida were raided, and the Department of Justice announced that Colonial was the target of a criminal investigation related to accounting irregularities in its mortgage lending unit.

98.     On August 4, 2009, HUD suspended TBW's HUD/FHA origination and underwriting approval.  In a press release announcing this suspension, HUD stated that this action was taken as a result of, among other things, its discovery that TBW's auditor ceased its financial examination after discovering certain irregular transactions that raised concerns of fraud, and that TBW failed to disclose, and falsely concealed, that it was the subject of two examinations into its business practices in the past year.

99.     In addition, Freddie Mac and Ginnie Mae terminated TBW's right to issue and service loans for them.

100.    On August 5, 2009, TBW laid off approximately 2,000 employees, or approximately 80% of its workforce, and significantly reduced its business operations.

101.    Also on August 5, 2009, DB and BNP, in their capacities as Swap Counterparties to Ocala Funding and TBW, provided formal written notices to Bank of America — as well as to TBW, Ocala Funding, and others — that an "Indenture Event of

Default" under Section 9.1 of the Indenture, and a "Termination Event" under the Purchase Agreement, had occurred.

102.     In addition, DB's letter instructed Bank of America, as indenture trustee, to declare the notes to be due, instructed Ocala Funding to cease purchasing mortgages, and notify TBW that such Events of Default had occurred.

103.     On August 10, 2009, the Trustee sent Ocala Funding, TBW, the Swap Counterparties, and others a Notice of Potential Indenture Event of Default, Indenture Event of Default, and Acceleration that implemented DB's instructions.

104.     On August 12, 2009, the Trustee commenced suit in the United States District Court for the Southern District of Florida, Miami Division, against Colonial and others to recover mortgages and other assets belonging to Ocala Funding.

105.     On August 14, 2009, the State of Alabama Department of Banking Regulation appointed FDIC as receiver of Colonial.[9]

106.     As a result of TBW, Platinum, Colonial's fraud, Ocala Funding lacks sufficient assets (either mortgages or cash) to pay off short-term notes it issued on July 20, 2009 and subordinated notes.

107.     On August 24, 2009, TBW filed a voluntary petition under Chapter 11 of the Bankruptcy Code, 11 U.S.C. § 101 et seq. in the United States Bankruptcy Court for the Middle District of Florida.  Prior to the filing of the bankruptcy petition, TBW's board of directors resigned and a new board, comprised of two restructuring professionals, was put in place.

---

[9]     On August 25, 2009, Colonial BancGroup Inc., the bank holding company that owned Colonial Bank, filed a voluntary petition in United States Bankruptcy Court for

108.    On Friday, September 4, 2009, Platinum was closed by the Office of Thrift Supervision, and the FDIC was named Receiver.

109.    FDIC-Receiver estimates the cost of the Platinum failure to its Deposit Insurance Fund to be approximately $114.3 million.

110.    Upon information and belief, Platinum failed and was placed into FDIC Receivership, in part, due to the fraudulent scheme described herein.

111.    On September 10, 2009, TBW and FDIC-Receiver for Colonial entered into a stipulation that allowed TBW to perform (i) a reconciliation of the borrower funds and other servicing-related monies that had been affected by the failure of TBW and Colonial, and (ii) an analysis of the mortgages that passed through TBW and were the subject of competing claims of ownership.

112.    In September 2009, upon information and belief, TBW transferred mortgage loans and/or mortgage loan servicing rights to subsequent servicers.

113.    Upon information and belief, TBW transferred mortgage loans and/or servicing rights based upon title assigned to such loans in TBW's mortgage servicing system.

114.    Upon information and belief, approximately 153 mortgage loans titled to Ocala Funding (hereinafter, the "Roundpoint Loans")[10] were transferred to Roundpoint Mortgage Servicing Corporation, as subsequent servicer for Ocala Funding.

---

the Middle District of Alabama under Chapter 11 of the Bankruptcy Code.

[10]    A non-exhaustive list identifying the Roundpoint Loans is attached hereto as Exhibit E.  Upon information and belief, the number and identity of the Roundpoint Loans may change based upon discovery from Defendant or other third parties.

115.     Notwithstanding Ocala Funding's ownership of Roundpoint Loans, FDIC-Receiver has control of the Roundpoint Loans and instructed Roundpoint to refuse to grant the Trustee access to, or the ability to transfer from Roundpoint, the Roundpoint Loans.

116.     Upon information and belief, FDIC-Receiver has accepted advances of P&I payments on the Roundpoint Loans from Roundpoint.

117.     Despite repeated requests that the Roundpoint Loans be returned to the Trustee, FDIC-Receiver has refused to allow Roundpoint to release the Roundpoint Loans.

118.     On July 1, 2010, TBW filed with the bankruptcy court its asset reconciliation report, which purported to identify facts related to the collapse of TBW and competing claims of ownership to assets that passed through TBW (the "Asset Reconciliation Report").[11]

119.     FDIC-Receiver reviewed and, in open court, endorsed the findings set forth in the Asset Reconciliation Report.

120.     Based, in part, upon facts identified in the Asset Reconciliation Report, the Trustee has identified approximately 45 mortgage loans that Ocala Funding purchased from COLB, which subsequently were transferred to Colonial Bank (hereinafter, the "Ocala Loans").[12]

---

[11]     Plaintiff incorporates by reference only those portions of the Asset Reconciliation Report related to Colonial Bank's participation in and knowledge of the fraud.

[12]     A non-exhaustive list identifying the Ocala Loans is attached hereto as Exhibit F. Upon information and belief, the number and identity of the Ocala Loans may change based upon discovery from Defendant or other third parties.

121.    Upon information and belief, the Ocala Loans have not been sold to any Takeout Investor.

122.    Upon information and belief, Colonial Bank did not purchase the Ocala Loans from Ocala Funding and Ocala Funding has not otherwise received value for the Ocala Loans.

<u>Colonial Bank Proof of Claim</u>

123.    On November 19, 2009, the Trustee timely filed with FDIC-Receiver for Colonial a proof of claim, a copy of which is attached hereto as Exhibit A.

124.    In its Colonial proof of claim, the Trustee sought allowance of a general unsecured claim against Colonial insofar as it was complicit in the fraud that resulted in losses to Ocala Funding and holders of beneficial interests in it.

125.    The amounts of the Trustee's claims currently are unliquidated and cannot be determined at this time.  However, upon information and belief, the sum of each such claim is up to $1.75 billion plus accrued and unpaid interest through the filing of this complaint and other charges (including attorney's fees and legal costs), but the Trustee seeks only a single recovery of such sum.

126.    The Trustee lacks access to the records of TBW, Colonial, and other third parties, which may include information that supports the Trustee's claims.

127.    Pursuant to 12 U.S.C. § 1821(d)(5)(A)(i), the FDIC-Receiver should have determined whether to allow or disallow the Trustee's Colonial proof of claim within 180 days of November 19, 2009.

128.    On May 17, 2010, the FDIC-Receiver and the Trustee agreed to a 90-day extension of the FDIC-Receiver's time to allow or disallow the Trustee's Colonial proof of claim, through August 6, 2010.

129.    Pursuant to 12 U.S.C. § 1821(d)(5)(A)(iv), FDIC-Receiver was further required to give the Trustee notice of disallowance of its claims, which notice was required to contain "a statement of each reason for the disallowance" and "the procedures available for obtaining agency review of the determination to disallow the claim or judicial determination of the claim."

130.    In a letter dated August 4, 2010, FDIC-Receiver notified the Trustee that its claims were disallowed.  A copy of FDIC-Receiver's notice is attached as Exhibit B.

131.    FDIC-Receiver's notice stated that the claims were disallowed because "[t]he claim has not been proven to the satisfaction of the Receiver."

132.    The notice provides no additional detail or explanation regarding FDIC's decision.

133.    Section 11(d)(2)(H) of the FDI Act states that FDIC "shall pay all valid obligations of the insured depository institution in accordance with the prescriptions and limitations of this chapter."  12 U.S.C. § 1821(d)(2)(H).

134.    FDIC-Receiver's disallowance of the Trustee's claims violated FDIC-Receiver's statutory duty to pay all valid claims in accordance with the FDI Act.

135.    The FDI Act further provides that when FDIC-Receiver has disallowed a claim, the claimant may "file suit on such claim …in the district or territorial court for the United States for the district within which the depository institution's principal place of

business is located or the United States District Court for the District of Columbia (and such court shall have jurisdiction to hear such claim)." 12 U.S.C. § 1821(d)(6)(A).

136.    FDIC-Receiver's notice directs the Trustee to file a lawsuit if it disagrees with the disallowance of its claims.

Platinum Community Bank Proof of Claim

137.    On December 9, 2009, the Trustee timely filed with FDIC-Receiver for Platinum a proof of claim, a copy of which is attached hereto as Exhibit C.

138.    In its Platinum proof of claim, the Trustee sought recovery for, *inter alia*, trust or preferred claims, claims for stolen property, and senior unsecured claims against Platinum insofar as it was complicit in the fraud that resulted in approximately $1.75 billion of losses to Ocala Funding and holders of beneficial interests in it.

139.    The amounts of the Trustee's claims currently are unliquidated and cannot be determined at this time.  However, upon information and belief, the sum of each such claim is up to $1.75 billion plus accrued and unpaid interest through the filing of this complaint and other charges (including attorney's fees and legal costs), but the Trustee seeks only a single recovery of such sum.

140.    The Trustee lacks access to the records of TBW, Platinum, and other third parties, which may include information that supports the Trustee's claims.

141.    Pursuant to 12 U.S.C. § 1821(d)(5)(A)(i), the FDIC should have determined whether to allow or disallow the Trustee's Platinum proof of claim within 180 days of December 10, 2009.

142.     On May 17, 2010, the FDIC and the Trustee agreed to a 90-day extension of the FDIC-Receiver's time to allow or disallow the Trustee's proof of claim, through August 6, 2010.

143.     Pursuant to 12 U.S.C. § 1821(d)(5)(A)(iv), the FDIC was further required to give the Trustee notice of disallowance of its claims, which notice was required to contain "a statement of each reason for the disallowance" and "the procedures available for obtaining agency review of the determination to disallow the claim or judicial determination of the claim."

144.     In a letter dated August 5, 2010, FDIC-Receiver notified the Trustee that its claims were disallowed.  A copy of FDIC-Receiver's notice is attached as Exhibit D.

145.     FDIC-Receiver's notice stated that the claims were disallowed because "[c]laim in the amount of $1,750,000 [sic] is not proven to the satisfaction of the Receiver."

146.     The notice provides no additional detail or explanation regarding FDIC's decision.

147.     Section 11(d)(2)(H) of the FDI Act states that FDIC "shall pay all valid obligations of the insured depository institution in accordance with the prescriptions and limitations of this chapter."  12 U.S.C. § 1821(d)(2)(H).

148.     FDIC-Receiver's disallowance of the Trustee's Claims violated FDIC-Receiver's statutory duty to pay all valid claims in accordance with the FDI Act.

149.     The FDI Act further provides that when FDIC-Receiver has disallowed a claim, the claimant may "file suit on such claim …in the district or territorial court for the United States for the district within which the depository institution's principal place of

business is located or the United States District Court for the District of Columbia (and such court shall have jurisdiction to hear such claim)."  12 U.S.C. § 1821(d)(6)(A).

150.    FDIC Receiver's notice directs the Trustee to file a lawsuit if it disagrees with the disallowance of its claims.

151.    As such, the Trustee brought this action.

## FIRST CAUSE OF ACTION
### (Determination of the Trustee's Colonial Proof of Claim)

152.    The Trustee repeats and realleges the allegations contained above, as if fully set forth herein.

153.    Under 12 U.S.C. § 1821(d)(6)(A), this Court has *de novo* jurisdiction to consider the Trustee's claims as set forth in its Colonial proof of claim.

154.    But for Colonial's negligent, intentional, and/or fraudulent acts, Ocala Funding would not have been defrauded of approximately $1.75 billion and would be able meet its obligation to existing short term and subordinated noteholders.

155.    Each of the Trustee's claims described herein is a valid and proven claim against the Colonial receivership, and FDIC-Receiver is obligated to pay such claims (subject to, and in accordance with, 12 U.S.C. § 1821(d)(11)).

## SECOND CAUSE OF ACTION
### (Declaration that Disallowance of the Trustee's Colonial Proof of Claim is Void)

156.    The Trustee repeats and realleges the allegations contained above, as if fully set forth herein.

157.    FDIC-Receiver's summary disallowance of the Colonial proof of claim is without any meaningful explanation and abrogated FDIC-Receiver's statutory duties.

158.    A justiciable controversy exists as to a determination of the rights of the Trustee and Ocala Funding's investors.

159.    As such, FDIC-Receiver's disallowance should be declared void and FDIC should be required to reconsider those portions of Trustee's Colonial proof of claim described herein as if FDIC-Receiver's August 4, 2010 disallowance never occurred.

### THIRD CAUSE OF ACTION
### (Determination of the Trustee's Platinum Proof of Claim)

160.    The Trustee repeats and realleges the allegations contained above, as if fully set forth herein.

161.    Under 12 U.S.C. § 1821(d)(6)(A), this Court has *de novo* jurisdiction to consider the Trustee's claims as set forth in its Platinum proof of claim.

162.    But for Platinum's negligent, intentional, and/or fraudulent acts, Ocala Funding would not have been defrauded of approximately $1.75 billion and would be able meet its obligation to existing short term and subordinated noteholders.

163.    Further, the Trustee has a valid priority claim for up to $62 million deposited in Platinum account number 0030270065 or other escrow accounts at Platinum.

164.    Each of the Trustee's claims described herein is a valid and proven claim against the Platinum receivership, and FDIC-Receiver is obligated to pay such claims (subject to, and in accordance with, 12 U.S.C. § 1821(d)(11)).

### FOURTH CAUSE OF ACTION
### (Declaration that Disallowance of the Trustee's Platinum Proof of Claim is Void)

165.    The Trustee repeats and realleges the allegations contained above, as if fully set forth herein.

166.    FDIC-Receiver's summary disallowance of the proof of claim is without any meaningful explanation and abrogated FDIC-Receiver's statutory duties.

167.     A justiciable controversy exists as to a determination of the rights of the Trustee and Ocala Funding's investors.

168.     As such, FDIC-Receiver's disallowance should be declared void and FDIC should be required to reconsider those portions of the Trustee's Platinum proof of claim described herein as if FDIC-Receiver's disallowance never occurred.

### FIFTH CAUSE OF ACTION
**(Fraud by Colonial)**

169.     The Trustee repeats and realleges the allegations contained above, as if fully set forth herein.

170.     As described above, Colonial actively concealed the true nature of (i) TBW's financial condition; (ii) Colonial's financial condition; and (iii) Ocala Funding's financial condition.

171.     In its capacity as indenture trustee, custodian, and collateral agent, the Trustee reasonably relied on Colonial's misstatements and omissions concerning the true nature of (i) TBW's financial condition; (ii) Colonial's financial condition; and (iii) Ocala Funding's financial condition.

172.     Executives at Colonial actively participated in the creation of false records, including records related to Ocala Funding, which allowed the fraudulent scheme to continue without detection for seven years.

173.     Upon information and belief, executives at Colonial actively participated in the fraudulent transfer of funds out of Ocala Funding bank accounts.

174.     Executives at Colonial actively participated in the transfer of $50 million from Ocala Funding's bank accounts to an escrow account at Platinum for the purpose of fraudulently obtaining TARP funds.

175.    Executives at Colonial actively participated in the double- and triple-pledging of mortgages to, among others, Ocala Funding.

176.    But for Colonial's acts, Ocala Funding would not have issued short terms notes and subordinated debt to investors and allowed TBW and Colonial to steal the proceeds from the issuance of those notes.  As such, Colonial proximately caused Ocala Funding to lose approximately $1.75 billion and be unable to meet its obligation to existing short term and subordinated noteholders.

### SIXTH CAUSE OF ACTION
### (Civil Conspiracy by Colonial and Platinum)

177.    The Trustee repeats and realleges the allegations contained above, as if fully set forth herein.

178.    As described herein, principals at TBW (including Farkas, Brown, and Delton De Armas) and Colonial (including Kissick and Kelly) knowingly participated in a concerted scheme to defraud Ocala Funding.

179.    Upon information and belief, principals at Platinum knew of or recklessly disregarded the conspiracy to steal funds from Ocala Funding.

180.    But for the conspiracy by TBW, Platinum, and Colonial, Ocala Funding would not have issued short terms notes and subordinated debt to investors and allowed TBW, Platinum, and Colonial to steal the proceeds from the issuance of those notes.

181.    As such, Colonial proximately caused Ocala Funding to lose approximately $1.75 billion and be unable to meet its obligations to existing short term and subordinated noteholders.

182.    As such, Platinum proximately caused Ocala Funding to lose approximately $1.75 billion and be unable to meet its obligations to existing short term and subordinated noteholders.

183.    As described above, Ocala Funding's losses were the result of a common scheme by TBW, Colonial, and Platinum to conceal losses and avoid bankruptcy and/or receivership.

## SEVENTH CAUSE OF ACTION
### (Unjust Enrichment/Constructive Trust by Colonial and Platinum)

184.    The Trustee repeats and realleges the allegations contained above, as if fully set forth herein.

185.    Colonial has been enriched through its improper retention of funds fraudulently transferred from Ocala Funding by TBW to Colonial.

186.    Funds fraudulently transferred from Ocala Funding to Colonial include the CFCA Funds, the MAA Funds, and the IFA Funds.

187.    At the time the FDIC placed Colonial in receivership, each of the CFCA, MAA and IFA still contained some portion of the CFCA Funds, MAA Funds and IFA Funds, respectively.

188.    Upon information and belief, Colonial has no equitable or legal right to funds fraudulently transferred to Colonial from Ocala Funding.

189.    Under the circumstances, equity and good conscience require that the funds be returned to the Trustee.

190.    FDIC-Receiver has been enriched through its improper assertion of control over the Roundpoint Loans and through its acceptance of P&I advances generated by the Roundpoint Loans.

191.    Upon information and belief, FDIC-Receiver has no equitable or legal right to the Roundpoint Loans.

192.    Under the circumstances, equity and good conscience require that the Roundpoint Loans be subject to a constructive trust and returned to the Trustee.

193.    Colonial has been enriched through its improper retention of the Ocala Loans.

194.    Upon information and belief, Colonial has no equitable or legal right to the Ocala Loans.

195.    Under the circumstances, equity and good conscience require that the Ocala Loans be subject to a constructive trust and returned to the Trustee.

196.    Platinum has been enriched through its improper retention of approximately $62 million fraudulently transferred by TBW to Platinum from Ocala Funding.

197.    At the time the FDIC placed Platinum in receivership, some portion of the $62 million fraudulently transferred to Platinum from Ocala Funding remained in Platinum account number 0030270065, or, upon information and belief, other accounts at Platinum.

198.    Platinum has no equitable or legal right to the $62 million fraudulently transferred to Platinum from Ocala Funding.

199.    Under the circumstances, equity and good conscience require that the funds be subject to a constructive trust and returned to the Trustee.

200.    By reason of the foregoing, the Trustee has been damaged in an amount to be determined at the trial of this action.

## EIGHTH CAUSE OF ACTION
### (Conversion by Colonial and Platinum)

201.    The Trustee repeats and realleges the allegations contained above, as if fully set forth herein.

202.    As described herein, Colonial unlawfully exercised dominion and control over funds and/or mortgage loans in which Ocala Funding maintained rights, including without limitation the CFCA Funds, MAA Funds and IFA Funds (the "Converted Funds").

203.    Colonial's unlawful conversion of the Converted Funds directly interfered with the Trustee's obligation to existing short term and subordinated noteholders.

204.    By its disallowance of the Trustee's Colonial proof of claim, FDIC-Receiver has denied and/or repudiated the Trustee's rights in the Converted Funds.

205.    As a result of Colonial's conversion, the Trustee is entitled to the full value of the Converted Funds.

206.    As described herein, FDIC-Receiver unlawfully exercised dominion and control over the Roundpoint Loans.

207.    Despite repeated requests that the Roundpoint Loans be released to the Trustee, FDIC-Receiver has denied and/or repudiated the Trustee's rights in the Roundpoint Loans.

208.    FDIC-Receiver's unlawful conversion of the Roundpoint Loans directly interfered with the Trustee's obligation to existing short term and subordinated noteholders.

209.    As a result of FDIC-Receiver's conversion, the Trustee is entitled to the full value of the Roundpoint Loans.

210.     As described herein, Colonial unlawfully exercised dominion and control over the Ocala Loans.

211.     Colonial's unlawful conversion of the Ocala Loans directly interfered with the Trustee's obligation to existing short term and subordinated noteholders.

212.     By its disallowance of the Trustee's Colonial proof of claim, FDIC-Receiver has denied and/or repudiated the Trustee's rights in the Ocala Loans.

213.     As a result of Colonial's conversion, the Trustee is entitled to the full value of the Ocala Loans unlawfully converted by Colonial.

214.     As described herein, Platinum unlawfully exercised dominion and control over $62 million unlawfully transferred from Ocala Funding to Platinum.

215.     Colonial's unlawful conversion of $62 million directly interfered with the Trustee's obligation to existing short term and subordinated noteholders.

216.     By its refusal to allow or disallow the Trustee's Platinum proof of claim, FDIC-Receiver has denied and/or repudiated the Trustee's rights to $62 million converted by Platinum Bank.

217.     As a result of Colonial's conversion, the Trustee is entitled to the full value of the $62 million converted by Platinum Bank.

## NINTH CAUSE OF ACTION
### (Actual Fraudulent Transfers by Colonial and Platinum)

218.     The Trustee repeats and realleges the allegations contained above, as if fully set forth herein.

219.     The law of the District of Columbia, D.C. Code, Div. V, title 28, Subtitle II, ch. 31, §§ 3101 *et seq.*, applies to the Trustee's claim for actual fraudulent transfers by Colonial and Platinum.

220.    TBW, Colonial, and, upon information and belief, Platinum made fraudulent transfers from Ocala Funding accounts at Bank of America within four years of the discovery of the fraud described herein.

221.    TBW and Colonial fraudulently transferred the CFCA Funds, MAA Funds, and IFA Funds.

222.    TBW and Colonial made these transfers as part of the conspiracy described herein and with the actual intent to hinder, delay, and defraud Ocala Funding and its investors.

223.    Neither Ocala Funding nor its investors received reasonably equivalent value in exchange for the fraudulent transfers described herein.

224.    TBW, Colonial, and, upon information and belief, Platinum transferred approximately $62 million to Platinum account number 0030270065, or, upon information and belief, other accounts at Platinum.

225.    TBW, Colonial, and, upon information and belief, Platinum made these transfers to Platinum as part of the conspiracy described herein and with the actual intent to hinder, delay, and defraud Ocala Funding and its investors.

226.    Neither Ocala Funding nor its investors received reasonably equivalent value in exchange for the fraudulent transfers to Platinum.

### TENTH CAUSE OF ACTION
**(Constructive Fraudulent Transfers by Colonial and Platinum)**

227.    The Trustee repeats and realleges the allegations contained above, as if fully set forth herein.

228.     The law of the District of Columbia, D.C. Code, Div. V, title 28, Subtitle II, ch. 31, §§ 3101 *et seq.*, applies to the Trustee's claim for constructive fraudulent transfers by Colonial and Platinum.

229.     TBW, Colonial, and, upon information and belief, Platinum made fraudulent transfers from Ocala Funding accounts at Bank of America within four years of the discovery of the fraud described herein.

230.     TBW and Colonial fraudulently transferred the CFCA Funds, MAA Funds and IFA Funds.

231.     TBW, Colonial, and, upon information and belief, Platinum transferred the approximately $62 million to Platinum account number 0030270065, or, upon information and belief, other accounts at Platinum.

232.     TBW and Colonial made these transfers for less than fair consideration.

233.     Allegations have been made that Ocala Funding was insolvent at the time the transfers were made, or became insolvent as a result of the transfers.  Insofar as these allegations are proven, upon information and belief, Ocala Funding was insolvent at the time these transfers were made, or became insolvent as a result of the transfers.

234.     TBW, Colonial, and, upon information and belief, Platinum knew that Ocala Funding was insolvent at the time these transfers were made, or became insolvent as a result of these transfers.

## **Prayer for Relief**

WHEREFORE, the Trustee respectfully requests the Court to grant the following relief:

1.  An order declaring the Trustee's claims described herein to be valid and proven against the Colonial receivership;

2.  An order directing FDIC-Receiver to pay the claims described herein from the assets of the Colonial receivership in accordance with 12 U.S.C. § 1821(d)(11);

3.  An order declaring that FDIC-Receiver's August 4, 2010 disallowance to be void, and that the parties should proceed as if such disallowance never occurred, as such disallowance relates to those claims described herein and asserted in the Colonial proof of claim;

4.  An order declaring Colonial liable for fraud, civil conspiracy, unjust enrichment, conversion, and actual fraudulent transfers and awarding the Trustee damages to be proven at trial;

5.  An order declaring the Trustee's claims described herein to be valid and proven against the Platinum receivership;

6.  An order directing FDIC-Receiver to pay the claims described herein from the assets of the Platinum receivership in accordance with 12 U.S.C. § 1821(d)(11);

7.  An order declaring that FDIC-Receiver's disallowance to be void, and that the parties should proceed as if such disallowance never occurred, as such disallowance relates to the claims described herein and asserted in the Platinum proof of claim;

8.  An order declaring Platinum liable for civil conspiracy, unjust enrichment, conversion, and actual fraudulent transfers awarding the Trustee damages to be proven at trial;

9.  An order imposing a constructive trust over: (i) the Roundpoint Loans, (ii) the Ocala Loans; and (iii) the $62 million transferred to Platinum;

10. Award the Trustee costs and attorneys' fees as may be permitted by law; and

11. Award the Trustee such other relief as may be just.

Dated: April 4, 2011

Respectfully submitted,

By:   /s/Frank E. Emory, Jr.
     Frank E. Emory, Jr.  (Bar No. 975713)
     Patrick L. Robson*

HUNTON & WILLIAMS LLP
Bank of America Plaza, Suite 3500
101 South Tryon Street
Charlotte, North Carolina 28280
Tel.  704 378 4700
Fax: 704 378 4890
femory@hunton.com
probson@hunton.com

- and -

Bonnie K. Arthur  (Bar No. 463687)
HUNTON & WILLIAMS LLP
1900 K Street, N.W.
Washington, DC  20006
Tel.  202 419 2063
Fax: 202 862 3619
barthur@hunton.com

*Attorneys for Plaintiff Bank of America,
National Association, as indenture trustee,
custodian, and collateral agent to Ocala
Funding, LLC*

*Admitted Pro Hac Vice*

## CERTIFICATE OF SERVICE

I hereby certify that on the 4th day of April, 2011, the foregoing Motion for Leave to Amend Complaint was served by CM/ECF notification and on April 5, 2011, by first-class U.S. mail, postage prepaid on:

> Athanasios Basdekis (DC Bar #463692)
> Benjamin L. Bailey (Admitted Pro Hac Vice)
> Christopher S. Morris (Admitted Pro Hac Vice)
> Bailey & Glasser, LLP
> 209 Capitol Street Charleston, WV 25301
> (304) 345-6555 (telephone)
> (304) 342-1110 (facsimile)
>
> *Attorneys for FEDERAL DEPOSIT INSURANCE CORPORATION as Receiver for Colonial Bank and as Receiver for Platinum Community Bank*

/s/ Bonnie K. Arthur

# EXHIBIT A

**Federal Deposit Insurance Corporation as Receiver for:**
<u>10103 – Colonial Bank, Montgomery, AL</u>
(Name of Bank/Financial Institution and Location)

# PROOF OF CLAIM

SSN/Tax ID # (1) _____ 94-1687665[1]

The undersigned, (2) ___ Cynthia A. Grim _____
(Name of person making the claim)

says that the __ Colonial Bank _____ now in liquidation is
(Name of Bank/Financial Institution)

justly indebted to (3) Bank of America, National Association, as Trustee (as defined in Exhibit A hereto), in the sum of
(Individual/Joint/Corporation/Partnership/Firm/Agency)

(4) __ up to $1.75 billion plus charges (subject to Exhibit A hereto) _____ Dollars upon the following Claim:[2]

| | Description of (invoice) claim: | Liability Number | Amount of Claim |
|---|---|---|---|
| C L A I M S | (5) Trust or preferred claims, secured claims, deposit liability claims (including FDIC guarantee and deposit insurance claims), claims for stolen property and senior unsecured claims, as more particularly described in Exhibit A hereto[3] | FDIC will complete | Each up to $1.75 billion plus charges, subject to Exhibit A hereto |
| | | Total Claim:(6) | |

The undersigned further states that he/she makes this claim on behalf of

(7) __ the Trustee for the secured parties on the Ocala Funding, LLC Short Term and Subordinated Notes ____,

that no part of said debt has been paid, that

(8) __ the Trustee _____
(Individual/Joint/Corporation/Partnership/Firm/Agency)

has given no endorsement or assignment of the same or any part thereof, and that there is no set-off or

counterclaim, or other legal or equitable defense to said claim or any part thereof.

NAME (9) _Cynthia A. Grim_____
(Signature of Person making the Claim)

Cynthia A. Grim,
Senior Vice President
(Title)

FIRM _____ Bank of America, National Association, as Trustee _____
(If applicable)

ADDRESS (10) __ 540 West Madison Street _____

CITY/STATE/ZIP _Chicago, IL 60661_____

TELEPHONE NUMBER _____ (312) 904-8001 _____

The penalty for knowingly making or inviting reliance of any false, forged, or counterfeit statement, document, or
thing for the purpose of influencing in any way the action of the Federal Deposit Insurance Corporation is a fine of
not more than $1,000,000 or imprisonment for not more than thirty years, or both (18 U.S.C. §1007).

---

[1] The tax ID number shown is for Bank of America, National Association ("Bank of America"). Many of the
claims described in this proof of claim, however, are made by Bank of America in its capacity as Trustee
on behalf of the secured parties with respect to the Ocala Funding, LLC Short Term and Subordinated Notes.
The tax ID number for Ocala Funding, LLC is 30-0292188.
[2] The Federal Deposit Insurance Corporation did not serve the Trustee with a claims notice and may not
consider the Trustee to be a claimant subject to the administrative claims process.
[3] This Proof of Claim should not, in any way, be construed as a waiver of any rights, substantive or procedural,
that the Trustee has or may have to proceed in the district court action, *Bank of America, N.A. v. FDIC*,
09-22384-Civ-Jordan (S.D. Fla.), or to assert any and all available claims, defenses and arguments in
that proceeding or otherwise outside the administrative process set forth in 12 U.S.C. §1821.

RLS7214

**EXHIBIT A**

**Federal Deposit Insurance Corporation as Receiver for:**
**10103 - Colonial Bank, Montgomery, AL**

---

**Exhibit A to Proof of Claim**
**of**
**Bank of America, National Association**
**(successor by merger to LaSalle Bank National Association),**
**as Indenture Trustee, Collateral Agent and Custodian**
**or in another representative capacity**
**for the**
**Ocala Funding, LLC Short Term Notes and Subordinated Notes**

1.      Bank of America, National Association, successor by merger to LaSalle Bank National Association ("*Bank of America*"), acts as indenture trustee, collateral agent and custodian and in other representative capacities (in any and all such capacities, the "*Trustee*") with respect to the Short Term Notes and the Subordinated Notes (collectively, the "*Notes*") issued by Ocala Funding, LLC ("*Ocala*"). Ocala is a special purpose entity owned and managed by Taylor, Bean & Whitaker Mortgage Corp. ("*TBW*"), which now is a debtor in bankruptcy and for which its restructuring agent is Navigant Capital Advisors, LLC ("*Navigant*").

2.      The Trustee acts on behalf of the Secured Parties, as defined in the documents related to the Notes (collectively, the "*Facility Documents*"), with respect to the transactions effected under the Facility Documents (the "*Ocala Funding Facility*"). The Trustee submits this Exhibit A to its proof of claim (together, this "*Proof of Claim*") on behalf of the Secured Parties in connection with the Ocala Funding Facility against Colonial Bank and such of its affiliates (collectively, "*Colonial Bank*") for which the Federal Deposit Insurance Corporation (the "*FDIC*") acts as receiver.

**Basis for Claims**

3.      The Ocala Funding Facility is a financing facility under which Ocala periodically purchased residential mortgage loans from TBW.  Ocala granted a security interest in, among other things,  its mortgage loans and the proceeds thereof (including the claims set forth in this Proof of Claim) to the Trustee as collateral security for payment of the Notes and other obligations owed by it to the Secured Parties, and the Trustee is authorized to file this Proof of Claim pursuant to the Facility Documents.  Ocala initially financed its mortgage loan purchases with the proceeds from issuance of the Notes, and Ocala financed subsequent mortgage loan purchases with the proceeds from sales of the mortgage loans that it previously purchased.  As seller, TBW arranged Ocala's mortgage loan purchases and caused the legal files for the related mortgage loans to be delivered to the Trustee.  As Ocala's manager, TBW directed the Trustee in the use of proceeds from Note issuances and sales of mortgage loans by Ocala (including by causing the Trustee to transfer those proceeds into accounts maintained at Colonial Bank).  TBW also serviced Ocala's mortgage loans and, as servicer, collected principal and interest on the mortgage loans (including by depositing the related principal and interest collections into accounts maintained at Colonial Bank), sold the mortgage loans for Ocala, directed the related mortgage loan buyers as to where to make their purchase price payments and directed the Trustee in delivering the legal files for Ocala's mortgage loans to TBW as servicer, to the related buyers or to others designated by TBW or the buyers (including to Colonial Bank under bailee letters).

4.      Upon information and belief, TBW and/or Colonial Bank:

(a)      arranged for Ocala to purchase mortgage loans, delivered the legal files for those mortgage loans to the Trustee and caused the Trustee to advance funds to Ocala and

2

pay for those mortgage loans in accordance with their instructions without causing all related liens and other encumbrances known to exist by them to be satisfied (including liens and other encumbrances held by, or granted by TBW to, Colonial Bank);

(b)     deposited principal and interest collections on Ocala's mortgage loans into fiduciary, custodial and/or general accounts maintained at Colonial Bank (including mortgage servicing accounts and noninterest-bearing transaction accounts as to which deposits were insured or guaranteed by the FDIC under 12 C.F.R. §330.7(d) and 12 C.F.R. §370.4, respectively) and converted certain of those collections for the benefit of one or both of them (including by using such collections to replenish funds previously converted by one or both of them from such FDIC-insured or guaranteed accounts, or from other accounts, and/or distributing such collections to third parties);

(c)     deposited the proceeds from Note issuances and mortgage loan sales by Ocala into fiduciary, custodial and/or general accounts maintained at Colonial Bank (including noninterest-bearing transaction accounts as to which deposits were insured or guaranteed by the FDIC under 12 C.F.R. §370.4) and converted certain of those proceeds for the benefit of one or both of them (including by using such proceeds to replenish funds previously converted by one or both of them from mortgage servicing accounts and noninterest-bearing transaction accounts as to which deposits were insured or guaranteed by the FDIC under 12 C.F.R. §330.7(d) and 12 C.F.R. §370.4, respectively, or from other accounts, and/or distributing such proceeds to third parties);

(d)     used TBW's power and authority to control principal and interest collections on Ocala's mortgage loans, and to direct buyers of mortgage loans sold for Ocala in where to make their purchase price payments and direct the Trustee in the

3

use of proceeds from Note issuances and mortgage loan sales by Ocala (such as by causing the Trustee to withdraw such proceeds from one or more accounts it maintained and transfer such proceeds to accounts maintained at Colonial Bank), to convert certain of those collections and other proceeds for the benefit of one or both of them (including by using such collections and other proceeds to replenish funds previously converted by one or both of them from mortgage servicing accounts and noninterest-bearing transaction accounts as to which deposits were insured or guaranteed by the FDIC under 12 C.F.R. §330.7(d) and 12 C.F.R. §370.4, respectively, or from other accounts, and/or distributing such proceeds to third parties); and

(e)   used TBW's power and authority to service and administer, and to direct the Trustee in delivering the legal files for, Ocala's mortgage loans to convert those mortgage loans for the benefit of one or both of them (including by acting as bailee of legal files for mortgage loans being sold by or serviced for Ocala under bailee letters and/or release requests sent by the Trustee to and/or signed and sent to the Trustee by one or both of them and then failing to return those legal files or transfer the proceeds of the related mortgage loans upon the Trustee's demand and, also, by transferring the servicing of Ocala's mortgage loans and/or causing those mortgage loans to be serviced for the benefit of one or both of them or the benefit of third parties).

### Trustee's Claims

5.   The Trustee hereby asserts all claims it has or may have against Colonial Bank as of the date on which Colonial Bank was closed by the FDIC (the "*Date of Closing*"), including the following (whether or not any of those claims may overlap):

(i)     Trust or Preferred Claims.   Claims with respect to (A) principal and interest collections, proceeds from Note issuances and mortgage loan sales by Ocala and all other Ocala amounts received by Colonial Bank or held in fiduciary or custodial accounts maintained at Colonial Bank (or that should have been held therein or should be so held), (B) the mortgage loans as to which legal files or sale proceeds were received by Colonial Bank as bailee and/or custodian for the Trustee, including claims that Colonial Bank was required to hold legal files and sale proceeds for mortgage loans on a temporary basis in trust, as agent, custodian and bailee for the Trustee, and that Colonial Bank failed to deliver such legal files or sale proceeds to the Trustee both as required under the related bailee letters, other applicable agreements and/or statutory and common law principles and upon demand by the Trustee after the Trustee terminated Colonial Bank's temporary right to hold such legal files and sale proceeds in trust as agent, custodian and bailee for the Trustee (which legal files and sale proceeds never were the property of Colonial Bank and which Colonial Bank lacked any right even to possess after the Trustee terminated the temporary custodial relationship under which Colonial Bank held them), and (C) all other Ocala funds, mortgage loans and other property that were received by Colonial Bank or that are held by or on behalf of or in an account maintained at Colonial Bank (or that should have been held therein or should be so held), including (i) property that, in equity, should be treated as "special" deposits or claims as to which the Trustee is entitled to be paid in full before other creditors of Colonial Bank, (ii) Ocala funds that TBW and/or Colonial Bank used to replenish funds previously converted by one or both of them or that TBW and/or Colonial Bank distributed to third parties by or for the benefit of one or both of them and

(iii) Ocala mortgage loans as to which servicing was transferred for the benefit of TBW and/or Colonial Bank or which TBW and/or Colonial Bank caused to be serviced for the benefit of one or both of them or the benefit of third parties;

(ii)     Secured Claims.    Claims with respect to all Ocala "instruments", "deposit accounts", "investment property", "money" and related "proceeds" within the meaning of the Uniform Commercial Code as in effect in any applicable jurisdiction, and all other Ocala property, which were received by Colonial Bank or are held by or on behalf of or in an account maintained at Colonial Bank (or that should have been held therein or should be so held) and as to which the Trustee has a security interest, including property that, in equity, should be treated as "special" deposits or claims as to which the Trustee is entitled to be paid in full before other creditors of Colonial Bank;

(iii)     Deposit Liability, Guaranty and Insurance Claims.  Claims with respect to (A) deposits of principal and interest collections, proceeds from Note issuances and mortgage loan sales by Ocala and all other Ocala funds received by Colonial Bank or held in fiduciary, custodial or general accounts maintained at Colonial Bank (or that should have been held therein or should be so held), (B) the proceeds of all related FDIC guarantees and deposit insurance coverage (including coverage for mortgage servicing accounts as to which deposits are insured by the FDIC under 12 C.F.R. §330.7(d), guarantees or coverage for noninterest-bearing transaction accounts as to which deposits are guaranteed or insured by the FDIC under 12 C.F.R. §370.4 and all other FDIC guarantees and deposit insurance coverage) and (C) as subrogee, the proceeds of all FDIC guarantees and deposit insurance coverage for any mortgage servicing accounts or other insured or guaranteed accounts which are or were maintained

at Colonial Bank and as to which deposits are or were insured or guaranteed by the FDIC under 12 C.F.R. §330.7(d), under 12 C.F.R. §370.4 or otherwise, to the extent that amounts previously converted by TBW and/or Colonial Bank from such accounts for the benefit of one or both of them were replenished by TBW and/or Colonial Bank using Ocala funds converted by TBW and/or Colonial Bank for the benefit of one or both of them, including in each case claims with respect to any deposit liability distributions that were not made ratably and that resulted from the assumption of Colonial Bank's deposit liabilities by any other institution;

(iv)    Stolen Property and Other Priority Claims.   Claims with respect to (A) civil theft committed by TBW and/or Colonial Bank for the benefit of one or both of them under Florida Statute §812.014(1) and otherwise when Colonial Bank failed to return the legal files for mortgage loans or pay the related sale proceeds received by Colonial Bank as bailee and/or custodian for the Trustee upon the Trustee's demand, when the servicing of Ocala mortgage loans was transferred for the benefit of TBW and/or Colonial Bank and when TBW and/or Colonial Bank caused those mortgage loans to be serviced for the benefit of one or both of them or the benefit of third parties, (B) civil theft committed by TBW and/or Colonial Bank for the benefit of one or both of them under Florida Statute §812.014(1) and otherwise when it or they converted Ocala funds for the benefit of one or both of them and (C) the foregoing Ocala funds and mortgage loans and all other property which was stolen from Ocala or the Trustee and which was received by Colonial Bank, is held by or on behalf of or in an account maintained at Colonial Bank or is serviced or administered for the benefit of Colonial Bank, including claims for the imposition of a constructive trust over

7

all such Ocala funds, mortgage loans and other property and, also, including claims that Colonial Bank was required to hold legal files and sale proceeds for mortgage loans on a temporary basis in trust, as agent, custodian and bailee for the Trustee, and that Colonial Bank failed to deliver such legal files or sale proceeds to the Trustee both as required under the related bailee letters, other applicable agreements and/or statutory and common law principles and upon demand by the Trustee after the Trustee terminated Colonial Bank's temporary right to hold such legal files and sale proceeds in trust as agent, custodian and bailee for the Trustee (which legal files and sale proceeds never were the property of Colonial Bank and which Colonial Bank lacked any right even to possess after the Trustee terminated the temporary custodial relationship under which Colonial Bank held them); and

(v)     Senior Unsecured Claims.  Claims with respect to (A) breach of contract, including under bailee letters, other applicable agreements and/or statutory and common law principles pursuant to which legal files and sale proceeds related to mortgage loans were received by Colonial Bank as bailee and/or custodian for the Trustee, (B) fraud, fraudulent inducement and misrepresentation, (C) conversion, (D) unjust enrichment, (E) replevin, (F) breach of fiduciary duty and (G) all other statutory or common law claims that the Trustee may have against Colonial Bank under the laws of any jurisdiction.

6.     The amounts of the Trustee's claims currently are unliquidated and cannot be determined at this time.  However, upon information and belief, the sum of each such claim is up to $1.75 billion (one billion, seven hundred fifty million dollars, or $1,750,000,000.00) plus accrued and unpaid interest through the Date of Closing and other charges

(including attorney's fees and legal costs), but the Trustee seeks only a single recovery of such sum.  The Trustee will amend and supplement this Proof of Claim as additional facts relevant to its claims in connection with the Ocala Funding Facility become known to it.

7.      No judgment has been rendered on the claims set forth in this Proof of Claim, and no part of those claims has been paid.

8.      The Trustee has given no endorsement or assignment of the claims set forth in this Proof of Claim or any part thereof, and to the best of the Trustee's knowledge, there is no valid setoff or counterclaim, or other legal or equitable defense, to the Trustee's claims or any part thereof; provided, however, that the Trustee expressly reserves and does not waive any setoff or recoupment rights that it may possess either by contract or under applicable law.

9.      The claims set forth in this Proof of Claim shall be general or senior liabilities of Colonial Bank (which are neither obligations subordinated to its depositors or general creditors nor obligations arising as a result of the Trustee's status as a shareholder or member of Colonial Bank or as a shareholder or creditor of any depository institution holding company) except as they may be alleged to be trust or preferred claims, secured claims, deposit liability claims (including FDIC guarantee and deposit insurance claims) or priority claims or as they may be determined to be administrative expense claims or subject to setoff or recoupment.

10.     This Proof of Claim is without prejudice to any claims that Claimant has or may have for payment of an administrative expense allowable under 12 U.S.C. §1821(d)(11)(A)(i) or otherwise with respect to, arising out of or related to the Ocala Funding Facility, whether or not such amounts are included in this Proof of Claim, and the Trustee expressly reserves its rights to file such claims or any similar claims at an appropriate time.

11.     The Facility Documents and other supporting data are voluminous, may contain proprietary information and, as a result, are not attached hereto.  In addition, the Trustee still is in the process of identifying all of the documents that relate to this Proof of Claim.  However, the FDIC has copies of certain Facility Documents and other supporting data.  The Trustee lacks access to the records of TBW, Colonial Bank and other third parties, which may include information that supports the Trustee's claims, but will furnish the Facility Documents and other supporting data in its possession to the FDIC promptly upon its request.

12.     This Proof of Claim is filed with a full reservation of rights and without prejudice to the filing by the Trustee or by Bank of America or any of its affiliates of additional proofs of claim with respect to any other liability or indebtedness of Colonial Bank.  The Trustee specifically preserves all of its procedural and substantive defenses and rights with respect to any claim that may be asserted against the Trustee, whether in its individual capacity or in its representative capacities as described herein, by Colonial Bank, any other party in interest in its receivership or any other person or entity whatsoever.

13.     The Trustee specifically reserves the right to amend and supplement this Proof of Claim from time to time to include any previously undiscovered claims that it may have against Colonial Bank with respect to the Ocala Funding Facility, including any claims based on events, information and/or documents obtained from the FDIC, Colonial Bank, TBW, Navigant or others through discovery or otherwise.  Without in any way limiting the foregoing, the Trustee reserves its rights to assert any claim it may have against Colonial Bank, TBW or any other party or against any property, as applicable.

14.     All notices and other communications in respect of this Proof of Claim should be forwarded to:

> Hunton & Williams LLP
> 101 South Tryon Street, 35th Floor
> Charlotte, North Carolina 28280
> Attention:  Frank E. Emory, Jr., Esq.

15.     Filing of this Proof of Claim is not and should not be construed to be (a) a waiver or release of the Trustee's rights against any property or against any other entity or person liable for all or part of any claim described herein, (b) a waiver of any right to the subordination, in favor of the Trustee, of indebtedness or liens held by creditors of Colonial Bank or (c) an election of remedy which waives or otherwise affects any other remedy of the Trustee.

16.     The Trustee reserves the right to amend and supplement this Proof of Claim as additional specific, reliable information becomes known to it.

17.     The Trustee maintains that its claims are not subject to the administrative procedures for determination of claims set forth in 12 U.S.C. § 1821(d)(3), *et seq.*, at least insofar as its claims are trust or preferred claims, secured claims and priority claims, but files this Proof of Claim to preserve its rights and the rights of the secured parties on whose behalf it is making the claims set forth in this Proof of Claim.  The Trustee, by presenting the claims set forth in this Proof of Claim, does not waive any cause of action set forth in the complaint filed in *Bank of America v. Federal Deposit Insurance Corp.*, 09-22384-Civ-Jordan (S.D. Fla.), hereinafter referred to as the "district court action."

18.     The Trustee's filing of this Proof of Claim (a) does not constitute (i) an admission or concession that assets and sums claimed by the Trustee are for any reason within the FDIC's jurisdiction or the receivership estate of Colonial Bank, (ii) a waiver, compromise or abandonment of any of the Trustee's various legal positions, arguments or rights in the district

11

court action or (iii) a waiver or concession of any right to assert any claim, defense or argument relating to ownership and priority interests with respect to assets and funds held by or on behalf of Colonial Bank, or the appropriate forum to adjudicate and determine any and all disputes between the Trustee and the FDIC, (b) shall not preclude the Trustee from raising any argument regarding the allocation of burdens of production or of proof with respect to such claims, defenses or arguments or any other substantive and procedural issues that may support such claims, defenses or arguments that the Trustee has previously asserted as well as new claims, defenses and arguments that the Trustee has not previously asserted, including jurisdictional arguments, and (c) shall not be referenced or otherwise used in any manner by the FDIC in any argument relating to jurisdiction over assets and sums claimed by the Trustee, or the proper forum to adjudicate disputes relating to the Trustee's claims.

# PROOF OF SERVICE

**Case Style:** N/A _____   **Case #** ___ N/A _____

**VS** ___ N/A _____

**Service on Process on:** Mr. Thomas J. Dujenski, Regional Director, Federal Deposit Insurance Company

**Name of Server:** Brandon Sachse _____, undersigned, being duly sworn, deposes and says that he/she was at the time of service, over the age of twenty-one, was not a party to this action;

**Date of Service:** November 19, 2009 _____   **Time of Service:** 1:40 pm

**Location of Service:** (Address)   1601 Bryan Street, 38th Floor

(City) Dallas _____ (State) Texas _____ (Zip) 75201 _____ (County) Dallas

**Documents Served:** ___ Proof of Claim _____
_____
_____
_____

**Person Served:**   A true and correct copy of the aforesaid papers were served on the above-named party or witness in the following manner:

☐   By personally delivering them into the hands of the person to be served.
☐   (Substitute) by leaving a copy at his/her usual place of abode with some person of suitable age and discretion then residing therein, to wit: _____

☐   By delivering them to an officer or managing agent whose name and title is:

☒   Other: ___ by delivering to Ausie McKinley, authorized to accept _____
_____
_____

**Description of Person Receiving Documents:**   The person receiving documents is described as follows:
Sex _____; Skin Color _____; Hair Color _____; Facial Hair _____
Age _____; Height _____; Weight _____

☐   To the best of my knowledge and belief, said person was not engaged in the U.S. Military at the time of service.

**Signature of Server:**   Undersigned declares under Penalty of perjury that the Foregoing is true and correct.

**Name of Server**
Lawyers Civil Process
400 S. Houston Street, Suite 105
Dallas, Texas 75202
214-651-7111
Fax: 214-651-7114
Brandon Sachse
Supreme Court No. SC000001082

Subscribed & Sworn to before me this
19th      day of   November   , 20  09  .

Notary Public

MELISSA PEREZ
MY COMMISSION EXPIRES
December 4, 2012

EXHIBIT B



**Federal Deposit Insurance Corporation**
1601 Bryan Street, Dallas, TX 75201         Division of Resolutions and Receiverships

**CERTIFIED MAIL 7009 3410 0000 3573 3342**
**RETURN RECEIPT REQUESTED**

August 4, 2010

Bank of America, National Association
C/o Cynthia A. Grim
540 West Madison Street
Chicago, IL 60661

SUBJECT:     10103–COLONIAL BANK
                MONTGOMERY, AL – In Receivership
                **NOTICE OF DISALLOWANCE OF CLAIM**

Dear Claimant:

The Receiver of COLONIAL BANK has reviewed your claim against the receivership. After a thorough review of your filed claim along with your supporting documentation, the Receiver has determined to disallow your claim for the following reason(s) :

              This claim has not been proven to the satisfaction of the Receiver.

Pursuant to 12 U.S.C. Section 1821 (d) (6), if you do not agree with this disallowance, you have the right to file a lawsuit on your claim (or continue any lawsuit commenced before the appointment of the Receiver), in the United States District (or Territorial) Court for the District within which the failed institution's principal place of business was located or the United States District Court for the District of Columbia within 60 days from the date of this notice.

**IF YOU DO NOT FILE A LAWSUIT** (or continue any lawsuit commenced before the appointment of the Receiver) **BEFORE THE END OF THE 60-DAY PERIOD, THE DISALLOWANCE WILL BE FINAL, YOUR CLAIM WILL BE FOREVER BARRED AND YOU WILL HAVE NO FURTHER RIGHTS OR REMEDIES WITH RESPECT TO YOUR CLAIM. 12 U.S.C. Section 1821(d)(6)(B).**

However, if a portion of your claim is for an insured deposit, your claim is not against the Receiver but rather is against the FDIC in its "corporate" capacity as deposit insurer. An insured depositor's rights are prescribed in 12 U.S.C. Section 1821(f) and differ from the rights described in the preceding paragraphs.

If you have any questions about this letter, please contact the undersigned at (972) 761-8677.

Sincerely,

Creditor Claims Agent
Claims Department



**U.S. Postal Service ™**
**CERTIFIED MAIL™ RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*
For delivery information visit our website at www.usps.com

Postage | $

3573 3342

EXHIBIT C

**Federal Deposit Insurance Corporation as Receiver for:**
**10115 – Platinum Community Bank, Rolling Meadows, IL**

## PROOF OF CLAIM

SSN/Tax ID # (1) __94-1687665__ [1]

The undersigned, (2) __Cynthia A. Grim__
(Name of person making the claim)

says that the __Platinum Community Bank_____ now in liquidation is
(Name of Bank/Financial Institution)

justly indebted to (3) Bank of America, National Association, as Trustee (as defined in Exhibit A hereto) in the sum of
(Individual/Joint/Corporation/Partnership/Firm/Agency)

(4) up to $1.75 billion plus charges (subject to Exhibit A hereto)_____ Dollars upon the following Claim: [2]

| | Description of (invoice) claim: | Liability Number | Amount of Claim |
|---|---|---|---|
| C L A I M S | (5)   Trust or preferred claims, secured claims, deposit liability claims (including FDIC guarantee and deposit insurance claims), claims for stolen property and senior unsecured claims, as more particularly described in Exhibit A hereto.[3] | FDIC will complete | Each up to $1.75 billion plus charges, subject to Exhibit A hereto |
| | | Total Claim:(6) | |

The undersigned further states that he/she makes this claim on behalf of

(7)   the Trustee for the secured parties on the Ocala Funding, LLC Short Term and Subordinated Notes

that no part of said debt has been paid, that

(8)   the Trustee
(Individual/Joint/Corporation/Partnership/Firm/Agency)

has given no endorsement or assignment of the same or any part thereof, and that there is no set-off or

counterclaim, or other legal or equitable defense to said claim or any part thereof.

NAME (9)  *Cynthia A. Grim*  
        (Signature of Person making the Claim)

Cynthia A. Grim,
Senior Vice President
(Title)

FIRM   Bank of America, National Association, as Trustee
(If applicable)

ADDRESS (10)   540 West Madison Street

CITY/STATE/ZIP   Chicago, IL 60661

TELEPHONE NUMBER   (312) 904-8001

The penalty for knowingly making or inviting reliance of any false, forged, or counterfeit statement, document, or thing for the purpose of influencing in any way the action of the Federal Deposit Insurance Corporation is a fine of not more than $1,000,000 or imprisonment for not more than thirty years, or both (18 U.S.C. § 1007).

1 The tax ID number shown is for Bank of America, National Association ("Bank of America"). Many of the claims described in this proof of claim, however, are made by Bank of America in its capacity as Trustee on behalf of the secured parties with respect to the Ocala Funding, LLC Short Term and Subordinated Notes. The tax ID number for Ocala Funding, LLC is 30-0292188.

2 The Federal Deposit Insurance Corporation did not serve the Trustee with a claims notice and may not consider the Trustee to be a claimant subject to the administrative claims process.

RLS7214

3 This Proof of Claim should not, in any way, be construed as a waiver of any rights, substantive or procedural, that the Trustee has or may have to proceed in the district court action, *Bank of America, N.A. v. FDIC, et al.* 09-22384-Civ-Jordan (S.D. Fla.), or to assert any and all available claims, defenses, and arguments in that proceeding or otherwise outside the administrative process set forth in 12 U.S.C. §1821.

## GENERAL INFORMATION AND INSTRUCTIONS FOR
## COMPLETING A PROOF OF CLAIM FORM

This form is being sent to you in the event you believe the failed institution owes you funds for services rendered or goods purchased prior to the date of closing. If the institution does not currently owe you any money, it is not necessary for you to complete this form.

The following blanks must be completed in order for your Proof of Claim to be considered: (The numbers correspond with those located on the proof of claim form.)

1)      A company's tax identification number or an individual's social security number.

2)      Name of the person making the claim.

3)      Review this name. Make corrections as needed. Fill in name if blank.

4)      Written dollar amount of the claim (ex. One hundred and no/100.)

5)      Detailed description of what is being claimed (i.e., the invoice number, type of service being claimed, account number, etc.).

6)      Total amount of claim. Total should NOT include interest or late fees accrued since institution closing.

7)      Review this name. Make corrections as needed. Fill in name if blank.

8)      Review this name. Make corrections as needed. Fill in name if blank.

9)      Signature of the person making claim and the title of that person if they are representing a company making a claim.

10)      The address and telephone number of the individual or company making the claim.

Should the above information be missing, your information will be entered into our tracking system, but your Proof of Claim form will be returned to you for completion.

### REQUIRED DOCUMENTATION

1)      Claims for Goods Purchased by the Former Institution: You must forward a copy of the Purchase order or other correspondence from the institution requesting the goods, a copy of your invoice and a receipt signed by the institution indicating that the goods were received.

2)      Claims for Services Rendered: You must forward a copy of the correspondence or signed initial contract sent by the institution to request your services and an invoice. In the case of legal fees, an itemized invoice must be sent indicating your prorated charges. For appraisal services, submit proof the appraisal was completed.

# EXHIBIT A

**Federal Deposit Insurance Corporation as Receiver for:
10115 – Platinum Community Bank, Rolling Meadows, IL**

Exhibit A to Proof of Claim
of
**Bank of America, National Association
(successor by merger to LaSalle Bank National Association),
as Indenture Trustee, Collateral Agent and Custodian
or in another representative capacity
for the
Ocala Funding, LLC Short Term Notes and Subordinated Notes**

1.      Bank of America, National Association, successor by merger to LaSalle Bank National Association (*"Bank of America"*), acts as indenture trustee, collateral agent and custodian and in other representative capacities (in any and all such capacities, the *"Trustee"*) with respect to the Short Term Notes and the Subordinated Notes (collectively, the *"Notes"*) issued by Ocala Funding, LLC (*"Ocala"*). Ocala is a special purpose entity owned and managed by Taylor, Bean & Whitaker Mortgage Corp. (*"TBW"*), which now is a debtor in bankruptcy and for which its restructuring agent is Navigant Capital Advisors, LLC (*"Navigant"*).

2.      The Trustee acts on behalf of the Secured Parties, as defined in the documents related to the Notes (collectively, the *"Facility Documents"*), with respect to the transactions effected under the Facility Documents (the *"Ocala Funding Facility"*). The Trustee submits this Exhibit A to its proof of claim (together, this *"Proof of Claim"*) on behalf of the Secured Parties in connection with the Ocala Funding Facility against Platinum Community Bank and such of its affiliates (collectively, *"Platinum"*) for which the Federal Deposit Insurance Corporation (the *"FDIC"*) acts as receiver.  Upon information and belief, Platinum is owned by Platinum Bancshares, Inc. (*"Bancshares"*), and TBW owns a controlling interest in Bancshares.

**Basis for Claims**

3.     The Ocala Funding Facility is a financing facility under which Ocala periodically purchased residential mortgage loans from TBW.   Ocala granted a security interest in, among other things,  its mortgage loans and the proceeds thereof (including the claims set forth in this Proof of Claim) to the Trustee as collateral security for payment of the Notes and other obligations owed by it to the Secured Parties, and the Trustee is authorized to file this Proof of Claim pursuant to the Facility Documents.  Ocala initially financed its mortgage loan purchases with the proceeds from issuance of the Notes, and Ocala financed subsequent mortgage loan purchases with the proceeds from sales of the mortgage loans that it previously purchased.  As seller, TBW arranged Ocala's mortgage loan purchases and caused the legal files for the related mortgage loans to be delivered to the Trustee.  As Ocala's manager, TBW directed the Trustee in the use of proceeds from Note issuances and sales of mortgage loans by Ocala (including by causing the Trustee to directly or indirectly transfer those proceeds into accounts held by or on behalf of or maintained at Platinum).   TBW also serviced Ocala's mortgage loans and, as servicer, collected principal and interest on the mortgage loans (including by directly or indirectly depositing the related principal and interest collections into accounts held by or on behalf of or maintained at Platinum), sold the mortgage loans for Ocala to buyers selected by it (including Platinum), directed the related mortgage loan buyers as to where to make their purchase price payments (including by directing Platinum to make its purchase price payments other than to the Trustee) and directed the Trustee in delivering the legal files for Ocala's mortgage loans to TBW as servicer, to the related buyers or to others designated by TBW or the buyers (including to or for the benefit of Platinum).

4.      Upon information and belief, TBW and/or Platinum, either acting on its own behalf, together with TBW, Bancshares and/or a third party or through TBW, Bancshares and/or a third party as its agent:

(a)      arranged for Ocala to purchase mortgage loans, delivered the legal files for those mortgage loans to the Trustee and caused the Trustee to advance funds to Ocala and pay for those mortgage loans in accordance with their instructions without causing all related liens and other encumbrances known to exist by them to be satisfied (including liens and other encumbrances held by, or granted by TBW to, Platinum);

(b)      directly or indirectly deposited principal and interest collections on Ocala's mortgage loans into fiduciary, custodial and/or general accounts held by or on behalf of or maintained at Platinum (including mortgage servicing accounts and noninterest-bearing transaction accounts as to which deposits were insured or guaranteed by the FDIC under 12 C.F.R. §330.7(d) and 12 C.F.R. §370.4, respectively) and converted certain of those collections for the benefit of one or both of them (including by using such collections to directly or indirectly replenish funds previously converted by one or both of them from such FDIC-insured or guaranteed accounts, or from other accounts, and/or directly or indirectly distributing such collections to third parties);

(c)      directly or indirectly deposited the proceeds from Note issuances and mortgage loan sales by Ocala into fiduciary, custodial and/or general accounts held by or on behalf of or maintained at Platinum (including noninterest-bearing transaction accounts as to which deposits were insured or guaranteed by the FDIC under 12 C.F.R. §370.4) and converted certain of those proceeds for the benefit of one or both of them (including by using such proceeds to directly or indirectly replenish funds

3

previously converted by one or both of them from mortgage servicing accounts and noninterest-bearing transaction accounts as to which deposits were insured or guaranteed by the FDIC under 12 C.F.R. §330.7(d) and 12 C.F.R. §370.4, respectively, or from other accounts, and/or directly or indirectly distributing such proceeds to third parties);

(d)     used TBW's power and authority to control principal and interest collections on Ocala's mortgage loans, and to direct buyers of mortgage loans sold for Ocala in where to make their purchase price payments and direct the Trustee in the use of proceeds from Note issuances and mortgage loan sales by Ocala (such as by causing the Trustee to withdraw such proceeds from one or more accounts it maintained and directly or indirectly transfer such proceeds to accounts held by or on behalf of or maintained at Platinum), to convert certain of those collections and other proceeds for the benefit of one or both of them (including by using such collections and other proceeds to directly or indirectly replenish funds previously converted by one or both of them from mortgage servicing accounts and noninterest-bearing transaction accounts as to which deposits were insured or guaranteed by the FDIC under 12 C.F.R. §330.7(d) and 12 C.F.R. §370.4, respectively, or from other accounts, and/or directly or indirectly distributing such proceeds to third parties); and

(e)     used TBW's power and authority to service and administer, and to direct the Trustee in delivering the legal files for, Ocala's mortgage loans to convert those mortgage loans for the benefit of one or both of them (including by acquiring mortgage loans and, also, by transferring the servicing of Ocala's mortgage loans and/or causing those mortgage loans to be serviced for the benefit of one or both of them or for the benefit of third parties).

### Trustee's Claims

5.      The Trustee hereby asserts all claims it has or may have against Platinum as of the

date on which Platinum was closed by the FDIC (the "*Date of Closing*"), including the following

(whether or not any of those claims may overlap):

(i)      Trust or Preferred Claims.  Claims with respect to (A) principal and

interest collections, proceeds from Note issuances and mortgage loan sales by Ocala and

all other Ocala amounts received by Platinum or held in fiduciary or custodial accounts

maintained at Platinum (or that should have been held therein or should be so held) and

(B) all other Ocala funds, mortgage loans and other property that were received by

Platinum or that are held by or on behalf of or in an account maintained at Platinum

(or that should have been held therein or should be so held), including (1) property that,

in equity, should be treated as "special" deposits or claims as to which the Trustee is

entitled to be paid in full before other creditors of Platinum, (2) Ocala funds that TBW

and/or Platinum used to replenish funds previously converted by one or both of them or

that TBW and/or Platinum distributed to third parties by or for the benefit of one or

both of them, (3) Ocala mortgage loans which Platinum acquired without paying the

related purchase price to the Trustee or as to which servicing was transferred for the

benefit of TBW and/or Platinum or which TBW and/or Platinum caused to be

serviced for the benefit of one or both of them or for the benefit of third parties,

(4) approximately $50 million (fifty million dollars, or $50,000,000) of Ocala's

note issuance and mortgage loan sale proceeds which, on information and belief,

TBW and/or Platinum caused the Trustee to withdraw from one or more accounts

it maintained and transfer to Platinum or to one or more accounts maintained at Platinum

(including Platinum account no. 0030270065) for the benefit of one or both of them to fund an escrow account created by TBW as part of financing that TBW was to provide to a depository institution holding company it was to acquire and (5) the legal files and/or sale proceeds that, on information and belief, Platinum holds for approximately 85 (eighty five) of Ocala's mortgage loans, which have an original principal balance of more than $13 million (thirteen million dollars, or $13,000,000);

(ii)     Secured Claims.   Claims with respect to all Ocala "instruments", "deposit accounts", "investment property", "money" and related "proceeds" within the meaning of the Uniform Commercial Code as in effect in any applicable jurisdiction, and all other Ocala property, which were received by Platinum or are held by or on behalf of or in an account maintained at Platinum (or that should have been held therein or should be so held) and as to which the Trustee has a security interest, including (A) property that, in equity, should be treated as "special" deposits or claims as to which the Trustee is entitled to be paid in full before other creditors of Platinum and (B) the funds, mortgage loans and other property specified in paragraphs 5(i)(B)(4) and (5) above;

(iii)     Deposit Liability, Guaranty and Insurance Claims.   Claims with respect to (A) deposits of principal and interest collections, proceeds from Note issuances and mortgage loan sales by Ocala and all other Ocala funds received by Platinum or held in fiduciary, custodial or general accounts maintained at Platinum (or that should have been held therein or should be so held), including the funds specified in paragraphs 5(i)(B)(4) and (5) above, (B) the proceeds of all related FDIC guarantees and deposit insurance coverage (including coverage for mortgage servicing accounts as to which deposits are

6

insured by the FDIC under 12 C.F.R. §330.7(d), guarantees or coverage for noninterest-bearing transaction accounts as to which deposits are guaranteed or insured by the FDIC under 12 C.F.R. §370.4 and all other FDIC guarantees and deposit insurance coverage) and (C) as subrogee, the proceeds of all FDIC guarantees and deposit insurance coverage for any mortgage servicing accounts or other insured or guaranteed accounts which are or were maintained at Platinum and as to which deposits are or were insured or guaranteed by the FDIC under 12 C.F.R. §330.7(d), under 12 C.F.R. §370.4 or otherwise, to the extent that amounts previously converted by TBW and/or Platinum from such accounts for the benefit of one or both of them were replenished by TBW and/or Platinum using Ocala funds converted by TBW and/or Platinum for the benefit of one or both of them, including in each case claims with respect to any deposit liability distributions that were not made ratably;

(iv)    Stolen Property and Other Priority Claims.    Claims with respect to (A) civil theft committed by TBW and/or Platinum for the benefit of one or both of them under Florida Statutes §812.014(1) and otherwise when Platinum acquired Ocala mortgage loans without paying the related purchase price to the Trustee or the servicing of Ocala mortgage loans was transferred for the benefit of TBW and/or Platinum and when TBW and/or Platinum caused those mortgage loans to be serviced for the benefit of one or both of them or for the benefit of third parties, (B) civil theft committed by TBW and/or Platinum for the benefit of one or both of them under Florida Statutes §812.014(1) and otherwise when it or they converted Ocala funds for the benefit of one or both of them and (C) the foregoing Ocala funds and mortgage loans and all other property which was stolen from Ocala or the Trustee and

7

which was received by Platinum, is held by or on behalf of or in an account maintained at Platinum or is serviced or administered for the benefit of Platinum, including in each case (A) claims for the imposition of a constructive trust over all such Ocala funds, mortgage loans and other property and (B) claims for the funds, mortgage loans and other property specified in paragraphs 5(i)(B)(4) and (5) above; and

(v)     Senior Unsecured Claims.   Claims with respect (A) misrepresentation, fraud and fraudulent inducement, (B) conversion, (C) unjust enrichment, (D) replevin, (E) breach of fiduciary duty, (F) breach of contract, express or implied, and (G) all other statutory, common law and other claims that the Trustee may have against Platinum under the laws of any jurisdiction.

6.     The amounts of the Trustee's claims currently are unliquidated and cannot be determined at this time.  However, upon information and belief, the sum of each such claim is up to $1.75 billion (one billion, seven hundred fifty million dollars, or $1,750,000,000.00) plus accrued and unpaid interest through the Date of Closing and other charges (including attorney's fees and legal costs), but the Trustee seeks only a single recovery of such sum.  The Trustee will amend and supplement this Proof of Claim as additional facts relevant to its claims in connection with the Ocala Funding Facility become known to it.

7.     No judgment has been rendered on the claims set forth in this Proof of Claim, and no part of those claims has been paid.

8.     The Trustee has given no endorsement or assignment of the claims set forth in this Proof of Claim or any part thereof, and to the best of the Trustee's knowledge, there is no valid setoff or counterclaim, or other legal or equitable defense, to the Trustee's claims or any

part thereof; provided, however, that the Trustee expressly reserves and does not waive any setoff or recoupment rights that it may possess either by contract or under applicable law.

9.      The claims set forth in this Proof of Claim shall be general or senior liabilities of Platinum (which are neither obligations subordinated to its depositors or general creditors nor obligations arising as a result of the Trustee's status as a shareholder or member of Platinum or as a shareholder or creditor of any depository institution holding company) except as they may be alleged to be trust or preferred claims, secured claims, deposit liability claims (including FDIC guarantee and deposit insurance claims) or priority claims or as they may be determined to be administrative expense claims or subject to setoff or recoupment.

10.     This Proof of Claim is without prejudice to any claims that Claimant has or may have for payment of an administrative expense allowable under 12 U.S.C. § 1821(d)(11)(A)(i) or otherwise with respect to, arising out of or related to the Ocala Funding Facility, whether or not such amounts are included in this Proof of Claim, and the Trustee expressly reserves its rights to file such claims or any similar claims at an appropriate time.

11.     The Facility Documents and other supporting data are voluminous, may contain proprietary information and, as a result, are not attached hereto.  In addition, the Trustee still is in the process of identifying all of the documents that relate to this Proof of Claim.  However, the FDIC has copies of certain Facility Documents and other supporting data.  The Trustee lacks access to the records of TBW, Platinum, and other third parties, which may include information that supports the Trustee's claims, but will furnish the Facility Documents and other supporting data in its possession to the FDIC promptly upon its request.

12.     This Proof of Claim is filed with a full reservation of rights and without prejudice to the filing by the Trustee or by Bank of America or any of its affiliates of additional proofs of

claim with respect to any other liability or indebtedness of Platinum. The Trustee specifically preserves all of its procedural and substantive defenses and rights with respect to any claim that may be asserted against the Trustee, whether in its individual capacity or in its representative capacities as described herein, by Platinum, any other party in interest in its receivership or any other person or entity whatsoever.

13. The Trustee specifically reserves the right to amend and supplement this Proof of Claim from time to time to include any previously undiscovered claims that it may have against Platinum with respect to the Ocala Funding Facility, including any claims based on events, information and/or documents obtained from the FDIC, Platinum, TBW, Navigant or others through discovery or otherwise. Without in any way limiting the foregoing, the Trustee reserves its rights to assert any claim it may have against Platinum, TBW or any other party or against any property, as applicable.

14. All notices and other communications in respect of this Proof of Claim should be forwarded to:

Hunton & Williams LLP
101 South Tryon Street, 35th Floor
Charlotte, North Carolina 28280
Attention: Frank E. Emory, Jr., Esq.

15. Filing of this Proof of Claim is not and should not be construed to be (a) a waiver or release of the Trustee's rights against any property or against any other entity or person liable for all or part of any claim described herein, (b) a waiver of any right to the subordination, in favor of the Trustee, of indebtedness or liens held by creditors of Platinum, or (c) an election of remedy which waives or otherwise affects any other remedy of the Trustee.

16. The Trustee reserves the right to amend and supplement this Proof of Claim as additional specific, reliable information becomes known to it.

17.   The Trustee maintains that its claims are not subject to the administrative procedures for determination of claims set forth in 12 U.S.C. § 1821(d)(3), *et seq.*, at least insofar as its claims are trust or preferred claims, secured claims and priority claims, but files this Proof of Claim to preserve its rights and the rights of the secured parties on whose behalf it is making the claims set forth in this Proof of Claim.   The Trustee, by presenting the claims set forth in this Proof of Claim, does not waive any cause of action set forth in the complaint filed in *Bank of America v. Federal Deposit Insurance Corp.*, 09-22384-Civ-Jordan (S.D. Fla.), hereinafter referred to as the "district court action."

18.   The Trustee's filing of this Proof of Claim (a) does not constitute (i) an admission or concession that assets and sums claimed by the Trustee are for any reason within the FDIC's jurisdiction or the receivership estate of either Platinum or Colonial Bank, (ii) a waiver, compromise or abandonment of any of the Trustee's various legal positions, arguments or rights in the district court action or (iii) a waiver or concession of any right to assert any claim, defense, or argument relating to ownership and priority interests with respect to assets and funds held by or on behalf of Platinum or Colonial Bank, or the appropriate forum to adjudicate and determine any and all disputes between the Trustee and the FDIC, (b) shall not preclude the Trustee from raising any argument regarding the allocation of burdens of production or of proof with respect to such claims, defenses or arguments or any other substantive or procedural issues that may support such claims, defenses or arguments that the Trustee has previously asserted as well as new claims, defenses and arguments that the Trustee has not previously asserted, including jurisdictional arguments, and (c) shall not be referenced or otherwise used in any manner by the FDIC in any argument relating to jurisdiction over assets and sums claimed by the Trustee, or the proper forum to adjudicate disputes relating to the Trustee's claims.

# PROOF OF SERVICE

**Case Style:** Re: Platinum Community Bank        **Case #** ___ n/a

VS _____

**Service on Process on:** Federal Deposit Insurance Company

**Name of Server:** Brandon Sachse _____, undersigned, being duly sworn, deposes and says that he/she was at the time of service, over the age of twenty-one, was not a party to this action;

| **Date of Service:** December 9, 2009 | **Time of Service:** 2:30 pm |
|---|---|

**Location of Service:** (Address)  1601 Bryan Street

| (City) Dallas | (State) Texas | (Zip) 75201 | (County) Dallas |
|---|---|---|---|

**Documents Served:** Proof of Claim
_____
_____
_____

**Person Served:**    A true and correct copy of the aforesaid papers were served on the above-named party or witness in the following manner:

☐    By personally delivering them into the hands of the person to be served.
☐    (Substitute) by leaving a copy at his/her usual place of abode with some person of suitable age and discretion then residing therein, to wit: _____

☐    By delivering them to an officer or managing agent whose name and title is:

☒    Other:  by delivering to Ausie L. McKinley, authorized to accept _____
_____
_____

**Description of Person Receiving Documents:**    The person receiving documents is described as follows:
Sex _____; Skin Color _____; Hair Color _____; Facial Hair _____
Age _____; Height _____; Weight _____

☐ To the best of my knowledge and belief, said person was not engaged in the U.S. Military at the time of service.

**Signature of Server:**    Undersigned declares under Penalty of perjury that the Foregoing is true and correct.

Subscribed & Sworn to before me this
11th    day of    December , 20 09 .

_____         _____
**Name of Server**                **Notary Public**

Lawyers Civil Process
400 S. Houston Street, Suite 105
Dallas, Texas 75202
214-651-7111
Fax: 214-651-7114

MELISSA PEREZ
MY COMMISSION EXPIRES
December 4, 2012

Brandon Sachse
Supreme Court No. SC000001082

# PROOF OF SERVICE

**Case Style:** Re: Platinum Community Bank

**Case #** n/a

VS

**Service on Process on:** Mr. Thomas J. Drjenski, Regional Director for Federal Deposit Insurance

**Name of Server:** Brandon Sachse                    , undersigned, being duly sworn, deposes and says that he/she was at the time of service, over the age of twenty-one, was not a party to this action;

**Date of Service:** December 9, 2009        **Time of Service:** 2:30 pm

**Location of Service:** (Address) 1601 Bryan Street

(City) Dallas        (State) Texas        (Zip) 75201        (County) Dallas

**Documents Served:** Proof of Claim

**Person Served:** A true and correct copy of the aforesaid papers were served on the above-named party or witness in the following manner:

☐    By personally delivering them into the hands of the person to be served.
☐    (Substitute) by leaving a copy at his/her usual place of abode with some person of suitable age and discretion then residing therein, to wit: _____

☐    By delivering them to an officer or managing agent whose name and title is: _____

☒    Other: by delivering to Ausie L. McKinley, authorized to accept

**Description of Person Receiving Documents:** The person receiving documents is described as follows:
Sex _____; Skin Color _____; Hair Color _____; Facial Hair _____
Age _____; Height _____; Weight _____

☐ To the best of my knowledge and belief, said person was not engaged in the U.S. Military at the time of service.

**Signature of Server:** Undersigned declares under Penalty of perjury that the Foregoing is true and correct.

Subscribed & Sworn to before me this 11th day of December, 20 09.

**Name of Server**

Lawyers Civil Process
400 S. Houston Street, Suite 105
Dallas, Texas 75202
214-651-7111
Fax: 214-651-7114

**Notary Public**

MELISSA PEREZ
MY COMMISSION EXPIRES
December 4, 2012

Brandon Sachse
Supreme Court No. SC000001082

EXHIBIT D



**Federal Deposit Insurance Corporation**
1601 Bryan Street, Dallas, TX 75201

Division of Resolutions and Receiverships

**CERTIFIED MAIL 7009 3410 0000 3573 1805**
**RETURN RECEIPT REQUESTED**

August 5, 2010

Bank Of America, National Association, As Trustee
540 West Madison Street
Chicago, IL 60661

SUBJECT:   10115–PLATINUM COMMUNITY BANK
ROLLING MEADOWS, IL – In Receivership
**NOTICE OF DISALLOWANCE OF CLAIM**

Dear Claimant:

The Receiver of PLATINUM COMMUNITY BANK has reviewed your claim against the receivership. After a thorough review of your filed claim along with your supporting documentation, the Receiver has determined to disallow your claim for the following reason(s) :

> Claim in the amount of $1,750,000 is not proven to the satisfaction of the Receiver.

Pursuant to 12 U.S.C. Section 1821 (d) (6), if you do not agree with this disallowance, you have the right to file a lawsuit on your claim (or continue any lawsuit commenced before the appointment of the Receiver), in the United States District (or Territorial) Court for the District within which the failed institution's principal place of business was located or the United States District Court for the District of Columbia within 60 days from the date of this notice.

**IF YOU DO NOT FILE A LAWSUIT** (or continue any lawsuit commenced before the appointment of the Receiver) **BEFORE THE END OF THE 60-DAY PERIOD, THE DISALLOWANCE WILL BE FINAL, YOUR CLAIM WILL BE FOREVER BARRED AND YOU WILL HAVE NO FURTHER RIGHTS OR REMEDIES WITH RESPECT TO YOUR CLAIM. 12 U.S.C. Section 1821(d)(6)(B).**

However, if a portion of your claim is for an insured deposit, your claim is not against the Receiver but rather is against the FDIC in its "corporate" capacity as deposit insurer. An insured depositor's rights are prescribed in 12 U.S.C. Section 1821(f) and differ from the rights described in the preceding paragraphs.

If you have any questions about this letter, please contact the undersigned at (972) 761-8677.

Sincerely,

Creditor Claims Agent
Claims Department

RLS7218

Exhibit E

| No. | Loan Number | Amount | Investor | Status Detail | Service Release Date |
|---|---|---|---|---|---|
| 1 | 1217407 | 385,774 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 2 | 1488079 | 195,951 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 3 | 1543838 | 95,436 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 4 | 1786828 | 404,272 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 5 | 2272467 | 247,006 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 6 | 2556160 | 378,160 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 7 | 2656209 | 92,338 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 8 | 2721193 | 105,701 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 9 | 2734125 | 226,229 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 10 | 2777191 | 119,158 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 11 | 2886297 | 314,472 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 12 | 2914617 | 412,548 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 13 | 2950377 | 201,100 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 14 | 3126626 | 167,198 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 15 | 3170620 | 303,690 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 16 | 3171114 | 151,485 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 17 | 3242994 | 415,902 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 18 | 3248086 | 237,222 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 19 | 3266959 | 211,466 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 20 | 3276478 | 349,138 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 21 | 3277100 | 149,314 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 22 | 3278327 | 192,568 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 23 | 3278524 | 188,000 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 24 | 3300701 | 417,000 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 25 | 3301212 | 311,177 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 26 | 3308504 | 153,761 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 27 | 3308588 | 213,782 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 28 | 3310373 | 60,539 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 29 | 3320202 | 123,128 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 30 | 3323281 | 105,878 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 31 | 3324198 | 143,310 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 32 | 3328407 | 302,619 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 33 | 3328932 | 386,000 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 34 | 3330418 | 187,290 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 35 | 3333075 | 320,000 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 36 | 3335709 | 344,000 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 37 | 3337302 | 269,668 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 38 | 3337625 | 57,000 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 39 | 3338745 | 289,269 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 40 | 3339707 | 232,000 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 41 | 3340462 | 94,880 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 42 | 3343021 | 275,320 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 43 | 3344166 | 201,400 | Ocala Funding | RoundPoint SR | 9/18/2009 |

| No. | Loan Number | Amount | Investor | Status Detail | Service Release Date |
|---|---|---|---|---|---|
| 44 | 3344666 | 133,600 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 45 | 3344713 | 265,273 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 46 | 3345858 | 157,029 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 47 | 3346192 | 168,500 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 48 | 3347028 | 265,449 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 49 | 3348896 | 196,722 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 50 | 3349364 | 65,000 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 51 | 3350821 | 146,315 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 52 | 3351064 | 228,000 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 53 | 3351565 | 130,000 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 54 | 3351845 | 324,591 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 55 | 3352699 | 232,000 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 56 | 3352810 | 69,934 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 57 | 3354101 | 109,484 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 58 | 3355572 | 237,000 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 59 | 3355643 | 131,000 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 60 | 3355972 | 123,783 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 61 | 3356599 | 98,292 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 62 | 3358414 | 209,646 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 63 | 3359728 | 252,005 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 64 | 3362775 | 397,440 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 65 | 3363411 | 149,854 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 66 | 3363596 | 175,611 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 67 | 3365019 | 174,276 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 68 | 3365776 | 343,500 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 69 | 3365827 | 232,933 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 70 | 3366404 | 125,742 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 71 | 3367772 | 197,658 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 72 | 3371104 | 384,302 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 73 | 3371132 | 181,781 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 74 | 3372134 | 119,852 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 75 | 3373585 | 309,218 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 76 | 3373682 | 403,304 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 77 | 3375347 | 166,400 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 78 | 3376504 | 200,838 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 79 | 3379064 | 142,000 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 80 | 3381789 | 76,843 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 81 | 3381887 | 361,228 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 82 | 3382468 | 117,700 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 83 | 3382586 | 180,000 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 84 | 3386081 | 327,000 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 85 | 3386167 | 114,542 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 86 | 3390777 | 262,177 | Ocala Funding | RoundPoint SR | 9/18/2009 |

| No. | Loan Number | Amount | Investor | Status Detail | Service Release Date |
|-----|-------------|--------|----------|---------------|----------------------|
| 87 | 3394800 | 67,200 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 88 | 3397533 | 116,030 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 89 | 3398253 | 166,000 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 90 | 3399631 | 224,433 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 91 | 3399645 | 57,200 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 92 | 3400254 | 392,000 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 93 | 3403263 | 235,696 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 94 | 3403866 | 66,332 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 95 | 3405056 | 237,048 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 96 | 3405844 | 415,721 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 97 | 3412198 | 110,088 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 98 | 3417121 | 60,491 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 99 | 3423360 | 167,657 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 100 | 7084326 | 103,491 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 101 | 7087880 | 56,019 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 102 | 7090682 | 32,879 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 103 | 7092315 | 138,528 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 104 | 7093628 | 259,833 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 105 | 7094993 | 136,588 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 106 | 7117148 | 71,387 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 107 | 7122428 | 80,583 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 108 | 7122524 | 483,204 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 109 | 7123178 | 308,679 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 110 | 7123578 | 200,470 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 111 | 7123674 | 81,298 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 112 | 7123846 | 84,763 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 113 | 7123868 | 89,544 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 114 | 7124022 | 298,987 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 115 | 7124408 | 132,473 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 116 | 7125465 | 109,066 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 117 | 7125737 | 78,597 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 118 | 7125826 | 139,722 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 119 | 7125982 | 362,000 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 120 | 7126157 | 103,449 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 121 | 7126395 | 69,870 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 122 | 7126440 | 162,651 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 123 | 7126506 | 349,138 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 124 | 7126732 | 84,329 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 125 | 7126892 | 108,696 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 126 | 7127029 | 198,453 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 127 | 7127111 | 245,831 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 128 | 7127625 | 289,897 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 129 | 7128073 | 41,250 | Ocala Funding | RoundPoint SR | 9/18/2009 |

| No. | Loan Number | Amount | Investor | Status Detail | Service Release Date |
|---|---|---|---|---|---|
| 130 | 7128127 | 415,868 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 131 | 7128727 | 90,546 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 132 | 7128743 | 173,162 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 133 | 7128983 | 105,000 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 134 | 7128986 | 168,000 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 135 | 7129082 | 289,000 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 136 | 7129228 | 186,470 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 137 | 7129267 | 132,297 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 138 | 7129654 | 134,962 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 139 | 7129712 | 275,661 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 140 | 7130487 | 200,000 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 141 | 7130727 | 417,000 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 142 | 7130848 | 172,819 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 143 | 7131257 | 413,741 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 144 | 7131690 | 189,542 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 145 | 7132007 | 99,905 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 146 | 7132060 | 150,331 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 147 | 7132461 | 403,967 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 148 | 7132706 | 88,118 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 149 | 7132838 | 175,049 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 150 | 7133308 | 113,569 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 151 | 7134432 | 375,000 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 152 | 7134537 | 294,669 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| 153 | 7137230 | 312,000 | Ocala Funding | RoundPoint SR | 9/18/2009 |
| Total | | $31,314,218 | | | |

EXHIBIT F

| No. | Loan Number | Amount | Investor | Status Detail | Service Release Date |
|---|---|---|---|---|---|
| 1 | 1965996 | 165,784 | TBW | TBW REO Sold | |
| 2 | 2068390 | 217,982 | Colonial | RoundPoint SR | 9/4/2009 |
| 3 | 2266358 | 294,396 | Colonial | RoundPoint SR | 9/4/2009 |
| 4 | 2525355 | 287,115 | Colonial | RoundPoint SR | 9/4/2009 |
| 5 | 2608702 | 90,960 | Colonial | RoundPoint SR | 9/4/2009 |
| 6 | 2665319 | 87,250 | Colonial | RoundPoint SR | 9/4/2009 |
| 7 | 2692065 | 120,746 | Colonial | RoundPoint SR | 9/4/2009 |
| 8 | 2711956 | 137,349 | Colonial | RoundPoint SR | 9/4/2009 |
| 9 | 2743691 | 77,537 | Colonial | RoundPoint SR | 9/4/2009 |
| 10 | 2769267 | 47,539 | Colonial | RoundPoint SR | 9/4/2009 |
| 11 | 2774888 | 244,106 | Colonial | RoundPoint SR | 9/4/2009 |
| 12 | 2825820 | 249,827 | Colonial | RoundPoint SR | 9/4/2009 |
| 13 | 2856210 | 237,881 | Colonial | RoundPoint SR | 9/4/2009 |
| 14 | 3038601 | 357,960 | Colonial | RoundPoint SR | 9/4/2009 |
| 15 | 3039920 | 55,696 | Colonial | RoundPoint SR | 9/4/2009 |
| 16 | 3089828 | 328,722 | Colonial | RoundPoint SR | 9/4/2009 |
| 17 | 3304185 | 256,835 | TBW/Selene | Selene SR | 11/6/2009 |
| 18 | 3305739 | 69,467 | TBW/Selene | Selene SR | 11/6/2009 |
| 19 | 3316450 | 72,637 | TBW/Selene | Selene SR | 11/6/2009 |
| 20 | 7077370 | 71,482 | Colonial | RoundPoint SR | 9/4/2009 |
| 21 | 7079304 | 248,706 | Colonial | RoundPoint SR | 9/4/2009 |
| 22 | 7080895 | 285,055 | Colonial | RoundPoint SR | 9/4/2009 |
| 23 | 7082953 | 105,889 | Colonial | RoundPoint SR | 9/4/2009 |
| 24 | 7082961 | 64,957 | Colonial | RoundPoint SR | 9/4/2009 |
| 25 | 7083053 | 179,165 | Colonial | RoundPoint SR | 9/4/2009 |
| 26 | 7083636 | 85,134 | TBW | TBW REO Sold | |
| 27 | 7084587 | 94,005 | Colonial | RoundPoint SR | 9/4/2009 |
| 28 | 7085195 | 198,057 | Colonial | RoundPoint SR | 9/4/2009 |
| 29 | 7085404 | 75,799 | TBW | TBW REO Sold | |
| 30 | 7086534 | 416,658 | Colonial | RoundPoint SR | 9/4/2009 |
| 31 | 7086539 | 142,726 | Colonial | RoundPoint SR | 9/4/2009 |
| 32 | 7086576 | 7,296 | TBW | TBW REO Sold | |
| 33 | 7086782 | 247,902 | Colonial | RoundPoint SR | 9/4/2009 |
| 34 | 7087713 | 139,284 | Colonial | RoundPoint SR | 9/4/2009 |
| 35 | 7088134 | 331,241 | Colonial | RoundPoint SR | 9/4/2009 |
| 36 | 7089178 | 170,403 | Colonial | RoundPoint SR | 9/4/2009 |
| 37 | 7090279 | 389,439 | Colonial | RoundPoint SR | 9/4/2009 |
| 38 | 7091551 | 360,121 | Colonial | RoundPoint SR | 9/4/2009 |
| 39 | 7100442 | 153,301 | Colonial | RoundPoint SR | 9/4/2009 |
| 40 | 7101287 | 106,876 | Colonial | RoundPoint SR | 9/4/2009 |
| 41 | 7109323 | 68,737 | Colonial | RoundPoint SR | 9/4/2009 |
| 42 | 7114244 | 166,919 | Colonial | RoundPoint SR | 9/4/2009 |
| 43 | 7114335 | 417,000 | Colonial | RoundPoint SR | 9/4/2009 |
| 44 | 7127272 | 75,599 | TBW/Selene | Selene SR | 11/6/2009 |
| 45 | 7128121 | 350,258 | TBW/Selene | Selene SR | 11/6/2009 |
| 46 | 7128509 | 222,630 | TBW/Selene | Selene SR | 11/6/2009 |
| Total | | $8,574,429 | | | |