**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **BANK OF AMERICA, N. A.,**<br>**As Indenture Trustee, Custodian, and**<br>**Collateral Agent for OCALA FUNDING,**<br>**LLC,** | |
| **Plaintiff and Counterclaim**<br>**Defendant,** | |
| **v.** | **Civil Action No. 10-CV-1681 (BJR)** |
| **FEDERAL DEPOSIT INSURANCE**<br>**CORPORATION, in its capacity as the**<br>**Receiver for COLONIAL BANK, and in its**<br>**capacity as the Receiver for PLATINUM**<br>**COMMUNITY BANK,** | **MEMORANDUM OPINION ON**<br>**CROSS MOTIONS TO DISMISS** |
| **Defendant and Counterclaim**<br>**Plaintiff.** | |

I.   INTRODUCTION ............................................................................................................. 2

II.   SUMMARY OF THE CASE ........................................................................................... 3

  A.   Overview of TBW's Operation ..................................................................................... 4

  B.   Factual Background Common to All Claims ................................................................. 6

  D.   Factual Allegations Specific to BOA's Claims Against the FDIC .................................. 9

  E.   Factual Allegations Specific to the FDIC's Counterclaims Against BOA ..................... 12

III.   PROCEDURAL HISTORY ........................................................................................... 14

IV.   DISCUSSION ............................................................................................................... 15

  A.   Standards of Review .................................................................................................. 15

  B.   The FDIC's Motion to Dismiss the Amended Complaint ............................................ 18

    1.   Whether This Court Has Subject Matter Jurisdiction over BOA's Claims................................ 18

      a.   Whether BOA Exhausted the Administrative Remedies under FIRREA on behalf of Ocala. 19

      b.   Whether BOA Has Standing to Bring Claims on Behalf of DB and BNP............................ 27

        i.   Whether DB and BNP Have Article III Standing ............................................................. 28

        ii.   Whether BOA Can Pursue the Claims on Behalf of DB and BNP .................................... 30

      c.   Whether Counts IX, X, and XI Have Been Administratively Exhausted under FIRREA ...... 32

2.    Whether the Amended Complaint States a Claim for Fraudulent Transfer ................................ 33

3.    Whether the Amended Complaint Pleads Fraud with the Requisite Specificity ........................ 39

C.    BOA's Motion to Dismiss the FDIC's Counterclaims ................................................... 42

1.    Whether the Counterclaims are Barred by the Exculpatory Clauses ........................................ 44

2.    Whether the Counterclaims State a Claim for Breach of the Custodial Agreement .................. 49

a.    Counterclaim 1 ................................................................................................................. 49

b.    Counterclaim 2 ................................................................................................................. 51

c.    Counterclaim 3 ................................................................................................................. 52

d.    Counterclaim 4 ................................................................................................................. 53

e.    Counterclaim 5 ................................................................................................................. 54

3.    Whether the Breach of Bailment Counterclaims Fail as a Matter of Law ................................ 55

a.    Whether the Bailee Letters Are Enforceable Contracts between Colonial and BOA ............. 57

b.    Whether the Breach of Bailment Counterclaims State a Claim for Relief .............................. 65

4.    Whether the Tort Counterclaims Fail As a Matter of Law ....................................................... 68

a.    Whether the Economic Loss Doctrine Bars the Tort Claims ................................................. 69

b.    Whether the Custodial Agreement Limits BOA's Tort Liability ........................................... 70

V.    CONCLUSION .................................................................................................................................. 71

## I.    INTRODUCTION

Before the Court are two motions to dismiss. First, Defendant and Counterclaimant Federal Deposit Insurance Corporation (the "FDIC"), in its capacity as the Receiver for both Colonial Bank ("Colonial") and Platinum Community Bank ("Platinum"), moves to dismiss the First Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(1) and (6). (Dkt. No. 26.). Second, Plaintiff and Counterclaim-Defendant Bank of America, N.A., ("BOA") moves to dismiss the FDIC's Counterclaims pursuant to Rule 12(b)(6). (Dkt. No. 36.). Having considered the parties' arguments, pleadings, and the relevant case law, the court is fully advised. For the reasons set forth below:

**IT IS HEREBY ORDERED** that each motion is **GRANTED in part and DENIED in part.**

## II.      SUMMARY OF THE CASE

This dispute is the result of a multi-billion dollar fraudulent scheme that left the financial sector reeling. The scheme was orchestrated by Lee Farkas, the former chairman of Taylor, Bean & Whitaker Mortgage Corp. ("TBW"), with the aid of several bank employees from Colonial and Platinum.[1] It stemmed from TBW's loan origination business, which started with humble roots in 1982, but grew at a frenetic pace as the United States' housing bubble grew. When the housing market began to crumble, so did TBW's finances. In 2002, Farkas and his co-conspirators hid TBW's financial decline through a complex scheme that evolved over several stages. Initially, they disguised overdrafts on TBW's bank accounts held at Colonial by "sweeping" funds from other accounts into the overdrawn accounts. As TBW's deficit grew to well over $100 million, Farkas and his co-conspirators initiated more sophisticated measures, including selling sham mortgage loans, multi-pledging collateral, and overstating the actual value of TBW's and its subsidiaries' assets. In the final stage of the scheme, Farkas and his co-conspirators attempted to fraudulently obtain $553 million from the Troubled Asset Relief Program. The scheme was eventually uncovered in August 2009. Farkas is now serving a 30-year sentence after being convicted in April 2011 of 14 counts of conspiracy and bank, wire, and securities fraud. A handful of other executives from TBW and Colonial have also been sentenced to prison for their roles in the fraud.

TBW's loan origination business operated through a complex web of financial agreements between multiple financial institutions. When TBW collapsed, these institutions were left behind in the wreckage. Many of these institutions turned to the courts to determine liability

---

[1]      The FDIC disputes whether Platinum employees were involved in the fraud.

for the multi-billion dollar losses caused by the fraud. This is one such case. In this case, BOA, acting in its capacity as the Indenture Trustee, Custodian, and Collateral Agent for one of TBW's subsidiaries, Ocala Funding, LLC ("Ocala"), seeks to recover approximately $1.7 billion from the FDIC as the Receiver for the now defunct Colonial and Platinum banks. The FDIC, in turn, has countersued. It seeks to recover $900 million from BOA for allegedly breaching its duties as the Custodian and Bailee for Colonial.

### A.     Overview of TBW's Operation

As previously stated, TBW operated through a complex web of financial arrangements with a number of financial institutions who operated in a number of different capacities. Before delving into the minutiae of these financing arrangements, it is helpful to understand the interplay between the various entities implicated in this lawsuit.

The process started with TBW originating a mortgage loan for an individual homebuyer. TBW funded the loan through a series of funding agreements it had with Colonial. Under these agreements, Colonial advanced funds to TBW in exchange for a 99% ownership interest in the loan; TBW retained a 1% ownership interest. At this point, Colonial and/or TBW sent the loan to BOA to be held for the benefit of Colonial and TBW (in their respective ownership interests). In this way, BOA acted as custodian and bailee of the loan for both Colonial and TBW.

Next, TBW's subsidiary, Ocala,  purchased Colonial's 99% ownership interest in the loan, thereby effectively paying Colonial back the amounts Colonial had extended to fund the loan. Ocala raised the money needed to purchase Colonial's 99% ownership interest by selling short-term notes to outside investors, to wit, Deutsche Bank ("DB") and BNP Paribas ("BNP"). TBW then notified BOA of Ocala's purchase of the loans and BOA would send the sale proceeds to Colonial from an account that Ocala maintained at BOA. At this point, BOA's relationship to

the loan changed. BOA still held the loan, but now it retained the loan as the indenture trustee, custodian, and collateral agent for Ocala and Ocala's outside investors (*i.e.*, DB and BNP). BOA held the loan in a collateral account that Ocala maintained at BOA.

Next, TBW arranged for Ocala to sell the loan to Freddie Mac. The proceeds from that sale were placed in Ocala's collateral account at BOA and were either used to pay back DB and BNP or to purchase more loans from Colonial. Finally, BOA would send the loan to a Freddie Mac custodial account at Colonial. The transaction was then complete.

The fractures in TBW's operation were not discovered until TBW collapsed in August 2009. At that point, the participants realized that TBW had been manipulating the system. BOA alleges that Farkas and employees at Colonial and Platinum fraudulently diverted virtually all of Ocala's assets, the result of which was that Ocala was unable to make payments to its outside investors, and DB and BNP ultimately lost approximately $1.7 billion. BOA seeks to recover this loss from the FDIC as the Receiver for both Colonial and Platinum. The FDIC, in turn, alleges that at some point in 2008, TBW began to manipulate its operation such that thousands of loans were pledged as collateral to Ocala, Colonial, and Freddie Mac at the same time. The FDIC alleges that Colonial was unaware of this "multi-pledging scheme" and ultimately lost a total of $900 million. The FDIC claims that BOA was complicit in the "multi-pledging" and seeks to recover the $900 million loss from BOA.

With this background in mind, the Court now turns to the detailed factual allegations asserted by both BOA and the FDIC.

**B.      Factual Background Common to All Claims[2]**

TBW was the largest independent (*i.e.*, non-depository owned) mortgage originator[3] and servicer[4] in the United States when it filed for Chapter 11 bankruptcy protection on August 24, 2009. (Dkt. No. 25 Answer to First Amended Complaint, Affirmative Defenses, and Counterclaims, at ¶ 9; Dkt. No. 20 First Amended Complaint at ¶ 27; Final Reconciliation Report of Debtor Taylor, Bean & Whitaker Mortgage Corp. (the "FRR")[5] at p. 9, ¶ 1, *In re Taylor, Bean & Whitaker Mortg. Corp*, No. 3:09-bk-07047-JAF (Bankr. M.D. Fla. filed Aug. 24, 2009), ECF No. 1644.). TBW provided mortgage financing to individual borrowers through a network of independent mortgage brokers and community banks.  (FRR at p. 13, ¶ 18.).   Its ultimate objective was to sell these mortgages to investors in the secondary market, typically Freddie Mac, and retain the right to service the mortgages for the investors. (*Id.*; Dkt. No. 20 at ¶ 31-32.).

In 2002 through 2009, TBW experienced tremendous growth in the number of loans it originated. For example, in 2004, TBW originated a total of 59,129 loans representing a dollar value in excess of $9.5 billion. (FRR at p. 14, ¶ 20.). By early 2009, TBW originated approximately 14,500 new loans representing a dollar value in excess of $2.7 billion *every month*. (*Id.*; Dkt. No. 20 at ¶¶ 29-30.).

---

[2]      Except when noted by the Court, these facts are not in dispute.

[3]      A "mortgage originator" is an institution that works with a borrower to complete a mortgage transaction. *See http://www.ftc.gov/bcp/edu/pubs/consumer/homes/rea10.shtm*.

[4]      A "mortgage servicer" is responsible for the day-to-day management of the mortgage loan account. *See http://www.ftc.gov/bcp/edu/pubs/consumer/homes/rea10.shtm*. A mortgage servicer may be a borrower's lender, but often the beneficial rights of principal and interest on mortgages are sold to investors such as Freddie Mac, Fannie Mae, and private investors. *Id.*

[5]      BOA submitted the Final Reconciliation Report to this Court during the October 2, 2012 hearing (without objection from the FDIC) and both parties referenced the Report throughout the hearing. Accordingly, the Court will take judicial notice of the Report. *See Miles v. State of California*, 320 F.3d 986, 987 n. 1 (9th Cir. 2003) (district court taking judicial notice of related state court proceedings).

TBW required significant financing in order to fund its loans at the time of closing and then hold onto them until they could be sold to Freddie Mac. (FRR at p. 14, ¶ 22.). This is where Colonial came in. Colonial was key to TBW's financing needs, serving as TBW's primary source of funding through a number of different funding arrangements. (Dkt. No. 20 at ¶¶ 18 and 44.) In particular, Colonial provided funding through various mortgage participation[6] agreements that the parties refer to as the "COLB Facilities." (*Id*. at ¶ 43.). Under the terms of the COLB Facilities, Colonial purchased from TBW a 99% participation interest in each loan that TBW originated; TBW retained a 1% participation interest in the loan. (*See* Dkt. No. 25 at ¶ 11; FRR at p.15, ¶ 24; Dkt. No. 20 at ¶ 43.). The parties refer to these loans as the "Participated Mortgage Loans." (Dkt. No. 25 at ¶ 11.).

As the United States' housing market began to show signs of weakness and TBW's sources of credit dried up, TBW sought additional sources of funding with which to originate and fund mortgages. (*Id*. at ¶ 13.). To that end, TBW created Ocala in 2005. (*Id*. at ¶ 14; FRR at pp. 53-54, ¶¶ 103-104.). TBW controlled Ocala and, as a practical matter, was fully responsible for all of Ocala's business activities. (Dkt. No. 20 at ¶ 53; FRR at p. 53, ¶ 103.).

TBW created Ocala to function as a conduit through which TBW could obtain funding from outside investors. (Dkt. No. 25 at ¶ 15; FRR at pp. 53-54, ¶ 104; Dkt. No. 20 at ¶ 49.). Ocala funded its operations by issuing short-term liquidity notes (the "Ocala Notes") that were supposed to be secured at all times by Participated Mortgage Loans that Ocala owned and/or the cash proceeds of the sale of these Loans to Freddie Mac. (Dkt. No. 25 at ¶¶ 15-19; Dkt. No. 20 at ¶¶ 50-51; FRR at p. 53-54, ¶ 104.). At the time of TBW's collapse, DB and BNP were the only

---

[6] A "mortgage participation" is a mortgage or pool of mortgages that is divided into units that are sold to one or more investors, each of whom participates in receiving payments of principal and interest. *See* http://www.ftc.gov/bcp/edu/pubs/consumer/homes/rea10.shtm.

holders of Ocala Notes. DB owned $1.2 billion of the Notes; BNP owned $480.7 million. (Dkt. No. 20 at ¶ 52; Dkt. No. 25 at ¶ 19.).

TBW arranged for Ocala to purchase Colonial's 99% participation interest in each Participated Mortgage Loan that TBW funded through the Colonial COLB Facilities. (Dkt. No. 20 at ¶ 60; Dkt. No. 25 at ¶16.). By arranging for Ocala to purchase Colonial's 99% interest, TBW effectively paid back Colonial, which, in turn, freed up more funding for TBW to use from the COLB Facilities. (Dkt. No. 25 at ¶ 16.). Once Ocala owned the Loans, TBW arranged for the Loans to be sold to Freddie Mac. (*Id.* at ¶ 17.). TBW would cause the proceeds from the Freddie Mac sale to either be applied to the balance outstanding on the Ocala Notes or to cause Ocala to buy more Participated Mortgage Loans from Colonial. *Id.*

BOA had several distinct but related roles in the above-described arrangement. First, TBW and Colonial needed a custodian to hold the Participated Mortgage Loans pending Ocala's purchase of Colonial's interest in the Loans. To that end, in July 2008, Colonial, TBW, and BOA entered into a contract entitled "Custodial Agreement." (Dkt. No. 25 at ¶ 22.). The provisions of the Custodial Agreement are set forth in greater detail herein at Section IV.D., but generally under this Agreement, BOA agreed to accept the Participated Mortgage Loans, hold them for the benefit of Colonial and TBW (to the extent of each entities' participation interest in the Loans), and either return the Loans to Colonial or remit payment to Colonial once the Loans were sold to Ocala. (*Id.* at ¶¶ 22-23.). BOA was paid a fee for these services. (*Id.* at ¶ 34.).

BOA asserts that the Custodial Agreement is the only agreement that governed this transfer of Loans. (Dkt. No. 36, BOA's Reply in support of its Motion to Dismiss, at 22.). The FDIC asserts that Colonial transmitted the Loans to BOA via bailee letters (the "Bailee Letter(s)") and that the Bailee Letters either modified the Custodial Agreement or constituted

new, independent agreements between Colonial and BOA. (Dkt. No. 41, the FDIC's Opp. to BOA's Motion to Dismiss, at 10.). It is pursuant to these agreements that the FDIC brings its Counterclaims.

BOA also agreed to act as the Indenture Trustee, Custodian and Collateral Agent for the Ocala Facility. (Dkt. No. 20 at ¶ 10.). This agreement is reflected in a set of agreements that the parties refer to as the "Ocala Facility Documents." (*Id.* at ¶¶ 53-54.). Three of these agreements are particularly relevant to this dispute, each dated June 30, 2008: (1) the Security Agreement, (2) the Purchase Agreement, and (3) the Base Indenture. The provisions of these agreements are discussed in detail herein at Section IV.C., but generally under these agreements, BOA agreed to administer and regulate the flow of mortgages and cash in and out of Ocala, certify the solvency of Ocala prior to its issuance of Ocala Notes, and, upon certain events of default, shut down Ocala and take other specific actions. BOA was paid a fee for these services.[7]

### D.    Factual Allegations Specific to BOA's Claims Against the FDIC

When TBW collapsed in August 2009, the parties discovered that the value of the collateral backing the Ocala Notes was grossly overstated. (Dkt. No. 20 at ¶ 1.). When the dust finally settled, Ocala owed DB and BNP approximately $1.7 billion, but the value of the mortgage loans backing the Ocala Notes coupled with Ocala's cash on deposit was less than $200 million. (*Id.*; FRR at p. 63, ¶ 119.). BOA, in its capacity as Indenture Trustee, Custodian, and Collateral Agent under the Ocala Facility Documents, seeks to recover the amounts owed on the Ocala Notes from the FDIC as the Receiver for Colonial and Platinum. (Dkt. No. 20 at ¶ 1.). The substance of BOA's claims is that Colonial and Platinum were parties to TBW's fraudulent

---

[7]     BOA's role as the Custodian for TBW and Colonial, as well as its role as the Indenture Trustee, Collateral Agent, and Custodian under the Ocala Facility Documents is also the subject of a pending case in the Southern District of New York. *See BNP Paribas Mortgage Corporation v. Bank of America, N.A.*, 778 F. Supp. 2d 375 (S.D.N.Y. 2011).

scheme that resulted in the loss of billions of dollars belonging to Ocala. (Dkt. No. 35, BOA's Opp. to the FDIC's Motion to Dismiss, at 1; Dkt. No. 20 at ¶¶ 1, 64-68, 106.).

Specifically, BOA alleges that when TBW began to experience significant liquidity problems in 2002, TBW and Colonial conspired to cover the cash shortfalls in TBW's master bank account (the "Master Account") by "sweeping" money from other TBW accounts at Colonial into the Master Account. (Dkt. No. 20 at ¶ 65a.). This gave the false appearance that the Master Account was not overdrawn. (*Id.*). The day after the funds were swept into the Master Account, TBW and Colonial swept the same funds back out of the Account. (*Id.*). BOA asserts that TBW and Colonial continued to disguise the Master Account's growing deficit by creating false mortgage loan data to give the impression that Colonial had purchased ownership interest in certain of TBW's loans. (*Id.* at ¶ 65b.). BOA claims that Colonial knew that this data included loans that either did not exist or that TBW had already committed or sold to outside investors (*i.e.,* Freddie Mac). (*Id.*). BOA alleges that during this same time, "billions of dollars" were transferred from Ocala accounts to a TBW account at Colonial for the purpose of purchasing mortgages. (*Id.* at ¶ 68.). However, BOA alleges, some of the funds were not actually used to purchase mortgages, or were used to purchase "sham" mortgages, and therefore, the transfers, were in fact, a theft of Ocala's assets. (*Id.*). Finally, BOA claims that TBW, Colonial, and Platinum diverted $50 million from Ocala to an escrow account at Platinum as part of their effort to fraudulently obtain TARP funds. (*Id.* at ¶ 74.).

BOA maintains that TBW and the banks concealed the above-described fraudulent diversions from BOA and Ocala's investors by, among other things, providing BOA with falsified collateral lists that misrepresented the status of loans in which Ocala allegedly held a

security interest. (*Id.* at ¶ 65i.). According to BOA, these falsified collateral lists misrepresented the ownership status of loans allegedly held by Ocala by more than $1 billion. (*Id.*).

BOA asserts that the combined effect of the above-described fraudulent activities was that TBW, Colonial and Platinum fraudulently diverted virtually all of Ocala's assets, leaving it unable to pay its obligations when the fraud was uncovered. (Dkt. No. 20 at ¶ 1.). In bringing this action, BOA seeks to recover Ocala's losses from Colonial and Platinum for the benefit of Ocala, Ocala's investors (*i.e.*, DB and BNP), and BOA itself. BOA maintains that it is entitled to bring such claims and, indeed, is obligated to bring the claims as Indenture Trustee, Custodian, and Collateral Agent under the Ocala Facility Documents. (Dkt. No. 20 at ¶¶ 8-10; Dkt. No. 35 at 8.).

According to BOA, it is pursuant to these obligations that BOA commenced suit in the United States District Court for the Southern District of Florida against Colonial to recover mortgages and other assets allegedly belonging to Ocala. (*Id.* at ¶¶ 102, 104.). The Eleventh Circuit dismissed the case, stating that BOA had to proceed through the statutory administrative claims process created by Congress for distressed financial institutions. (*See* Dkt. No. 35 at 9 (citing *Bank of Am. N.A. v. Colonial Bank*, 604 F.3d 1239, 1241 (2010)).). Therefore, on November 19, 2009 and December 9, 2009, BOA filed proofs of claim with the FDIC (as the Receiver for Colonial and Platinum), seeking allowance of general unsecured claims against Colonial and Platinum, respectively, for the losses suffered by Ocala and its investors (*i.e.*, DB and BNP). (*Id.* at ¶¶ 123-124 and 137-138.).

The parties dispute on whose behalf BOA filed the proofs of claim. BOA asserts that it filed the claims on behalf of Ocala, Ocala's investors (*i.e.*, DB and BNP) and itself. (*See* Dkt. No. 35 at 16.). The FDIC counters that the claims were only filed on behalf of DB and BNP. (*See* Dkt. No. 26, the FDIC's Motion to Dismiss, at 9.). On August 4, 2010, the FDIC disallowed the

claim against Colonial. (Dkt. No. 20 at ¶ 130.). Similarly, on August 5, 2010, the FDIC

disallowed the claim against Platinum. (*Id*. at 144.). BOA filed the present action seeking a *de*

*novo* review of the FDIC's denial of the receivership claims (Counts I through IV). (*Id*. at ¶ 10.).

BOA also alleges claims for fraud (Count V), civil conspiracy (Count VI), unjust enrichment

(Count VII), conversion (Count VIII), and actual and constructive fraudulent transfer (Counts IX

and X). (*Id*. at ¶¶ 169-234.).

### E.    Factual Allegations Specific to the FDIC's Counterclaims Against BOA

The FDIC concedes that Colonial employees were involved in aspects of TBW's

fraudulent scheme. (Dkt. No. 41 at 4.). However, it claims that these employees were not

involved in any wrongful actions with respect to Ocala. (*Id*.). Instead, the FDIC maintains that

Ocala's inability to pay back the Ocala Notes was due to a facet of TBW's scheme of which

Colonial was unaware, and that TBW was only able to pull off because BOA breached its

obligations to Colonial. (Dkt. No. 25 at ¶¶ 1-8.).

The FDIC alleges that in July 2008, Colonial, TBW, and BOA entered into the Custodial

Agreement. (*Id*. at ¶ 22.). The stated purpose of the Custodial Agreement was to govern the

transfer of the Participated Mortgage Loans from TBW to Colonial pursuant to the mortgage

participation agreement under the Colonial COLB Facilities. (*See Custodial Agreement* at

Recitals attached as Ex. A to Dkt. No. 36-1, Declaration of Kristin Linsley Myles (the "Myles

Decl."). Under the Agreement, BOA "agreed to act on behalf of [Colonial] and [TBW]…as

[Colonial's] and [TBW's] agent and bailee (to the extent of their respective ownership interests

in Participated Mortgage Loans) for purposes of holding the [documents] related to the

Participated Mortgage Loans…". (*Id*.). The FDIC also asserts that Colonial routinely transferred

the Participated Mortgage Loans and associated documents to BOA under cover of a standard

bailee letter (the "Bailee Letters"), utilizing the letter as a Loan Transmittal Sheet. (Dkt. No. 25 at ¶ 31; *see also* a copy of a *Bailee Letter* attached as Ex. B to Dkt. No. 36-1, Myles Dec.).

The FDIC claims that the Custodial Agreement and Bailee Letters, together and separately, establish that BOA was Colonial's agent and bailee, placing certain obligations on BOA. (Dkt. No. 25 at ¶¶ 24-25.). Among other things, BOA was obliged to hold the Participated Mortgage Loans for Colonial's exclusive use and benefit and for the purpose of perfecting Colonial's ownership in the Loans until Colonial was paid for their sale. (*Id*.). The FDIC alleges that BOA breached these obligations in the following manner.

The FDIC claims that at some point beginning around June 2008, TBW started notifying BOA that Ocala had "purchased" certain Participated Mortgage Loans from the Colonial COLB Facilities, but would never instruct BOA to pay Colonial for the Loans that Ocala allegedly purchased. (*Id*. at ¶ 43.).[8] Instead, BOA would receive the Loans from TBW and enter them into its collateral management system as collateral for DB and BNP without first paying Colonial. (*Id*.). Next, BOA would assist Ocala in selling the Loans to Freddie Mac. (*Id*.). The FDIC asserts that BOA would accomplish this by falsifying Freddie Mac Form 996E forms entitled "Warehouse Lender Release of Security Interest," on which BOA would state that it was the "Warehouse Lender," that TBW was the "Seller," and that there were no other encumbrances on the Loans. (*Id*. at ¶ 44.).

The FDIC claims that after Freddie Mac paid Ocala for the Loans, TBW would instruct BOA to forward the sales proceeds to Colonial. (*Id*. at ¶ 45.). However, the sales proceeds were not used to pay Colonial for the Loans that were just sold to Freddie Mac; instead, the FDIC alleges, TBW directed BOA to pay Colonial for Loans that had been shipped to BOA earlier and

---

[8]      If Ocala was operating as it was supposed to, TBW's notification of the purchase should have been accompanied by a corresponding request that BOA transfer the sales proceeds to Colonial. (FRR at ¶ 117a.).

that had already been sold by Ocala to Freddie Mac in the intervening time. (*Id*.). In effect, the new sales proceeds were used to pay Colonial for its prior sales to Ocala. Thus, Ocala was never current on the amount that it owed Colonial. The FDIC asserts that a substantial number of these Loans were listed as collateral under the Colonial COLB Facilities even though Colonial was not paid for the Loans at the time of Ocala's "purchase" of the Loans. (*Id*.). The FDIC asserts that the net effect of this course of conduct was that thousands of Participated Mortgage Loans were sold to Freddie Mac but remained listed in BOA's system as collateral for the Ocala Notes. (*Id*. at ¶¶ 45-49).

The FDIC asserts that the above-described process was unknown to Colonial at the time because Colonial still typically received payment for the Loans within the appropriate amount of time under the Bailee Letters. (*Id*. at 46.). However, when TBW collapsed in August 2009, the process described above came to an abrupt halt. (*Id*.). At that time, Colonial, DB/BNP, and Freddie Mac each believed that they owned the same 4,205 Participated Mortgage Loans, and Colonial and Freddie Mac believed that they owned an additional 603 Loans. (Dkt. No. 25 at ¶ 48.). In other words, according to the FDIC, in August 2009, BOA was obligated to Colonial for 4,808 Participated Mortgage Loans with a total value of $900 million. (*Id*. at ¶ 49.). The FDIC filed sixteen Counterclaims alleging breach of contract, bailment, fiduciary duties, and common law bailment with respect to these 4,808 Participated Mortgage Loans. (*Id*. at ¶¶ 67-154.).

## III.    PROCEDURAL HISTORY

BOA commenced this action on October 1, 2010. (Dkt. No. 1.). The FDIC moved to dismiss the Complaint on March 14, 2011. (Dkt. No. 16.). In response, BOA moved to amend the Complaint pursuant to 12 U.S.C. § 1821(d)(6)(A)(ii), which the Court granted on April 11,

2011. (Dkt. Nos. 19-20; Minute Entry dated April 11, 2011.). The FDIC filed the present motion to dismiss, and also filed an Answer and Counterclaims. (Dkt. Nos. 25 and 36.).

On October 24, 2011, BOA moved to dismiss the FDIC's Counterclaims pursuant to Rule 12(b)(6), claiming that each Counterclaim fails as a matter of law. (Dkt. No. 37.). The case was reassigned to this District Court Judge on January 27, 2012. (Dkt. No. 42.). Thereafter, BOA filed a motion before the Judicial Panel on Multidistrict Litigation to transfer this case to the Southern District of New York. *In Re Ocala Funding, LLC*, ___ F. Supp. 2d ___, 2012 WL 2089209 (US. Jud. Pan. Mult. Lit. June 8, 2012). On March 20, 2012, this Court stayed the case pending the Panel's resolution of the motion. (Minute Entry dated March 20, 2012.). On June 18, 2012, the parties notified the Court that the Panel denied BOA's motion to transfer the case, and the Court lifted the stay. (Minute Entry dated June 18, 2012.).

The Court heard oral arguments on the cross motions to dismiss on October 2, 2012. (Minute Entry dated October 2, 2012.). The motions are now ripe for review.

## IV.   DISCUSSION

### A.   Standards of Review

#### 1.   *The Standard of Review for 12(b)(1) Motions*

The FDIC moves to dismiss the Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(1). When a party files a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), "the plaintiff[ ] bear[s] the burden of proving by a preponderance of the evidence that the Court has subject matter jurisdiction." *Biton v. Palestinian Interim Self-Gov't Auth.*, 310 F. Supp. 2d 172, 176 (D.D.C. 2004). Because subject matter jurisdiction focuses on a court's power to hear the plaintiff's claim, a Rule 12(b)(1) motion imposes on the court an affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority.

*Grand Lodge of Fraternal Order of Police v. Ashcroft*, 185 F. Supp. 2d 9, 13 (D.D.C. 2001). For this reason, BOA's "'factual allegations in the complaint…will bear closer scrutiny in resolving [the] 12(b)(1) motion' than in resolving [the] 12(b)(6) motion for failure to state a claim." *Id.* at 13-14 (quoting 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1350 (2d ed. 1987) (alternation in original)).

In deciding the Rule 12(b)(1) motion, this Court need not limit itself to the allegations of the Amended Complaint. *See Hohri v. United States*, 782 F.2d 227, 241 (D.C. Cir. 1986, vacated on other grounds, 482 U.S. 64 (1987). Rather, this Court may "consider such materials outside the pleadings as it deems appropriate to resolve the question whether it has jurisdiction in the case." *Scolaro v. D.C. Board of Elections and Ethics*, 104 F. Supp. 2d 18, 22 (D.D.C. 2000) (citing *Herbert v. Nat'l Acad. of Scis*, 974 F.2d 192, 197 (D.C. Cir. 1992); *see also Venetian Casino Resort, L.L.C. v. E.E.O.C.*, 409 F.3d 359, 366 (D.C. Cir. 2005) ("given the present posture of this case—a dismissal under Rule 12(b)(1) on ripeness grounds—the court may consider materials outside the pleadings").

### 2.      The Standard of Review for 12(b)(6) Motions

The FDIC and BOA both move to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)) (internal quotes omitted)). This Court must construe the operative pleading in the light most favorable to the pleader and must accept as true all reasonable factual inferences drawn from well-pleaded factual allegations. *Aktieselskabet AF 21 November 2001 v. Fame Jeans Inc.*, 525 F.3d 8, 15 (D.C. Cir. 2008). This Court need not, however, "accept inferences drawn by

[pleaders] if such inferences are unsupported by the facts set out in the [operative pleading]. Nor must the [C]ourt accept legal conclusions cast in the form of factual allegations." *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994).

If the well-pleaded facts do not permit the Court, drawing on its judicial experience and common sense, to infer more than the "mere possibility of misconduct," then the operative pleading has not shown that the pleader is entitled to relief. *Iqbal*, 556 U.S. at 679 (citing Fed. R. Civ. P. 8 (a)(2)). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that [the movant] has acted unlawfully." *Id.* at 678 (citation omitted). "Where a complaint pleads facts that are merely consistent with [the movant's] liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Ashcroft*, 556 U.S. at 678 (internal citation and quotation marks omitted).

In addition, because this Court's review of the Rule 12(b)(6) motions is based upon consideration of the allegations contained in the operative pleadings, the Court will not consider extraneous documents, except under limited circumstances.  *See generally Hinton v. Corr. Corp. of Am.*, 624 F. Supp. 2d 45, 46 (D.D.C. 2009). For instance, this Court may consider documents attached to the Amended Complaint and/or Counterclaims, *Stewart v. Nat'l Educ. Ass'n*, 471 F.3d 169, 173 (D.C. Cir. 2006), or referred to in the Amended Complaint and/or Counterclaims if the documents are central to the claims and the parties do not dispute the documents' authenticity, *Kaempe v. Myers*, 367 F.3d 958, 965 (D.C. Cir. 2004).  Here BOA and the FDIC refer the Court to a number of documents that are central to their respective claims, the authenticity of which is not contested.  Accordingly, the Court has considered these documents in resolving these motions.

**B.      The FDIC's Motion to Dismiss the Amended Complaint**

The FDIC and BOA each move to dismiss their counterparts' claims in their entirety. The Court will address the FDIC's motion first. The FDIC moves to dismiss the Amended Complaint pursuant to Federal Rule 12(b)(1) for failure to exhaust administrative remedies under the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA") and for lack of standing. (*See* Dkt. No. 26, at 2-3.). The FDIC also asserts, again pursuant to FIRREA, that this Court lacks subject matter jurisdiction over the three equitable claims (Counts II, IV, and VII). (*Id*. at 4.).

In the alternative, the FDIC seeks to dismiss Counts V (Fraud), IX (Actual Fraudulent Transfer), and X (Constructive Fraudulent Transfer) for failure to state a claim upon which relief can be granted. (*Id*.). The FDIC contends that the Amended Complaint does not allege several of the material elements necessary to state a claim for actual and/or constructive fraudulent transfer, and does not assert factual allegations sufficient to establish entitlement to relief. (*Id*.) The FDIC also alleges that the fraud claim does not meet the heightened pleading requirements of Federal Rule 9(b). (*Id*.). The Court addresses each argument in turn.

### *1.   Whether This Court Has Subject Matter Jurisdiction over BOA's Claims*

Federal courts are courts of limited jurisdiction and have subject matter jurisdiction only to the extent that it is conferred by statute or the Constitution. *See Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994); *see also Gen. Motors Corp. v. Envtl. Prot. Agency*, 363 F.3d 442, 448 (D.C. Cir. 2004) (noting that "[a]s a court of limited jurisdiction, we begin, and end, with an examination of our jurisdiction"). The claimant bears the burden of establishing by a preponderance of the evidence that a court has jurisdiction; failure to do so is fatal to the claim. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992); *Kokkonen*, 511 U.S. at 377. A

court must dismiss a complaint for lack of subject matter jurisdiction where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Bobreski v. U.S. E.P.A.*, 284 F. Supp. 2d 67, 72 (D.D.C. 2003) (quoting *Empagran S.A. v. F. Hoffman-LaRoche, Ltd.*, 315 F.3d 338, 343 (D.C. Cir. 2003)). A court may consider relevant materials outside the pleadings to determine whether it has jurisdiction. *Wilson v. District of Columbia*, 269 F.R.D. 8, 11 (D.D.C. 2010).

The FDIC contends that this Court does not have subject matter jurisdiction over the claims asserted in the Amended Complaint for the following three reasons. First, to the extent that BOA seeks to recover damages allegedly incurred by Ocala, this Court is without jurisdiction because Ocala has not exhausted its administrative remedies under FIRREA. Second, to the extent that BOA seeks to recover damages allegedly incurred by DB and BNP, this Court is without jurisdiction because DB's and BNP's injuries are derivative of Ocala's injuries and, as such, cannot confer Article III standing. Third, the FDIC argues that Counts VI (Civil Conspiracy), IX (Actual Fraudulent Transfer) and X (Constructive Fraudulent Transfer) have not been exhausted under FIRREA.[9]

### a.   Whether BOA Exhausted the Administrative Remedies under FIRREA on behalf of Ocala

In enacting FIRREA, Congress created a comprehensive statutory scheme under which it granted the FDIC the authority to act as the Receiver for a failed financial institution. The "core purpose" of FIRREA is to "ensure that the assets of a failed institution are distributed fairly and promptly among those with valid claims against the institution." *Freeman v. FDIC*, 56 F.3d

---

[9]   The FDIC also contends that this Court does not have subject matter jurisdiction over the three equitable claims (Counts II, IV and VII) pursuant to FIRREA. BOA did not dispute this claim in its opposition to the FDIC's motion. Accordingly, the Court deems the argument conceded and will grant the FDIC's motion to dismiss as to Counts II, IV and VII. *See Bancoult v. McNamara*, 227 F.Supp.2d 144, 149 (D.D.C.2002) ("if the opposing party files a responsive memorandum, but fails to address certain arguments made by the moving party, the court may treat those arguments as conceded"); *accord Day v. D.C. Dep't of Consumer & Regulatory Affairs*, 191 F.Supp.2d 154, 159 (D.D.C.2002).

1394, 1401 (D.C. Cir. 1995). Congress intended to grant the FDIC the "power to take all actions necessary to resolve problems posed by financial institutions in default" in an "expeditious manner." H.R. Rep. No. 101-54(I) at 322, 330, *as reprinted in* 1989 U.S.C.C.A.N. 86, 118, 126. To that end, Congress created a statutory procedure for the orderly and efficient processing of claims against failed financial institutions. This administrative claims process, set forth in 12 U.S.C. §§ 1821(d)(3) through (13), centralizes the initial consideration and resolution of claims by requiring that all claims be submitted to the Receiver by the "claims bar date," a date certain established by the Receiver. Once a timely administrative claim is submitted, the Receiver has 180 days to determine whether to approve or disallow the claim. *Id*. § 1821(d)(5)(A)(i). The Receiver may disallow any portion of a timely claim that is not proven to the Receiver's satisfaction. *Id*. §§ 1821(d)(5)(C), 1821(d)(5)(D). Section 1821(d)(6)(A) also establishes that a claimant can file a new suit, or continue a pre-existing suit, on a claim within 60 days after the earlier of (i) the Receiver's initial determination of a claim, or (ii) termination of the 180-day period in which the Receiver may determine the claim. In such a suit, the court performs a *de novo* judicial determination of the claim. *Id*. §§ 1821(d)(5)(A)7(E).

The administrative claims process is mandatory. Thus, in Section 1821(d)(13)(D), Congress withdrew jurisdiction from all courts to hear claims against the FDIC as Receiver, except as granted elsewhere in Section 1821(d). *See Freeman*, 56 F.3d at 1399-1400. The jurisdictional bar provision and the claims procedures work together to impose a "statutory exhaustion requirement" that is "explicitly jurisdictional." *Rosa v. RTC*, 938 F.2d 383, 395 (3d Cir. 1991), *cert. denied*, 502 U.S. 981 (1991); *see Freeman*, 56 F.3d at 1400 ("Section 1821(d)(13)(D) thus acts as a jurisdictional bar to claims or actions by parties who have not exhausted their § 1821(d) administrative remedies."). This Circuit recognizes that

"[j]urisdictional provisions in federal statutes are [] strictly construed." *Hardin v. City Title & Escrow Co.*, 797 F.2d 1037, 1040 (D.C. Cir. 1986); *Freeman*, 56 F.3d at 1400 (strictly applying Sections 1821(d)(6) and (13)(D) to dismiss claims for lack of jurisdiction); *see Office & Prof'l Emps. Int'l Union, Local 2 v. FDIC*, 962 F.2d 63, 66 (D.C. Cir. 1992) ("FIRREA…preclude[s] suit on a claim that was not first presented to the Receiver."); *see also*, *Brady Dev. Co. v. RTC*, 14 F.3d 998, 1007 (4th Cir. 1994) ("The administrative prerequisite to suit set forth [FIRREA] has been strictly construed and is considered an absolute and unwaivable jurisdictional requirement….") (internal quotation marks and brackets omitted).

In the suit at hand, BOA purports to assert claims on behalf of Ocala. The FDIC moves to dismiss these claims, arguing that neither Ocala, nor BOA on Ocala's behalf, filed an administrative claim with the FDIC, as is required to confer jurisdiction upon this Court. The FDIC asserts that while BOA contends that it filed administrative claims on behalf of Ocala (*i.e.*, the November 19 and December 19, 2009 proofs of claim referenced above in Section II.D.), the claims themselves reveal that they were actually filed on behalf of DB, BNP, and BOA. In support of its argument, the FDIC points to the cover page for each proof of claim on which "claimant" is identified as "BOA as Trustee (as defined in Exhibit A hereto)." (Dkt. No. 20 at Exs. A and C). Exhibit A, in turn, states that the claim is submitted "on behalf of the Secured Parties, as defined in the [Ocala Facility Documents]." (*Id.*). The FDIC asserts that Ocala is not included in the definition of "Secured Parties" under the Ocala Facility Documents. Rather, Ocala is listed as the "Issuer." (*Id.*). The FDIC also maintains that the proofs of claim do not allege damages to Ocala. Instead, the claims only seek recovery for losses allegedly incurred by the Secured Parties. Therefore, the FDIC concludes, the proofs of claim cannot reasonably be read as asserting a claim on behalf of Ocala.

BOA counters that it filed the proofs of claim as a "representative" of Ocala, thereby exhausting Ocala's administrative remedies. BOA asserts that the proofs of claim expressly state that Ocala had granted BOA a security interest in all of Ocala's assets and that BOA was pursuing the claims with the receivership to vindicate BOA's security interest. According to BOA, this representative status is expressly recognized in the definition of "Secured Parties." BOA further asserts that the FDIC had abundant notice not only of the nature of the claims asserted by BOA, but also of the specific relationships among the various Ocala parties and the representative capacity in which BOA was filing the proofs of claim.

BOA also maintains that courts take a "lenient" view in determining whether a claim constitutes notice under FIRREA. According to BOA, neither FIRREA nor the FDIC regulations define the precise form in which a claim must be presented in order to satisfy the administrative exhaustion requirement. (Dkt. No. 35, at 13 (citing *FDIC v. Lacentra Trucking, Inc.*, 157 F.3d 1292, 1304 (11th Cir. 1998); *Branch v. FDIC*, 833 F. Supp. 56, 59 (D. Mass. 1996).). In light of this absence of statutory definition, BOA argues, the D.C. Circuit has construed the term "claim" liberally and used broad latitude in determining whether the claimant has adequately presented a claim in the administrative process. (*Id.* at 14 (citing *Branch*, 833 F. Supp. at 60 ("an administrative claim is sufficient if it provides the government with notice of the general nature of the claim and with sufficient information to allow it to investigate and determine whether settlement of the claim is appropriate")).). Given this "flexible" standard for reviewing claims, BOA argues, the FDIC had enough notice of Ocala's potential claims to satisfy the FIRREA's exhaustion requirement. (*Id.*).

The Court disagrees. A careful reading of the proofs of claim shows that BOA filed the claims on its own behalf and that of DB and BNP—not Ocala. BOA submitted the claims on a

standard "proof of claim" form that is available at the FDIC's website. (Dkt. No. 35 at 13 fn. 3.). In the section of the form left blank for the name of the debtee, BOA entered "Bank of America, National Association, as Trustee (as defined in Exhibit A hereto)."[10] (Dkt. No. 20, Ex. A at 1.). On the section of the form that requests information on whose behalf the claim is filed, BOA entered: "the Trustee *for the [S]ecured [P]arties* on the Ocala Funding, LLC Short Term and Subordinate Notes." (*Id*.) (emphasis added.). BOA again reiterated that it submitted the claims on behalf of itself and the Secured Parties in a footnote to the proof of claim: "The tax ID number shown is for [BOA]. Many of the claims described in this proof of claim, however, are made by [BOA] in its capacity as Trustee *on behalf of the [S]ecured [P]arties* with respect to the Ocala Funding, LLC Short Term and Subordinate Notes." (*Id*. at 1 fn. 1) (emphasis added).

Exhibit A, which is attached to each proof of claim, describes the nature and basis of each claim in more detail. (Dkt. No. 20, Exs. A and C.). In the first paragraph of Exhibit A, BOA explains that it is the "indenture trustee, collateral agent and custodian" with respect to the Ocala Notes. (*Id*. at Ex. A and C to FAC, Ex. A at ¶ 1.). BOA then states that it is acting "*on behalf of the Secured Parties*, as defined in the [Ocala Facility Documents]…" and further states that it submits "Exhibit A to its proof of claim…*on behalf of the Secured Parties*." (Ex. A and C to FAC, Ex. A at ¶ 2) (emphasis added). Finally, BOA states that it filed the receivership claims in order "to preserve *its rights* and *the rights of the [S]ecured [P]arties on whose behalf* it is making the claims set forth in this proof of claim." (*Id*. at ¶ 17) (emphasis added).

The Ocala Facility Documents, in turn, define "Secured Parties" as "…each Swap Counterparty, the Indenture Trustee, the Collateral Agent, the Series 2005-I Depository, the Series 2008-I Depository, the holders of the Short Term Notes, the holders of the Term Notes,

---

[10]     Cynthia A. Grim, Senior Vice President for BOA, is listed as the "person making the claim." (Dkt. No. 20, Ex. A.).

the holders of the Subordinated Notes, the holders of the Extended Notes and the holders of the Non-Called Notes (such Persons, collectively the 'Secured Parties and each a 'Secured Party')." (*See* Dkt. No. 39, Ex. B the *Security Agreement* at fourth WHEREAS clause; *see also* Dkt. No. 39 Ex. C Schedule I to the *Base Indenture Agreement*, at p. 31 (using the same definition for the term "Secured Parties").). On the other hand, the Facility Documents list Ocala as the "Issuer" under the agreements. Therefore, by stating that it is submitting the receivership claims as the "Trustee for the *Secured Parties*" and that is acting "on behalf of the *Secured Parties*," BOA, by definition, is not acting on behalf of Ocala.

Nevertheless, BOA argues that, read as a whole, the proofs of claim clearly indicate that it seeks to recover for "losses incurred by the Ocala [F]acility itself, *including* losses incurred by all investors in the Ocala [F]acility and by BOA itself." (Dkt. No. 35 at 18) (emphasis in original). According to BOA, "[b]y bringing claims 'on the Ocala Funding, LLC Short Term and Subordinate Notes,' *see* Exs. A & C at 1, and pursuant to the security interest granted to it by *Ocala* in *Ocala's assets*, *see id.* at ¶ 3, BOA necessarily sought an administrative remedy for Ocala *and* all parties with interest in the Ocala assets, including Ocala's investors and BOA itself." (*Id.*) (emphasis in original).

The Court is not persuaded. A common sense reading of the proofs of claim shows that they were filed on behalf of entities other than Ocala. Nowhere in the claims does BOA state that it is acting on behalf of Ocala. Instead, the claims repeatedly state that they are being made for, or on behalf of, BOA and the Secured Parties (*i.e.*, DB and BNP). Indeed, in every instance where the claims mention Ocala's alleged property, it is clear that BOA seeks to recover the property for itself and DB and BNP and not for the benefit of Ocala. (*See, e.g.*, Dkt. No. 20, Exs. A and C, Ex. A at ¶ 5(i)-(ii) (asserting a claim to all Ocala property to which the "Trustee has a

security interest" and to which "the Trustee is entitled to be paid in full before other creditors of Colonial Bank").). In short, regardless of BOA's right under the Ocala Facility Documents to exhaust Ocala's administrative remedies, BOA failed to do so.

Nor is the Court persuaded that it must apply a lenient standard in determining whether the proofs of claim were sufficient to exhaust Ocala's administrative remedies. The cases on which BOA relies for this proposition are inapposite and contrary to the law of this Circuit. For instance, the first case on which BOA relies, *Office & Prof'l Emps. Inter'l Union v. FDIC,* 962 F.2d 63 (D.C. Cir. 1992), stands only for the proposition that a representative can make an administrative claim on behalf of another and that such claim will be sufficient to exhaust the administrative remedies of the represented entity. The FDIC has not argued that BOA cannot make an administrative claim on behalf of Ocala; rather, the FDIC argues that BOA *failed* to make such a claim. *Lacentra Trucking, Inc*., is equally inapplicable. In that case, the plaintiff never filed an administrative claim and was absolved by the court of doing so by the Receiver's decision to litigate. *FDIC v. Lacentra Trucking, Inc*., 157 F.3d 1292 (11th Cir. 1998). That is not the case here. Finally, the third case on which BOA relies, *Branch v. FDIC*, is no longer good law. 833 F. Supp. 56 (D. Mass. 1993). *Branch* takes the position that statutory limitations on federal court jurisdiction "are to be construed narrowly," citing *Heno v. FDIC*, 996 F.2d 429, 435 (1st Cir. 1993) *withdrawn and substituted on reh'g by* 20 F.3d 1204 (1st Cir. 1994) for this proposition. *See Branch*, at 60. However, in a subsequent ruling, the First Circuit withdrew the opinion upon which *Branch* relied, and replaced it with an opinion which does not include the language cited in *Branch*. *See Heno v. FDIC*, 20 F.3d 1204 at 1205.

Next BOA argues that even if the proofs of claim were not sufficient to place the FDIC on notice that BOA was bringing a claim on behalf of Ocala, its pre-receivership suit against

Colonial filed in the Southern District of Florida was sufficient to place the FDIC on notice of the claim. This argument is unavailing. The FIRREA administrative exhaustion requirement applies to all claimants, even those that filed pre-receivership suits against failed financial institutions. *See, e.g., Marquis v. FDIC*, 965 F.2d 1148, 1151 (1st Cir. 1992) ("FIRREA makes participation in the administrative claims review process mandatory for all parties asserting claims against failed institutions, regardless of whether a lawsuit to enforce those claims was initiated prior to the appointment of a receiver"); *Brady Development Co., Inc. v. RTC*, 14 F.3d 998, 1002 (4th Cir. 1994) ("litigants who have an action pending in court against a [financial institution] that is subsequently placed in receivership…must avail themselves of FIRREA's administrative process in order to continue the action"); *Intercontinental Travel Mktg., Inc. v. FDIC*, 45 F.3d 1278, 1283 (9th Cir. 1994) (citing *Carney v. Resolution Trust Corp*., 19 F.3d 950, 955-56 (5th Cir. 1994) (the FIRREA "neither creates a separate scheme for cases pending at the time of the FDIC's appointment as receiver, nor allows claimants to pursue administrative and judicial remedies simultaneously")).[11]

Finally, BOA alleges that "repeated communications" between the FDIC and BOA were sufficient to place the FDIC on notice of Ocala's claim. This argument is without merit. A claimant may not exhaust its administrative remedies through communications outside of its proof of claim. *See, e.g., Brady Dev. Co*., 14 F.3d at 1003 (noting that Congress  sought to ensure that all claims undergo the administrative claims process); *Henderson v. Bank of New England*, 986 F.2d 319, 320-21 (9th Cir. 1993) (holding that FIRREA strips all courts of jurisdiction over claims made outside the administrative process of FIRREA); *RTC v. Elman*, 949 F.2d 624, 627

---

[11] BOA's argument is also unavailing because BOA did not sue on behalf of Ocala in the Florida case. Rather, BOA sued in its own name and, despite references to both Ocala and "certain secured parties," BOA demanded that the property at issue be returned to BOA and that BOA be awarded damages.

(2d Cir. 1991) (holding that a claimant must first present its case to the RTC under the administrative procedures erected by FIRREA before seeking relief in federal court).

Again, BOA cites to three inapposite cases in support of its theory: *Plymouth Mills, Inc. v. FDIC*, 876 F. Supp. 439 (E.D.N.Y. 1995); *Heno,* 20 F.3d at 1205; and *Hachikan v. FDIC*, 914 F. Supp. 14 (D. Mass. 1996). *Heno* and *Plymouth Mills* both dealt with cases in which the claimants' claims came into existence after the claims bar date. In *Heno*, the First Circuit approved the FDIC's having permitted late filing by certain claimants whose claims had not come into existence until after the bar date had passed. 20 F.3d at 1209. In *Plymouth Mills*, the claimant had timely filed a proof of claim with respect to some claims, but later attempted to supplement the claim with a letter detailing claims that allegedly occurred after the bar date. 876 F. Supp. at 441. Thus *Heno* and *Plymouth Mills* are inapplicable; BOA does not contend that Ocala's claims came into existence after the relevant claims bar dates. Likewise, *Hachikan* is also inapplicable. In *Hachikan*, the claimant did not file a formal proof of claim, but did file a detailed letter setting forth his claims. 914 F. Supp. at 16. The *Hachikan* court determined that the letter was sufficient notice of a claim. Here, BOA did not submit a claim on behalf of Ocala. Accordingly, based on the foregoing, to the extent that the Amended Complaint purports to state claims on behalf of Ocala, those claims are dismissed.

> ### b.   Whether BOA Has Standing to Bring Claims on Behalf of DB and BNP

Next, the FDIC moves to dismiss the claims that BOA asserts on behalf of DB and BNP. It argues that this Court does not have jurisdiction over those claims because: (1) DB and BNP do not have Article III standing to bring the claims, and (2) BOA did not allege a basis for bringing such claims on behalf of DB and BNP. (Dkt. No. 26 at 12-13.).

### i.    *Whether DB and BNP Have Article III Standing*

As the party invoking federal jurisdiction, BOA bears the burden of establishing standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992); *City of Waukesha v. Envtl. Prot. Agency*, 320 F.3d 228, 233 (D.C. Cir. 2003) (per curiam). In *Lujan*, the Supreme Court set forth the test for Article III standing. *Sierra Club v. Envtl. Prot. Agency*, 292 F.3d 895, 898 (D.C. Cir. 2002) (*citing Lujan*, 504 U.S. at 560). First, DB and BNP must have suffered an injury-in-fact, defined as a harm that is concrete and actual or imminent, not conjectural or hypothetical. *Byrd v. Envtl. Prot. Agency*, 174 F.3d 239, 243 (D.C. Cir. 1999) (citing *Steel Co*., 523 U.S. 83, 103 (1998).). Second, the injury must be fairly traceable to Colonial's or Platinum's alleged conduct. *Id*. Finally, it must be likely that the requested relief will redress the alleged injury. *Id*.

This Circuit has made clear that no standing exists if the plaintiff's allegations are "purely speculative[, which is] the ultimate label for injuries too implausible to support standing." *Tozzi v. Dep't of Health & Human Servs*., 271 F.3d 301, 307 (D.C. Cir. 2001). Nor does standing exist where a court "would have to accept a number of very speculative inferences and assumptions in any endeavor to connect the alleged injury with [the challenged conduct]." *Winpisinger v. Watson*, 628 F.2d 133, 139 (D.C. Cir. 1980). However, a court must also be cognizant of the fact that a motion to dismiss is brought during the initial stages of a case, before discovery has commenced, thus general factual allegations of injury resulting from the defendant's alleged conduct will suffice to support standing. *Sierra Club*, 292 F.3d at 898–99.

The parties dispute whether DB and BNP suffered an "injury-in-fact" that is "fairly traceable" to Colonial's and Platinum's actions. Focusing on the derivative nature of DB and BNP's claims, the FDIC asserts that BOA does not, and indeed, cannot, allege that DB and BNP were directly harmed by Colonial and/or Platinum. Rather, any injury suffered by DB and BNP

is indistinguishable from harm sustained by Ocala, and thus too remote to confer standing. (*See* Dkt. No. 26 at 12 (citing *Assoc. Gen'l Contractors of Calif., Inc. v. Calif. State Council of Carpenters*, 459 U.S. 519, 532, fn. 25 (1983)).).

BOA counters that the "notion that a financial loss of nearly $1.75 billion does not constitute [an] 'injury-in-fact' is absurd." (Dkt. No. 35 at 24.). According to BOA, the injury in fact requirement consistently has been described as a minimalist threshold and that a "massive financial loss" of the sort suffered by DB and BNP necessarily meets this threshold. (*Id.* (citing *Shaffer v. Defense Intelligence Agency*, 601 F. Supp. 2d 16, 23 (D.D.C. 2009).). Moreover, BOA argues, the Amended Complaint is replete with examples of how DB and BNP's injuries are directly traceable to Colonial's and/or Platinum's fraudulent activities. (Dkt. No. 35 at 24.).

The Court concludes that BOA has alleged factual allegations sufficient to state a plausible injury-in-fact to DB and BNP that is fairly traceable to Colonial and Platinum's actions. (*See, e.g.*, Dkt. No. 20 at ¶ 2 ("TBW's, Colonial's, and Platinum's fraud on the Trustee, Ocala Funding, *and the holders of beneficial interests in Ocala Funding*…") (emphasis added); *Id.* at ¶ 64 (alleging that "TBW and Colonial engaged in a scheme to defraud various entities and individuals, *including investors in Ocala Funding*") (emphasis added); *Id.* at ¶¶ 66-68, 74, 78 (describing specific fraudulent transfers from Ocala to Colonial and Platinum); *Id.* at ¶¶ 1,3 (asserting that DB and BNP lost approximately $1.7 billion as a result of TBW's, Colonial's, and Platinum's action).). The standing requirement is meant to ensure that a plaintiff has a "personal stake in the outcome of the controversy as to warrant…federal-court jurisdiction and to justify" a court-imposed remedy. *Warth v. Seldin*, 422 U.S. 490, 498 (1975); *Russell-Murray Hospice, Inc. v. Sebelius*, 724 F. Supp. 2d 43, 53 (D.D.C. 2010) (citing *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 38 (1976). BOA claims that Colonial and Platinum misappropriated the very assets

that secured DB's and BNP's investment in the Ocala Notes. As a result, DB and BNP are out nearly $2 billion. Clearly, DB and BNP have a personal stake in whether the Ocala assets can be recovered from the banks. If the assets can be recovered, DB and BNP stand to recoup at least a portion of their losses. In addition, BOA has sufficiently alleged that the injury would not have occurred but for the banks' challenged conduct. *See Duke Power Company v. Carolina Environmental Study Group, Inc*., 438 U.S. 59, 74-75 (1978) (a plaintiff establishes sufficient causal connection between injury and challenged action if he can make a reasonable showing that the alleged injury would not have occurred "but for" the defendant's challenged conduct). Accordingly, the Court concludes that DB and BNP have standing to assert their claims.[12]

### ii.   *Whether BOA Can Pursue the Claims on Behalf of DB and BNP*

Having concluded that DB and BNP have Article III standing to bring their claims, the Court now must determine whether BOA has standing to bring the claims on their behalf. The FDIC argues that the Amended Complaint does not allege the basis for BOA's "derivative standing on behalf of [DB and BNP]," and, therefore, to the extent that BOA seeks recovery on their behalf, the Complaint must be dismissed for lack of subject matter jurisdiction. (*See* Dkt. No. 26 at 19.).[13] BOA counters that the Ocala Facility Documents, specifically the Indenture Agreement and the Security Agreement, unquestionably give it the right to pursue the claims on behalf of DB and BNP.[14]

---

[12]    Given that DB and BNP are seeking recovery for their damages—not Ocala's—it is not necessary for the Court to determine whether prudential standing requirements have been met.

[13]    The FDIC raises the same argument with respect to Ocala. However, given that the Court has already concluded that the claims filed on behalf of Ocala must be dismissed, *supra* at Section IV.C.(1), it need not address this argument.

[14]    Because the FDIC has framed BOA's authority to bring suit on behalf of DB and BNP as an issue of subject matter jurisdiction, the Court may consider materials outside the pleadings, including the relevant contract provisions, to determine whether it has jurisdiction. *Coalition for Underground Expansion v. Mineta*, 333 F.3d 193, 198 (D.C. Cir. 2003).

The Court finds BOA's position to be correct. Section 3.1 of the Indenture Agreement expressly states that Ocala granted BOA a security interest in all of Ocala's collateral for the benefit of DB and BNP:

> Section 3.1   Security Interest. (a) Pursuant to the Security Agreement, in order to secure [Ocala's] Obligations, [Ocala] has pledged, assigned, conveyed, delivered, transferred and set over to [BOA], for the benefit of the [Secured Parties], and has granted to [BOA] for the benefit of the Secured Parties, a security interest in all of [Ocala's] right, title and interest in and to all of the Collateral assigned to [BOA] pursuant to the Security Agreement.

 (*See* the *Indenture Agreement* at § 3.1; *see also, Security Agreement* at § 4.01.). Section 6.02 of the Security Agreement states that in the event of a default by Ocala:

> [BOA] shall have, with respect to the Assigned Collateral…, in addition to any other rights and remedies which may be available to it at law or in equity or pursuant to this [Security] Agreement…all rights and remedies of a secured party under any applicable version of the Uniform Commercial Code…relating to the Assigned Collateral…

(Security Agreement at § 6.02, second paragraph.). Section 9.2 of the Indenture Agreement requires that in the event of a default, BOA "shall" exercise the rights and remedies available to it under the Security Agreement. Finally, section 9.10 of the Indenture Agreement authorizes BOA to:

> file such proofs of claim…as may be necessary or advisable in order to have the claims of [BOA] allowed in any judicial proceedings relative to [Ocala]…, its creditors or its property, and shall be entitled and empowered to collect, receive and distribute and money or other property payable or deliverable on any such claim.

(*Id*. at § 6.).

These provisions make it clear that BOA has a security interest in the very claims being pursued in this suit. This is sufficient to confer standing on BOA to pursue the present claims on behalf of DB and BNP. *See, e.g., Sprint Commc'ns Co. v. APCC Services, Inc.*, 554 U.S. 269, 285 (2008) (upholding the long tradition of conferring Article III standing on assignees of

claims, even if the party seeking recovery must turn it over to another upon collection); *W.R. Huff Asset Management Co., LLC v. Deloitte & Touch, LLP*, 549 F.3d 100, 107 (2d Cir. 2008) (the assignment of the right to pursue a claim confers standing).

### c.  *Whether Counts IX, X, and XI Have Been Administratively Exhausted under FIRREA*

Next, the FDIC argues that this Court lacks subject matter jurisdiction over BOA's claims against Colonial and Platinum for civil conspiracy and actual and constructive transfer (Counts IX, X and XI) because these claims were not raised in proofs of claim. (Dkt. No. 26 at 14.). BOA concedes that it did not previously raise these claims, but alleges that the proofs of claim were sufficient to place the FDIC on notice of the potential that BOA would bring such claims. BOA argues that not only are the conspiracy and fraudulent transfer claims based on "essentially the same facts and legal theories as those specifically named in the proof[s] of claim, but they seek the same monetary relief." (Dkt. No. 35 at 31.). BOA also points out that the proofs of claim include a catch-all provision that asserts "all other statutory or common law claims that [B]OA may have" against Colonial or Platinum in addition to the specific claims raised in the proofs of claim. (Dkt. No. 20, Exs. A and C at Ex. A.).

Where a complaint alleges entirely new legal theories that are different from those reflected in the administrative proof of claim, the district court is without subject matter jurisdiction. *See Jahn v. FDIC*, 828 F. Supp. 2d 305, 317 (D.D.C. 2011). However, such is not the case here. The proofs of claim in this case detail the facts underlying the civil conspiracy and fraudulent transfer claims. They include allegations of cooperation between Colonial, Platinum, and TBW in furtherance of the fraud, thereby laying the foundation for a claim that the banks and TBW conspired to deprive Ocala of its assets and DB and BNP of their investment. (*See e.g.* Dkt. No. 20, Exs. A and C, Ex. A at ¶¶ 4(c)-(e).). The proofs of claim also contain allegations

that Colonial and Platinum fraudulently caused funds owed to DB and BNP to be diverted into accounts maintained by Colonial and/or Platinum. (*Id.*). These allegations are sufficient to place the FDIC on notice of potential civil conspiracy and fraudulent transfer claims.

### 2. *Whether the Amended Complaint States a Claim for Fraudulent Transfer*

Next, the FDIC argues that even if this Court does not dismiss the fraudulent transfer claims for lack of exhaustion, Counts IX and X must still be dismissed pursuant to Rule 12(b)(6). Count IX asserts that TBW, Colonial, and Platinum, acting in concert, made fraudulent transfers from Ocala accounts at BOA to accounts at Colonial and Platinum with the actual intent to "hinder, delay, and defraud" Ocala and its investors (*i.e.*, DB and BNP). (Dkt. No. 20 at ¶¶ 220-222.). BOA asserts that the transfers were made in furtherance of the conspiracy described herein and that neither Ocala nor DB and BNP received reasonably equivalent value in exchange for the transfers. (*Id.* at ¶¶ 223, 225.) Count X asserts the same allegations, in addition to claiming that TBW, Colonial, and Platinum knew that Ocala was insolvent at the time the transfers were made, or became insolvent as a result of the transfers. (*Id.* at ¶¶ 233-234.). BOA brings both Counts IX and X pursuant to the District's Uniform Fraudulent Transfer Act ("UFTA") as codified in D.C. Code §§ 28-3101-3111 (2001), and seeks to recover the fraudulent transfers on behalf of DB and BNP.[15, 16] (Dkt No. 20 at ¶¶ 219 and 228.).

The FDIC moves to dismiss the claims, arguing that the Amended Complaint does not allege many of the necessary elements for fraudulent transfer claims, thereby running afoul of the pleading requirements under *Iqbal* and *Twombly*. The FDIC maintains that BOA failed to plead facts sufficient to support its contention that the funds transferred from Ocala originated at

---

[15]   BOA also brings the claims on behalf of Ocala, but as discussed *supra*, this Court has determined that Ocala's claims are barred.

[16]   UFTA superseded a District of Columbia statute known as the Uniform Fraudulent Conveyance Act of 1995 (the "UFCA"). The parties dispute whether DC's UFTA statute should govern this dispute or Florida's statue, but also concede that the point is moot as the statutes are identical.

and were the property of Ocala, nor did BOA identify the allegedly fraudulent transfers with sufficient specificity. This alone, the FDIC argues, warrants dismissal of the claims.

However, the FDIC also contends that dismissal of each claim is warranted for the following reasons. It claims that Count IX (actual fraudulent transfer) must be dismissed because BOA failed to meet the heightened pleading requirements of Rule 9(b). In particular, the FDIC asserts that the Amended Complaint does not contain any allegation that BOA was Ocala's creditor, that Ocala made a transfer with the intent to avoid payment of a debt owed to BOA, or that Colonial and Platinum received the transfers. As for the constructive fraudulent transfer claim (Count X), the FDIC urges this Court to dismiss the claim because the Amended Complaint does not allege that BOA was Ocala's creditor, that Colonial and/or Platinum were the transferees, that Ocala did not receive "reasonably equivalent value," or that the transfers left Ocala with insufficient capital or unable to paid its debts.

The main thrust of BOA's response to the FDIC's arguments is that the FDIC has mischaracterized the fraudulent transfer claims, namely suggesting that the claims are only brought on BOA's behalf. BOA points out that it is not relying solely on its position as a creditor of Ocala in its own capacity; rather, the claims were also brought on behalf of DB and BNP as the investors in Ocala. BOA maintains that once the claims are properly characterized, it becomes apparent that the FDIC's motion to dismiss Counts IX and X must be denied. The Court agrees.

In order to state a claim for actual fraudulent transfer under UFTA, a plaintiff must plead that: (1) the debtor (here, Ocala) made a transfer; (2) the plaintiff (*i.e.*, BOA) was a creditor of the debtor (Ocala); and (3) the debtor (Ocala) made the transfer with actual intent to hinder, delay, or defraud any creditor of the debtor (Ocala). *See Bertram v. WFI Stadium, Inc.*, 41 A.3d

1239, 1244 (D.C. 2012) (citing D.C. Code § 28-3104(a)(1)). In order to establish liability for a constructively fraudulent transfer, a plaintiff must plead and prove that: (1) the debtor (Ocala) made a transfer; (2) the plaintiff (BOA) was a creditor of the debtor (Ocala); (3) the debtor (Ocala) did not receive reasonably equivalent value in exchange for the transfer and was insolvent or became insolvent as a result of the transfer. D.C. Code § 28-1305(a).

The Amended Complaint asserts the following factual allegations in support of Counts IX and X: (1) TBW was Ocala's owner and controlled all major decisions and actions for Ocala (Dkt. No. 20 at ¶¶ 55-56); (2) all of Ocala's activities were "directed by TBW" and "in concert with Colonial" (*Id*. at ¶ 62); (3) at all relevant times Platinum was controlled by and acted at the direction of TBW (*Id*. at ¶ 84); (4) TBW and Colonial "engaged in a scheme to defraud…investors in Ocala []" (*Id*. at ¶ 64); (5) TBW, in concert with Colonial, conspired to divert funds from Ocala (*Id*. at ¶ 63); (6) TBW and Colonial "misappropriate[d] over $1 billion in collateral from Ocala" which caused Ocala to "experience[] significant shortfalls in the amount of collateral it possessed to back its obligations to DP and BNP" (*Id*. at ¶¶ 64, 65(h)); (7) TBW and Colonial also engaged in sham mortgage loan sales in order to disguise TBW's cash shortfalls from regulators, auditors, third-party lenders and Ocala's creditors (*Id*. at ¶ 65(g); 85); (8) TBW and Colonial concealed their fraudulent activities from BOA by providing it with falsified collateral lists that misrepresented the status of the Participated Mortgage Loans in which Ocala should have had a security interest (*Id*. at ¶ 65(i)); and (9) the fraudulent activities described above could not have been accomplished without the active participation of each of TBW, Colonial, and Platinum. (*Id*. at ¶ 83.).

The Amended Complaint further alleges that the following specific transfers occurred in furtherance of the fraudulent scheme: (1) between June 30, 2008 and August 3, 2009,

approximately $675 million was transferred from Ocala accounts at BOA to a TBW account at Colonial known as the Custodial Funds Clearing Account (*Id*. at ¶ 66); (2) during this same time, approximately $451 million was transferred from Ocala accounts at BOA to a TBW maintained account at Colonial known as the Master Advance Account (*Id*. at ¶ 67); (3) also during this time period, "billions of dollars" were transferred from Ocala to a TBW account at Colonial referred to as the Investor Funding Account and some of the funds were not used to "purchase mortgages" and therefore "constituted a theft of Ocala assets" (*Id*. at ¶ 68); (4) on March 30, 2009, TBW, Colonial and Platinum caused $25 million to be wired from the Ocala Funding Collateral Account (#722493.4) at BOA to an unnamed account (Account #0030270065) at Platinum (*Id*. at ¶¶ 74-75); (5) on April 3, 2009, these same entities caused another $25 million to be transferred from the Ocala account at BOA to the same unnamed account at Platinum (*Id*. at ¶¶ 74, 76); Account #0030270065 was an escrow account set up at Platinum by TBW and Colonial as part of their fraudulent scheme to obtain TARP funds (*Id*. at ¶ 77); (6) on October 3, 2008, another $12,239,697.21 was wired from the Ocala Funding Collateral Account at BOA to Platinum; the funds from this deposit were used to purchase mortgages for the benefit of TBW (*Id*. at ¶ 78).

These allegations are more than sufficient to plausibly state a claim for both actual and constructive fraudulent transfer. Only two of the FDIC's arguments for dismissal warrant discussion. First, the FDIC contends that Counts IX and X are deficient because BOA does not allege any facts that indicate that the purported transfers from Ocala were for the benefit of Colonial and Platinum. Instead, the FDIC argues, the Amended Complaint alleges that the funds were transferred to TBW accounts held at Colonial and Platinum. Because TBW and not

Colonial or Platinum controlled the accounts, the FDIC argues, liability cannot be imposed on the banks.

The FDIC fails to cite any authority in support of its position. However, the Court's own research shows that a majority of courts interpreting state UTFA statutes have declined to impose liability for fraudulent transfers on third parties who did not receive the assets in question. *Magten Asset Mgmt. Corp. v. Paul Hastings Janofsky & Walker LLP*, No. 04-1256-JJF 2007 WL 129003, *3 (D. Del. Jan. 12, 2007) (interpreting Montana's UTFA statute); *see also GATX Corp. v. Addington*, __ F. Supp. 2d __, No. 11-122-DLB, 2012 WL 1621363, *8 (E.D. Ky. May 9, 2012) (noting that district courts interpreting state UFTA statues in Delaware, Arizona, Indiana, Maine and Texas have concluded that liability cannot attach to non-transferees); *Mack v. Newton*, 737 F.2d 1343, 1358 (5th Cir. 1984) (recognizing that holding nontransferee liable for fraudulent transfer is inconsistent with purpose of fraudulent transfer statutes which is to "preserve the assets of the bankrupt" and not "to render civilly liable all persons who may have contributed in some way to the dissipation of those assets"); *Robinson v. Watts Detective Agency, Inc.*, 685 F.2d 729, 737 (1st Cir. 1982) (finding no liability because neither defendant received any of the fraudulently transferred property); *Jackson v. Star Sprinkler Corp. of Fla.*, 575 F.2d 1223, 1234 (8th Cir. 1978) (holding that "recovery under the Bankruptcy Act does not extend to permit a judgment against 'conspirators' who did not receive the property transferred").

The FDIC does not cite and this Court is unable to locate a case in which a court interpreting the District's UFTA statute has addressed this issue. However, BOA has provided no reason for this Court to deviate from the consistent conclusion of the other states that non-transferees may not be liable for aiding and abetting a fraudulent conveyance.[17] The Court has reviewed the Amended Complaint and agrees with the FDIC that BOA never alleged that either

---

[17] Indeed, BOA failed to respond to this argument in its opposition to the FDIC's motion.

Colonial or Platinum received the transfers. (*See, e.g.*, Dkt. No. 20 ¶¶ 36-38, 66-68 (alleging that the funds were transferred to TBW owned accounts at Colonial); 74-77 (alleging funds were deposited at Platinum but failing to allege that the funds were in Platinum's control); 78 (alleging funds were deposited at Platinum and used for TBW's benefit).).

However, at oral argument, BOA referred the Court to the Final Reconciliation Report filed by the Chief Restructuring Officer in the TBW bankruptcy. The Report indicates that Colonial and Platinum indeed had control of and benefited from the transfers. (*See* FRR at p. 82, Table 10.). The Report also indicates that some of the TBW accounts at Colonial were under the banks' control. (*Id.* at p. 56 (stating that while the accounts were in TBW's name, TBW did not have signature authority over them).)**.** In light of this, the Court finds that BOA has alleged sufficient factual allegations to state a plausible claim that Colonial and/or Platinum benefited from the alleged fraudulent transfers. The parties may revisit this issue if discovery proves otherwise.

Second, the FDIC argues that the fraudulent transfer claims are deficient because BOA does not allege that Ocala intended to defraud its creditors or even caused the transfers to happen; rather, BOA alleges that TBW directed the transfers. This argument is without merit. Courts have routinely held that, where the transferee controls the disposition of the debtor's property, as TBW did here, the fraudulent intent of the transferee may be imputed to the debtor. *See, e.g., In re Acequia, Inc.*, 34 F.3d 800, 806 (9th Cir. 1994); *Schoenmann v. FDIC*, No. 10-03989 CRB, 2011 WL 1522364, *6 (D. Cal. Apr. 21, 2011); *In re Chase & Sanborn Corp.*, 51 B.R. 739, 740-41 (S.D. Fla. 1985) ("The extensive and often circuitous movement of funds among the several entities controlled by [the debtor's principal], to his personal benefit…and to the injury of this debtor, …[establish an] actual[] intent to hinder, delay and defraud this debtor's

creditors.") Here, BOA alleges that TBW was the entity in control of Ocala and exclusively controlled its actions. Such allegations are sufficient to state a plausible claim that TBW's fraudulent intent may be imputed to Ocala.

Based on the foregoing, the Court concludes that BOA has alleged facts sufficient to state plausible claims for both actual and constructive fraudulent transfer. Accordingly, the FDIC's motion to dismiss Counts IX and X is denied.

### 3. *Whether the Amended Complaint Pleads Fraud with the Requisite Specificity*

The FDIC next argues that Count V must be dismissed because BOA failed to meet the heightened pleading requirements of Fed. R. Civ. P. 9(b). "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). To state a claim for fraud, a plaintiff must allege the following elements with particularity: "(1) a false representation, (2) made in reference to a material fact, (3) with knowledge of its falsity, (4) with the intent to deceive, and (5) an action that is taken in reliance upon the representation." *In re Estate of McKinney*, 953 A.2d 336, 342 (D.C. 2008) (citation omitted). Motions to dismiss for failure to plead fraud with sufficient particularity are evaluated in light of the overall purposes of Rule 9(b), which is to "ensure that defendants have adequate notice of the charges against them to prepare a defense[,]" *United States ex rel. McCready v. Columbia/HCA Healthcare Corp.*, 251 F. Supp. 2d 114, 116 (D.D.C. 2003), to discourage "suits brought solely for their nuisance value" or as "frivolous accusations of moral turpitude[,]" *United States ex rel. Joseph v. Cannon*, 642 F.2d 1373, 1385 (D.C. Cir. 1981), and to "'protect reputations of ... professionals from scurrilous and baseless allegations of fraud,'" *id*. at 1385 n. 103 (alteration in original) (quoting *Felton v. Walston & Co., In*c., 508 F.2d 577, 581 (2d Cir. 1974)).

"[A]lthough Rule 9(b) does not require plaintiffs to allege every fact pertaining to every instance of fraud when a scheme spans several years, defendants must be able to 'defend against the charge and not just deny that they have done anything wrong.'" *United States ex rel. Williams v. Martin-Baker Aircraft Co., Ltd*., 389 F.3d 1251, 1259 (D.C. Cir. 2004) (quoting *United States ex rel. Lee v. SmithKline Beecham, Inc*., 245 F.3d 1048, 1052 (9th Cir. 2001)); *accord McCready*, 251 F. Supp. 2d at 116 (reasoning that a court "'should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which she will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts'" (quoting *Harrison v. Westinghouse Savannah River Co*., 176 F.3d 776, 784 (4th Cir.1999))).

In Count V, BOA alleges that Colonial actively concealed its own financial condition, as well as the financial condition of TBW and Ocala, and that these misrepresentations allowed the fraudulent scheme to continue undetected for at least seven years. (Dkt. No. 20 at ¶¶ 170, 172.). BOA maintains that in its capacity as Indenture Trustee, Custodian, and Collateral Agent under the Ocala Facility Documents, it reasonably relied on Colonial's misstatements and omissions to its own financial detriment and to the financial detriment of DB and BNP. (*Id*. at ¶¶ 64-65, 171, 176.). According to BOA, but for Colonial's acts, Ocala would not have issued the Ocala Notes, thereby allowing TBW and Colonial to steal the proceeds from the Notes, and leaving DB and BNP to bear the loss. (*Id*. at ¶ 176.).

The factual allegations set forth in the Amended Complaint that support Count V are as follows: (1) TBW and Colonial conspired to divert funds from Ocala to cover the monetary shortfalls TBW was experiencing (Dkt. No. 20 at ¶ 63); (2) executives at Colonial have admitted that from late 2003 through August 2009, TBW and Colonial engaged in a scheme to defraud

Ocala (*Id.* at ¶ 64); (3) this scheme defrauded third party lenders and creditors of billions of dollars, including Ocala (*Id.* at ¶ 65(g)); (4) Colonial provided materially false information to the FDIC and other regulators in order to conceal evidence of its fraudulent activity (*Id.* at ¶ 70); (5) Colonial, with its co-conspirators, diverted $50 million from an Ocala account at BOA (*Id.* at ¶ 74); (6) in March and April 0f 2009, Colonial and its co-conspirators used $12,239,697.21 of Ocala funds to purchase assets for the benefit of TBW (*Id.* at ¶ 78); and (7) Colonial made numerous misrepresentations to regulators, including materially false filings with the Securities and Exchange Commission that concealed the theft of Ocala's assets (*Id.* at ¶ 82).

In further support of its claim for fraud against Colonial, BOA incorporates by reference the June 15, 2010 indictment of Farkas (TBW's former chairman), the Government's June 16, 2010 Motion for Pre-Trial Detention of Farkas, and the Statements of Facts from the criminal proceedings involving Catherine Kissick (the former Senior Vice President of Colonial) and Teresa Kelly (the former Operations Supervisor in Colonial's Mortgage Warehouse Lending Division). (Dkt. No. 20 at ¶ 64 fn. 6.). BOA asserts that these documents make clear that Colonial executives knew that in April 2005, Ocala funded $200 million in ineligible loans for TBW and were also aware that the same funds were being "shipped" back and forth in order to give the appearance that debt was being eliminated. (*Id.* at ¶ 90(b), (e).).

The Court concludes that BOA has pled the fraud claim with sufficient particularity to survive the FDIC's motion to dismiss. The underlying basis of this claim is a massive fraud that TBW and Colonial employees admit to endeavoring to hide for years. BOA claims that it does not have all of the documents necessary to fully set forth the claims (many, it asserts, are in the possession of the FDIC). (*Id.* at ¶ 2.). It may be that after discovery, BOA will not be able to substantiate this claim. However, at this stage of the proceedings, BOA has sufficiently pled the

claim so as to give the FDIC adequate notice of the charges against it in order to prepare a defense, thereby satisfying the purpose of Rule 9(b). *See McCready*, 251 F. Supp. 2d at 116. Accordingly, the FDIC's motion as to Count V is denied.

      **C.     BOA's Motion to Dismiss the FDIC's Counterclaims**

      The FDIC claims that 4,808 Participated Mortgage Loans were purchased by Ocala off of the Colonial COLB, but that Colonial never received payment for its 99% ownership interest in those Loans. (*Id*. at ¶ 39.). These 4,808 Loans are the subject matter of the FDIC's Counterclaims against BOA. (*Id*.).

      As discussed previously at Section II.A., Ocala was intended to function in the following manner: Colonial would send its Participated Mortgage Loans to BOA (in BOA's capacity as the Custodian of the Loans under the Custodial Agreement); the Ocala Facility would purchase Colonial's ownership interest in the Loans from the COLB Facilities; after BOA sent Colonial the purchase amount for its ownership interest in the Loans from Ocala's collateral account at BOA, Ocala would be the owner of the Loans; the Loans would then be applied as collateral for the Ocala Notes; next, Ocala would sell the Loans to Freddie Mac; after Freddie Mac purchased the Loans, the purchase funds (from Freddie Mac) would be sent back to Ocala's collateral account at BOA and would serve as either collateral for the Ocala Notes or as capital with which Ocala could purchase more Loans from the Colonial COLB Facilities. (Dkt. No. 25 at ¶ 40.).

      The FDIC alleges that in certain instances commencing around December 2008, the payments were not made to Colonial (as outlined above); instead, BOA would receive the Loans from Colonial, and upon instructions from TBW, would pledge them as collateral and sell them to Freddie Mac, all without payment to Colonial. (*Id*. at ¶ 43.). The FDIC further asserts that in transmitting the Loans to Freddie Mac in these instances, BOA would sign a document (the

"Form 996Es") stating that it had the exclusive right to sell them, thus denying the existence of Colonial's ownership interest. (*Id.* at ¶ 44.).

The FDIC asserts that although Colonial eventually received payment for the Loans (other than the 4,808 Loans) in these instances, it was not paid until after BOA had effectively stripped Colonial of its ownership interest in the Loans. (*Id.* at ¶ 45.). The FDIC further claims that Colonial was unaware of BOA's actions because it typically received payment for the Loans within an appropriate period of time. (*Id.* at ¶ 46.). However, BOA's conduct was revealed when Colonial closed on August 14, 2009 and 4,808 Loans had been purchased by Ocala off of the COLB Facilities, for which Colonial was never paid. (*Id.* at ¶ 47.).

The FDIC asserts sixteen Counterclaims. (*See* Dkt. No. 25.). The first five causes of action are based on BOA's alleged breach of the Custodial Agreement between it, Colonial and TBW (Counts 1 through 5). (*Id.* ¶¶ at 46–92.) The next seven claims are based on BOA's alleged violation of the terms of the Bailee Letters that were used to transfer the Participated Mortgage Loans from Colonial to BOA (Counts 6 through 12). (*Id.* at ¶¶ 93-103.). The FDIC's final four Counterclaims sound in tort (Counts 13 through 16). (*Id.* at ¶¶ 134-154.). The FDIC alleges that BOA breached its duty of care as Colonial's agent, as well as its fiduciary duties of care and loyalty, by pledging the Loans as collateral for the Ocala Notes and then selling them to Freddie Mac without first ensuring that Colonial was paid. The FDIC also asserts that BOA breached its duty of care under a common law bailment by encumbering the loans, executing the Form 996Es, and selling the Loans to Freddie Mac, again without first ensuring that Colonial was paid.

BOA moves to dismiss each of the FDIC's Counterclaims. First, it argues that the claims for breach of the Custodial Agreement and Bailee Letters must be dismissed pursuant to exculpatory clauses in the Custodial Agreement. Second, BOA argues that each of the claims for

breach of the Custodial Agreement are independently subject to dismissal because the FDIC failed to allege violations of any specific contract provisions. Next, BOA argues that the claims based on breach of bailment fail because they are based on Bailee Letter provisions that are inconsistent with the Custodial Agreement. Lastly, BOA argues that the tort claims fail as a matter of law because: (1) the Custodial Agreement expressly limits BOA's liability; (2) the Custodial Agreement shelters BOA from liability for claims based on something other than the Custodial Agreement; (3) the Economic Loss Doctrine bars each of the tort claims as a matter of law; (4) the Custodial Agreement expressly limits BOA's liability to acts of gross negligence; and (5) the Custodial Agreement expressly disclaims any fiduciary duty. The Court will address each of BOA's arguments in turn.

### 1.   Whether the Counterclaims are Barred by the Exculpatory Clauses

The Custodial Agreement between BOA, TBW, and Colonial contains the following two provisions:

> [10.]A.   Limitation of Liability. *Neither [BOA]* nor any of its directors, officers, employees or agents…*shall be liable for any action taken or omitted to be taken by it or them under or in connection with this Agreement or the Participated Mortgage Loans, except for its or their own gross negligence or willful misconduct, breach of this Agreement by [BOA] that constitutes bad faith or a material breach* that is not cured within 10 days of notice from the other parties or if such breach is a of [SIC] a nature that is not unable [SIC] within such 10-day period and [BOA] is diligently and in good faith working on curing same, then within 30 days of such notice or within such other reasonable period, *or other malfeasance by [BOA] hereunder. The duties of [BOA] hereunder shall be mechanical and administrative in nature and nothing in this Agreement or any of the Participated Mortgage Loans, express or implied, is intended to or shall be so construed as to impose upon [BOA] any obligations in respect of this Agreement or any of the Participated Mortgage Loans except as expressly set forth herein.* Subject to the foregoing, in performing its functions and duties hereunder on behalf of [Colonial] and/or [TBW], [BOA] shall not (a) be responsible in any manner to [Colonial] or the [TBW] for the effectiveness, enforceability, genuineness, validity, due execution, collectability, priority or sufficiency of this Agreement or any of the Participated Mortgage Loans, or for any recital, representation, warranty,

document, certificate, report or statement herein or therein made or furnished under or in connection with this Agreement or the Participated Mortgage Loans, or for the sufficiency of the Collateral or the validity, perfection or priority of any security agreement on the part of [TBW], or the financial condition of [TBW] or the existence or possible existence of any event of default under any such loan or security agreement or any other document or agreement of [TBW] or [Colonial]. *[BOA] shall act as the agent of [Colonial] and [TBW] in performing its obligations as Custodian hereunder and with respect to the Participated Mortgage Loans and nothing herein contained shall be deeded to create a fiduciary relationship among or between [BOA], [TBW] or [Colonial].*

. . .

11.   <u>LIMITATION ON OBLIGATIONS OF CUSTODIAN</u>. *[BOA] agrees to act* in accordance with any direction given it pursuant to this Agreement *in good faith in the performance of any obligations and duties required pursuant to this Agreement and shall incur no liability to [Colonial] or [TBW] for any acts or omissions on the part of [BOA] except as may result from [BOA]'s gross negligence or willful misconduct occurring in connection with the performance of the duties, responsibilities and obligations to be performed by [BOA] under this Agreement.* [BOA] shall also be entitled to rely upon any notice, document, correspondence, request or directive received by it from [Colonial] or [TBW], as the case may be, which [BOA] believes to be genuine and to have been signed or presented by the proper and duly authorized officer or representative thereof, and shall not be obligated to inquire as to the authority or power of any Person so executing or presenting such documents or as to the truthfulness of any statement set forth therein. *[BOA] shall have no duties or responsibilities to [TBW] or [Colonial] except as expressly provided in this Agreement or by law or by any other agreements to which [BOA] is a party*, and [BOA] shall not be obligated to recognize, nor have any liability or responsibility to, [Colonial] or [TBW] under any instrument to which [BOA] is not a party.

(*Custodial Agreement* at ¶¶ 10A, 11, attached as Ex. A  Myles Decl., Dkt. No. 36-2) (emphasis added).

BOA argues that the above language forms an exculpatory provision that precludes the FDIC's claims for breach of the Custodial Agreement and/or Bailee Letters. (Dkt. No. 43 at 2.). BOA contends that the exculpatory language limits BOA's liability to instances of gross negligence, willful misconduct, material breach, bad faith, or "other malfeasance," and precludes

liability for "material breach" unless the parties have given BOA notice of the breach and an opportunity to cure, all of which, BOA asserts, the FDIC failed to plead in its Counterclaims. (Dkt. No. 43 at 3 (citing the *Custodial Agreement* at ¶ 10A). BOA concedes that the language in paragraph 10A "is more specific" than that of paragraph 11, but argues that both paragraphs preclude liability "under the circumstances" alleged in the Counterclaims. (*Id*. at 3.). According to BOA, the exculpatory language "could not be clearer or less equivocal." (Dkt. No. 36 at 14.).

Under Florida law, [18] exculpatory clauses are disfavored and strictly construed against the party claiming to be relieved from liability. *Murphy v. Young Men's Christian Ass'n of Lake Wales, Inc*., 974 So. 2d 565, 567-68 (Fla. Dist. Ct. App. 2008); *see also, Hackett v. Grand Seas Resort Owner's Ass'n Inc*., 93 So. 3d 378, 380 (Fla. Dist. Ct. App. 2012) (noting that exculpatory clauses are disfavored). "Such clauses are enforceable only where and to the extent that the intention to be relieved was made clear and unequivocal in the contract, and the wording must be so clear and understandable that an ordinary and knowledgeable party will know what he is contracting away." *Murphy*, 974 So. 2d at 568 (quoting *Southworth & McGill, P.A. v. S. Bell Tel. and Tel. Co*., 580 So. 2d 628, 634 (Fla. Dist. Ct. App. 1991)); *see also, Dynair Tech of Fla. v. Cayman Airways Ltd*, 558 So. 2d 30, 32 (Fla. Dist. Ct. App. 1989) (holding that exculpatory clauses had "no force and effect" because they contradicted each other).

The FDIC argues that the exculpatory language in question here is anything but clear. Indeed, according to the FDIC, the exculpatory language is unenforceable because the language contained in both paragraphs 10A and 11 is unclear and contradictory, thereby making it impossible for this Court to ascertain the parties' intent. The FDIC also points to other alleged contradictions between provisions in the Custodial Agreement. For instance, the FDIC alleges,

---

[18] The parties agree that Florida law governs the Counterclaims for purposes of this motion. (*See* the *Custodial Agreement* at § 17A).).

on the one hand, the Custodial Agreement requires BOA to "exercise reasonable care in the custody and preservation" of Colonial's loans, but on the other hand, it purports to release BOA for its failure to exercise such care with respect to the Loans. (Dkt. No. 41 at 8 (citing the *Custodial Agreement* at ¶¶ 4D, 11).).

The Court finds that, viewing the facts in the light most favorable to the FDIC as it is required to do, the exculpatory language in the Custodial Agreement is simply too ambiguous to be "so clear and understandable that an ordinary and knowledgeable person will know what he is contracting away." *Murphy*, 974 So. 2d at 568. First, the Court does not find—as BOA urges it to do—that paragraph 10A shelters BOA from liability except for actions constituting gross negligence, willful misconduct, and bad faith, or for an uncured material breach.  Paragraph 10A actually opens BOA up to far greater liability:

> [BOA]…shall [not] be liable for any action taken or omitted to be taken by it…in connection with this Agreement or the Participated Mortgage Loans, expect for [BOA's]… own gross negligence or willful misconduct, breach of this Agreement…that constitutes bad faith or a material breach that is not cured within 10 days of notice…, *or other malfeasance by [BOA] hereunder.*

(*Custodial Agreement* at ¶ 10A.) (emphasis added). The term "other malfeasance" as used in paragraph 10A is undefined and is simply too broad to constitute "clear and unequivocal" notice of what Colonial contracted away when it entered into the Custodial Agreement. Under Florida law, "malfeasance" means the commission of some act that is unlawful. *See, e.g., Bent v. Ballantyne*, 368 So. 2d 351, 353 (Fla. 1979) (defining malfeasance as the "commission of some act which is positively unlawful," citing *Black's Law Dictionary* 1109 (rev. 4th ed. 1968)); *Thompson v. Napotnik*, 923 So. 2d 537, 540 (Fla. Dist. Ct. App. 2006) (defining malfeasance in the context of recall petitions); *Moultrie v. Davis*, 498 So. 2d 993, 995 (Fla. Dist. Ct. App. 1986) (same). Whatever its meaning, the term "malfeasance" is certainly broad enough to include the

allegations brought in the FDIC's Counterclaims. In fact, it is difficult to imagine a more broadly defined scope of liability.

In addition, there is the nonsensical sentence in paragraph 10A (and repeated in section D of the same paragraph):

> a material breach that is not cured within 10 days of notice from the other parties *or if such breach is a of a [SIC] nature that is not unable [SIC] within such 10-day period* and Custodian is diligently and in good faith working on curing same, then within 30 days of such notice or within such other reasonable period….

(*Custodial Agreement*, ¶ 10A.) (emphasis added). It is clear that the sentence, "if such breach is a of a nature that is not unable within such 10-day period," contains several clerical errors. The clerical errors render the sentence unintelligible. This is significant because the sentence is meant to set forth one of the exceptions to the limitation on BOA's liability, a limitation that is meaningless due to its unintelligibility.

Likewise, the exculpatory language in paragraph 11 is ambiguous. BOA argues that paragraph 11 limits its liability to breaches for gross negligence and/or willful misconduct, but a careful reading of paragraph 11 shows that it actually opens the door to much greater liability. The last sentence of paragraph 11 states:

> "[BOA] shall have no duties or responsibilities to [TBW] or [Colonial] except as expressly provided in this Agreement *or by law or by other agreements to which [BOA] is a party*…."

(*Custodial Agreement*, ¶ 11.) (emphasis added). By imposing on BOA any duties or responsibilities provided "by law or by other agreements to which [BOA] is a party," this sentence can reasonably be interpreted as leaving BOA's liability open to limitless possibilities.

The question before the Court is whether the language attempting to limit BOA's liability is "so clear and understandable that an ordinary and knowledgeable person will know what he is

contracting away." *Cain v. Banka*, 932 So. 2d 575, 578 (Fla. Dist. Ct. App. 2006). That is not the case here. Accordingly, the Court determines that the exculpatory language in paragraphs 10A and 11 is ambiguous and, therefore, unenforceable.[19]

### 2. *Whether the Counterclaims State a Claim for Breach of the Custodial Agreement*

Having determined that the FDIC's Counterclaims based on BOA's alleged breach of the Custodial Agreement are not barred by the Agreement's exculpatory provisions, the Court must now determine whether Counts 1 through 5 allege factual allegations sufficient to survive BOA's motion to dismiss for failure to state a claim.

### a. *Counterclaim 1*

Count 1 pertains to BOA's alleged obligations under paragraph 4B of the Custodial Agreement. Paragraph 4B provides as follows:

> [4]B.       Possession of Mortgage Files. Following [BOA's] receipt of each Mortgage File…, *[BOA] shall retain possession and custody thereof solely for the exclusive use and benefit of [Colonial] and [TBW] (to the extent of their respective ownership interests in the Participated Mortgage Loans) as the agent and bailee of [Colonial] and [TBW], and for purposes of perfecting [Colonial's] and [TBW's] ownership interest in the Participated Mortgage Loans and the related Mortgage File* as contemplated by the Uniform Commercial Code of the State of Florida or other jurisdiction or such other applicable jurisdiction in effect and adopted thereby (*it being understood that [BOA] has no responsibility to ensure such perfection or compliance with state law*)…[BOA] shall segregate and maintain continuous custody of all mortgage documents constituting the Mortgage File in secure and fire-resistant facilities in accordance with customary standards for such custody.

(*Custodial Agreement* at ¶ 4B.) (emphasis added.). The FDIC alleges that, pursuant to this provision, BOA was obligated to hold the Participated Mortgage Loans for the exclusive use and benefit of Colonial and for the purpose of perfecting Colonial's ownership interest in said Loans.

---

[19]       The court also notes that the Custodial Agreement required BOA to carry "errors and omissions insurance," something that appears to further contradict BOA's suggestion that the parties intended to substantially limit BOA's liability exposure. (*See* the *Custodial Agreement* at ¶ 15.).

(Dkt. No. 25 at ¶ 68.). The FDIC claims that BOA breached this obligation with respect to the 4,808 Participated Mortgage Loans because it failed to hold the Loans for Colonial's exclusive use, and engaged in acts that were inconsistent with "the purposes of perfecting Colonial's ownership interests in these [Loans]." (*Id.* at ¶ 69.).

BOA argues that Count 1 must be dismissed because the claim improperly relies on the premise that BOA owed an exclusive duty to Colonial, when in fact, it owed a duty to both Colonial and TBW. (*See* Dkt. No. 36 at 16.). According to BOA, the Counterclaims allege that it collateralized and sold the Loans "upon instructions from TBW." (*Id.* (citing Dkt. No. 25 at ¶ 43.). BOA asserts that because it owed the same duties to Colonial and TBW under paragraph 4B, it cannot have breached "its duties to the one by acting on instructions from the other." (*Id.*). As such, BOA argues Count 1 must be dismissed.[20]

In response, the FDIC contends that the fact that BOA owed duties to TBW under the Custodial Agreement in addition to those it owed to Colonial is irrelevant as to whether BOA breached its obligations to Colonial. According to the FDIC, BOA mischaracterizes Count 1. The FDIC asserts that it does not claim that BOA breached its duties to Colonial by following TBW's instructions; rather, it alleges that Colonial should have received payment for the 4,808 loans before BOA collateralized the Loans and sold them to Freddie Mac. (*See* Dkt. No. 41 at 22 (citing Dkt. No. 25 at ¶ 42).).

The Court agrees. Count 1 must be read in context with the rest of the Counterclaims, which unequivocally allege that BOA failed to ensure that Colonial received payment for the 4,808 Loans before they were pledged as collateral for the Ocala Notes and ultimately sold to

---

[20] BOA also argues that paragraph 11 of the Custodial agreement absolves it of liability for any action it takes pursuant to "any direction given it pursuant to [the Agreement]." (*Id.* at 17 (citing the *Custodial Agreement* at ¶ 11.). As this Court has already determined that the exculpatory provisions in paragraph 11 are unenforceable, this argument is unavailing.

Freddie Mac. (*See* Dkt. No. 25 at ¶¶ 36, 39, 43-49.).  While not the most artfully pled allegation, Count 1 need not be read as BOA would have the Court read it (*i.e.*, that BOA owed an exclusive duty to Colonial), a claim that would not be supported by paragraph 4B. Count 1 is more logically read to assert that BOA was obligated to hold the Loans for the exclusive use and benefit of Colonial with respect to Colonial's 99% ownership interest in the Loans. Indeed, paragraph 4B states as much: "[BOA] shall retain possession and custody thereof solely for the exclusive use and benefit of [Colonial] and [TBW] (*to the extent of their respective ownership interests in the Participated Mortgage Loans*)...." (Custodial Agreement at ¶ 4B) (emphasis added). This Court is obligated to view the allegations in the Counterclaims in the light most favorable to the FDIC. Given this standard, and in light of the remaining allegations in the Counterclaims, the Court concludes that Count 1 states a plausible claim upon which relief may be granted. Therefore, BOA's motion to dismiss Count 1 is denied.

###    b.   *Counterclaim 2*

Again citing paragraph 4B of the Custodial Agreement, Count 2 alleges that BOA was obligated to segregate and maintain continuous custody of any mortgages documents associated with a Participated Mortgage Loan that was transferred to BOA. (Dkt. No. 25 at ¶ 73.). The FDIC alleges that BOA failed to meet this obligation. (*Id*. at ¶ 74.). BOA argues that Count 2 must be dismissed because paragraph 4B simply instructs it on how to store the mortgage documents during the time that they are in its custody. (Dkt. No. 36 at 17-18 (noting that paragraph 4B requires BOA to store the documents in "secure and fire-resistant facilities in accordance with customary standards for such custody.). BOA accuses the FDIC of reading into this provision a requirement that does not exist—namely, that BOA maintain custody of the documents "in perpetuity." (*Id*. at 18.).

In response, the FDIC argues that the Counterclaims allege that BOA was required to segregate the loans in order to "protect Colonial's ownership interest and that BOA failed to perform as promised." Count 2, itself, makes no such allegation. However, the claim incorporates the allegations contained in Count 1, which do make such an allegation. (Dkt. No. 25 at ¶ 72.). And, as this Court determined above, paragraph 4B plausibly supports such assertions. Accordingly, BOA's motion to dismiss is denied as to Count 2.

### c.   Counterclaim 3

In Count 3, the FDIC alleges that paragraph 4D of the Custodial Agreement obligated BOA to exercise reasonable care in the custody and preservation of the items that it received from Colonial, and that BOA failed to fulfill this obligation with respect to the Participated Mortgage Loans. (Dkt. No. 25 at ¶¶ 78-79.). Paragraph 4D of the Custodial Agreement reads as follows:

> D.   Care of Collateral. *[BOA] shall exercise reasonable care in the custody and preservation of the Collateral in its possession to the extent required by statutes* and in any event shall be deemed to have exercised reasonable care if it (i) takes such action for that purpose as [Colonial] shall reasonably request in writing (but no omission to comply with any request of [Colonial] shall of itself be deemed a failure to exercise reasonable care), or (ii) exercises at least the same degree of care as it would exercise with respect to a like transaction in which it alone is interested.

(*Custodial Agreement* at ¶ 4D) (emphasis added). BOA argues that Count 3 must be dismissed because paragraph 4D only requires it to exercise reasonable care "to the extent required by applicable statute," and the FDIC does not allege that BOA failed to comply with "any statutory duty of care." (Dkt. No. 36 at 19.). In other words, BOA argues, because the FDIC's claims rest on a provision that can be breached only be violating a statute, the FDIC must identify what statute it allegedly breached.

The FDIC counters that it is not required to reference a specific statute in its pleadings in order to survive a motion to dismiss. Citing *Skinner v. Switzer*, 131 S. Ct. 1289 (2011), the FDIC argues that the Federal Rules of Civil Procedure do not require that a complaint pin a plaintiff's claim to relief to a precise legal theory. (Dkt. No. 41 at 25.). The Court finds *Skinner v. Switzer* inapplicable. The FDIC gives no indication whatsoever of which statute BOA allegedly ran afoul. In the absence of a statute, the Court must dismiss the claim. If the FDIC does have a statute on which it relies for this claim, it may move to amend the Counterclaims. In the meantime, Count 3 is dismissed for failure to state a claim upon which relief may be granted.

### d.   *Counterclaim 4*

Citing paragraph 7A of the Custodial Agreement, the FDIC alleges in Count 4 that BOA breached its duty to return to Colonial any Participated Mortgage Loan that was not purchased within six business days of BOA's receipt of the Loan. BOA argues that this claim must be dismissed because it had no duty to act under paragraph 7A unless and until instructed to do so by TBW.

Paragraph 7A states:

7.   <u>RELEASE OF COLLATERAL</u>

A.   <u>Release of Collateral to [TBW] or its Designee</u>. [BOA] shall…*upon receipt from [TBW] of a Request for Release of Documents and Receipt release any Collateral specified in such request and [BOA] shall thereupon cause delivery of the same to [TBW] or its designee*. Any such Request for Release of Documents and Receipt shall be subject to the prior approval of [Colonial], at its sole and absolute discretion. In the event that a Participated Mortgage Loan is not purchased by Ocala within 6 Business Days from receipt of the related Mortgage file, *[TBW] shall request, and [BOA] shall deliver*, such Mortgage File to [Colonial].

(*Custodial Agreement* at ¶ 7A.) (emphasis added). As BOA correctly points out, the FDIC did not allege in the Counterclaims that TBW ever issued a request for a release of an outstanding

Participated Mortgage Loan. Apparently conceding this point, the FDIC attempts to avoid the ramifications of this failure by arguing that the word "and" in the last sentence of paragraph 7A created an independent requirement on the part of BOA to deliver the Loans, regardless of whether TBW first requested them. The FDIC argues that "[t]his independent obligation is sensible because [BOA], the entity in possession of the [L]oans and [Ocala's] bank accounts, was in the best position to know whether a [L]oan had been purchased within six days." (Dkt. No. 41 at 26.). At a minimum, the FDIC argues, paragraph 7A is ambiguous and, as such, Count 4 cannot be resolved on a motion to dismiss. (*Id*.).

The Court agrees as to the ambiguity of Count 4. While the FDIC's reading of paragraph 7A may be a stretch, in deciding a motion to dismiss, this Court is required to evaluate all inferences derived from the allegations contained in the Counterclaims in the light most favorable to the FDIC. In doing so, this Court concludes that Count 4 survives BOA's motion to dismiss.

### e.   *Counterclaim 5*

In Count 5, the FDIC alleges that under paragraph 17K of the Custodian Agreement, BOA represented and warranted that it did not have at the time of execution, and would not hold during the existence of the Agreement, any interest adverse to Colonial, by way of security or otherwise, in the Participated Mortgage Loans. (Dkt. No. 25 at ¶ 88.). Paragraph 17K states:

> K.   <u>No Adverse Interest</u>. By execution of this Agreement, [BOA] represents and warrants that it currently holds, and during the existence of this Agreement shall hold, no interest adverse to [Colonial] or [TBW], by way of security or otherwise, in any Participated Mortgage Loan, and hereby waives and releases any such interest which it may have in any Participated Mortgage Loan as of the date hereof.

(*Custodial Agreement* at ¶ 17k.). The FDIC maintains that BOA breached this warranty and argues that the Court need look no further than the Amended Complaint—in which BOA asserts

a security interest in some of the Participated Mortgage Loans—to see evidence of the breach. (*Id*. at ¶¶ 89-90.).

BOA counters that paragraph 17K only applies to BOA's interests in its own capacity. (Dkt. No. 36 at 20.). BOA disavows that it brought the underlying action in its own capacity; rather, it filed suit "in its capacity as the representative of the Ocala Facility." (*Id*. at 21.). Furthermore, the "Custodial Agreement contemplated 'that BOA would obtain security and possessory interests in the loans on behalf of Ocala's Secured Parties.'" (*Id*.).

The FDIC responds that paragraph 17K is not clearly and unambiguously limited to BOA in its own capacity. (Dkt. No. 41 at 27.). The "clear purpose" of the Custodial Agreement was to ensure that Colonial's ownership interest in the Loans was protected. The Agreement, the FDIC argues, contemplated that BOA would obtain a security interest on behalf of the Ocala Facility *after* Colonial received payment for its interest in the Loans. Because BOA failed to remit payment, Colonial's interest was not satisfied, and the requirements of paragraph 17K continue to apply. (*Id*. at 28.).

The Court agrees. At a minimum, paragraph 17K is ambiguous. Furthermore, as discussed previously at Sections II.B.-D., it is not entirely clear that BOA does not seek relief for damages it allegedly incurred in its own capacity. As such, Count 5 will not be dismissed.

### 3. *Whether the Breach of Bailment Counterclaims Fail as a Matter of Law*

Next, BOA moves, in the alternative, to dismiss the breach of bailment Counterclaims (Counts 6 through 12) pursuant to Rule 12(b)(6) for failure to state a claim upon which relief may be granted. Counts 6 through 12 pertain to Colonial's use of a standard financing form known as a "bailee letter" (the "Bailee Letter(s)") when it transferred Participated Mortgage

Loans to BOA under the Custodial Agreement.[21] (*See* Dkt. No. 25 at ¶ 31.). The FDIC maintains that the Bailee Letters either created a new agreement between Colonial and BOA that superseded the Custodial Agreement or the Letters modified the Agreement. Either way, the FDIC argues, BOA was obligated to abide by the terms of the Bailee Letters. (*Id*. at ¶ 32-33.).

The provisions of the Bailee Letters are as follows:

> Pursuant to the terms and conditions set forth below, [Colonial] hereby deliver[s] to [BOA], as Custodian for [Ocala], with this letter, the [Participated Mortgage Loans]…By taking physical possession of this Bailee Letter, the [Participated Mortgage Loans] and other loans documents, [BOA] hereby agrees and is bound:

>> i.      to hold in trust, as bailee for Colonial [], the [Loans]…, subject to the direction and control of Colonial until [BOA's] status as bailee is terminated…;

>> ii.      to not release or deliver…the [Loans]…to [TBW]…which release, delivery or other action could cause the security interest of [Colonial] to become unperfected or which could otherwise jeopardize the perfected security interest and/or title and ownership interest of [Colonial] in the Loan(s);
>> …

>> iv.      to return the [Loans] immediately to Colonial [] upon receipt of a written or telephonic request by Colonial…;

>> v.      not to honor request or instructions from [TBW] relating to any [Loans]…;

>> vi.      immediately upon [Ocala's] acceptance or rejection of the Loan(s) for purchase, and in any event within forty-five (45) days after the date of delivery of this Bailee Letter to either (A) remit the [sales proceeds] to Colonial or (b) [SIC] return the [Loans] to Colonial;
>> …

> By your acceptance of the enclosed [Loans], you are bound by the terms, provisions and conditions of this Bailee Letter. We request that you acknowledge receipt of this Bailee Letter and the enclosed [Loans] by signing in the space provided at the bottom of this Bailee Letter and returning it to

---

[21] The parties do not explain why it was Colonial rather than TBW who transferred the loans, as the Custodial Agreement contemplated.

Colonial…(but your failure to do so in no way compromises the terms, provisions and conditions of this Bailee Letter or nullifies your agreements resulting from your acceptance of the enclosed [Loans], as set forth in this Bailee Letter.

(Dkt. No. 36, Myles Decl., at Ex. B; Dkt. No. 25 at ¶ 33.). The FDIC claims that the 4,808 Participated Mortgage Loans that are the subject of its Counterclaims were transferred to BOA pursuant to the above-listed terms of the Bailee Letters, yet Colonial never received payment for its ownership interest in those Loans. (*Id*. at ¶ 39.). As such, the FDIC asserts, BOA breached the terms of the bailment between the parties.

BOA argues that Counts 6 through 12 must be dismissed because: (1) to the extent that the FDIC argues that the Bailee Letters modified, amended or superseded the Custodial Agreement, that argument fails as a matter of black-letter contract law; or (2) to the extent that the FDIC argues that the Custodial Agreement and Bailee Letters can be harmonized, that argument similarly fails because the Letters contradict material terms of the Custodial Agreement. (*See* Dkt. No. 36 at 22-23.).

### a. Whether the Bailee Letters Are Enforceable Contracts between Colonial and BOA

BOA argues that the provisions of the Bailee Letters upon which the FDIC relies for its breach of bailment claims are inconsistent with the Custodial Agreement, and therefore each claim must be dismissed. BOA contends that the "broad structure and terms" of the Bailee Letters are inconsistent with Custodial Agreement because they read as though BOA's custodial duties were owed only to Colonial, and not divided with a duty to TBW (as provided for in the Custodial Agreement). As an example of this, BOA points to the provisions of the Bailee Letters that require BOA to "hold in trust, as bailee for Colonial [], the Loans]…" and prohibit BOA from releasing the Loans to TBW if "doing so would jeopardize the security interest of

[Colonial]," and further prohibit BOA from "honor[ing] requests or instructions from [TBW] relating to any [Loans]…." (*See* Dkt. No. 36 at 29 (quoting the *Bailee Letter* at ¶ 2(i),(ii), and (v).).

BOA argues that these terms directly contradict the Custodial Agreement, which require BOA to act as the Custodial Agent and Bailee for *both* Colonial and TBW, referring the Court to the provisions of the Custodial Agreement that state that BOA is appointed as "Custodian…by each [Colonial] and [TBW] as its agent and bailee hereunder," and further state that BOA "shall retain possession and custody [of the Loans] solely for the exclusive use and benefit of [Colonial] and [TBW]," and authorize BOA to act on the instructions of both Colonial and TBW. (*Id*. at 28-29 (quoting the Custodial Agreement, ¶¶ 2, 4B and 7).).

According to BOA, these inconsistencies render the Bailee Letters unenforceable, noting that it is "hornbook law" that a party cannot unilaterally supersede or amend an agreement. BOA claims that Florida courts have rejected similar tactics by parties who attempted to modify governing contracts with unilateral form letters. (*Id*. (citing *Gulf Power Co. v. Coalsales II, L.L.C.*, 661 F. Supp. 2d 1270, 1279 (N.D. Fla. 2009) and *Newkirk Constr. Corp. v. Gulf Cnty.*, 366 So. 2d 813, 815 (Fla. Dist. Ct. App. 1979).). BOA maintains that a recent district court decision from the Ninth Circuit, *FDIC v. First Am. Title Ins. Co.*, No. SACV 10–0713 DOC (MLGx), 2011 WL 3737435 (C.D. Cal. Aug. 24, 2011), is directly on point. *First American* involved a loan transaction in which IndyMac Bank was the lender and First American Title Insurance Company ("First American") was the closing agent. *Id*. at *1. The FDIC, as receiver for IndyMac Bank, sought to enforce negotiated Closing Instructions between the parties, and First American argued that a pre-printed Funding Letter that First American included with the closing documents served to modify the Closing Instructions. *Id*. In granting summary judgment

for the FDIC, the district court held that the Funding Letter did not modify the Closing Instructions for several reasons. First, the court noted that nothing in the Funding Letter purported to modify the Instructions. *Id.* at *5-6 (stating that "[i]f First American were truly modifying [the] Closing Instructions, it would have specified *exactly* what provisions to which it did not agree and would have indicated so on the Closing Instructions document itself") (emphasis in original). Second, the court noted that the Funding Letter was not supported by additional consideration to IndyMac for First American's purported release from the Closing Instructions. *Id.* at *6. Lastly, the court rejected First American's argument that merely by funding the loan, IndyMac performed under the Funding Letter and had thereby accepted its terms. *Id.* at *7.

BOA argues that the same is true in this case. It asserts that the Bailee Letters, like the Funding Letter in *First American*, make no mention of any intent, much less "specific intent," to modify the Custodial Agreement. (Dkt. No. 36 at 26.). Nor do the Bailee Letters offer any sort of additional consideration for the reduction of BOA's or TBW's rights under the Custodial Agreement. In addition, BOA argues, the FDIC does not allege in the Counterclaims that BOA ever signed, acknowledged, or even read the Bailee Letters. Therefore, BOA argues, this Court cannot enforce the terms of the Bailee Letters over the negotiated terms of the Custodial Agreement because to hold otherwise "would afford too little recognition to the other documents and the overall character of the transaction." (*Id.* at 27 (quoting *Pioneer Commercial Funding Corp. v. Am. Fin. Mortg. Corp.*, 579 Pa. 275, 296 (Pa. 2004).). Finally, BOA argues that the Custodial Agreement contains an integration clause that prohibits unilateral amendments to the Agreement. (*Id.* at 24 (citing the *Custodial Agreement* at ¶ 17C).).

In response, the FDIC argues that the Counterclaims allege factual allegations sufficient to state a claim that bailments existed between Colonial and BOA and that these bailments, established pursuant to the terms of the Bailee Letters, represent new, independent agreements between Colonial and BOA that are separate from the Custodial Agreement. (*See* Dkt. No. 41 at 10.). The FDIC maintains that the fact that BOA did not sign the Bailee Letters is not fatal to the enforceability of the agreements because Florida does not require a countersignature on a bailee letter in order to create a bailment. (*Id*. at 10 (citing Fla. Stat. Ann. § 679.3131, comment 9; 4 James J. White, Robert S. Summers, & Robert A. Hillman, *Uniform Commercial Code* § 31-8 (6th ed.).). Instead, the FDIC argues, acceptance of the collateral documents constitutes assent to the terms of the bailee letter. *Id*. (citing *Goldman Sachs Mortg. Co. v. Natixis Real Estate Capital, Inc*., No. 0602359/2007, 2008 WL 1999522 (Trial Order) (N.Y. Sup. Ct.  Apr. 30, 2008) ("The standard practice in the [mortgage warehouse lending industry] is not to require a countersignature on the bailee letter…[the] acceptance of the collateral documents constitutes assent to the terms of the bailee letter…").). Here, BOA accepted the terms of the Bailee Letters when it accepted the Loans under cover of the Letters, held them in trust, and then remitted payment to Colonial (until the alleged breach) once the Loans were sold to Ocala. (*Id*. at 13 (citing *Counterclaims*, ¶¶ 31, 36 and 42).).

What is more, the FDIC argues, the Bailee Letters expressly stated that acceptance of the Loans transmitted under the Bailee Letter constituted acceptance, and failing to countersign the Letter "in no way…nullifies [BOA's] agreements resulting from [BOA's] acceptance of the enclosed Note(s)…" (*Id*. at 12 (citing *Bailee Letter* at p. 2).). The FDIC claims that this provision of the Bailee Letters is consistent with the use of bailee letters in the mortgage warehouse lending industry as a whole and is reflected in Florida's statutes, which allow a mortgage

warehouse lender who transfers mortgage notes to a custodian pursuant to a bailee letter to retain its perfected security interest in the notes, as long as the lender instructed the bailee to hold the collateral for the benefit of the lender. (*Id*. at 13 (citing Fla. Stat. Ann. § 679.3131(8), n. 9 ("Requiring [lenders] to obtain authenticated acknowledgments …would be unduly burdensome and disruptive of established practices")).).

In the alternative, the FDIC argues that the Bailee Letters operated to modify the terms of the Custodial Agreement, and BOA's acceptance of the Bailee Letters in the ordinary course of business without objection formed either "(i) an 'agreement in writing' that overrides the integration clause in the Custodial Agreement or (ii) an amendment of the Custodial Agreement through course of performance." (Dkt. No. 41 at 28.).

The Court concludes that the FDIC has alleged facts sufficient to state a plausible claim for breach of bailment. To create a bailment under Florida law, there must be: (1) the delivery of a bailor's property to a bailee; (2) acceptance of the property by the bailee; and (3) an agreement, either express or implied, to use the property for a particular purpose and later redeliver it to the bailor. *See Monroe Sys. for Bus., Inc. v. Intertrans Corp*., 650 So. 2d 72, 75-76 (Fla. Dist. Ct. App. 1994); 46 *Am. Jur. Proof of Facts* 3d 361 (1998). Here, the FDIC alleges that: (1) Colonial delivered the Loans in question to BOA under cover of a Bailee Letter (Dkt. No. 25 at ¶ 31); (2) BOA accepted the Loans (*Id*. at ¶ 43); and (3) BOA agreed to hold the Loans, and within 45 days of delivery, to either remit payment for the Loans or return the Loans to Colonial (*Id*. at ¶ 33.). These factual allegations are sufficient to state a plausible claim that a separate, independent contract for bailment existed between the parties.

Moreover, the Court is not persuaded that the terms of the Bailee Letters materially conflict with the terms of the Custodial Agreement. The Custodial Agreement unequivocally

states that BOA's duties with respect to TBW and Colonial are limited to the extent of each of TBW's and Colonial's respective ownership interests in the Loans. *See, e.g.*, the *Custodial Agreement* at Fifth WHEREAS Clause (stating that BOA is authorized to act as TBW's and Colonial's custodial agent and bailee "*to the extent of their respective ownership interests* in [the] Participated Mortgage Loans") (emphasis added); *see also Id.* at ¶ 4B ("…the Custodian shall retain possession and custody thereof solely for the exclusive use and benefit of [Colonial] and [TBW] (*to the extent of their respective ownership interests in the Participated Mortgage Loans*) as the agent and bailee of [Colonial] and [TBW], and for purposes of perfecting [Colonial's] and [TBW's] ownership interest in the [Loans]….") (emphasis added).[22] Similarly, the Bailee Letters acknowledge that Colonial has only a "participation" interest in the Loans. (*See Bailee Letter*, Introductory paragraph "[Colonial] owns a participation interest in the Loan(s) and the proceeds thereof…"). Accordingly, the Bailee Letters can be read to affect *only* Colonial's participation interest in the Loans, thereby leaving unaffected TBW's interest in the Loans and BOA's obligations thereto under the Custodial Agreement.

What is more, the Custodial Agreement gives Colonial the power to direct BOA's actions towards the Loans on behalf of TBW. (*See Custodial Agreement* at ¶ 2 "[TBW] hereby irrevocably appoints [Colonial] as its attorney in fact and agent…to take any action and give any direction hereunder on behalf of [TBW] with respect to [TBW's] interest in any [Loan], and [BOA] shall be entitled to rely on [Colonial's] directions and instructions on behalf of itself and [TBW]"). As such, Colonial's use of the Bailee Letters can be read as entirely consistent with the terms of the Custodial Agreement. At a minimum, these provisions create an ambiguity that cannot be resolved on a motion to dismiss. *See Novoneuron Inc. v. Addiction Research Inst., Inc.*,

---

[22]     It is undisputed that at the time the Loans were transferred to BOA pursuant to the Custodial Agreement, Colonial had a 99% participation interest in the Loans and TBW retained a 1% interest. (Dkt. No. 20 at ¶ 43; Dkt. No. 25 at ¶ 11.).

326 F. App'x 505, 508-509 (11th Cir. 2009) (trial court erred in granting motion to dismiss for failure to state a claim when disputed contract was susceptible to two different interpretations, each one of which was reasonably inferred from the terms of the contract).

Nor is the Court persuaded by BOA's argument that Paragraph 17C of the Custodial Agreement bars the creation of a separate agreement. Paragraph 17C states:

> <u>Entire Agreement</u>.  This  Agreement  contains  the  entire  agreement  and understanding  among  the  parties  hereto  with  respect  to  the  subject  matter hereof  and  *supersedes  all  prior  and  contemporaneous  agreements*, understandings,  inducements  and  conditions,  express  or  implied,  oral  or written,  of  any  nature  whatsoever  with  respect  to  the  subject  matter  hereof including any prior custody agreements. The express terms hereof control and supersede any course of performance and/or usage of the trade inconsistent with any of the terms hereof. This Agreement may not be modified or amended other than by an agreement in writing.

(*Custodial Agreement*, ¶ 17C.) (emphasis added.). The plain language of this provision precludes only agreements made prior to, or contemporaneously with, the Custodial Agreement. Because the Bailee Letters were issued after the parties executed the Custodial Agreement, the first sentence of paragraph 17C is inapplicable to the present situation. Nor does the last sentence of paragraph 17C, which refers to "modified or amended," necessarily bar the creation of an entirely new agreement. On the briefing before it, the Court is not persuaded that there was a meeting of the minds that this last sentence was meant to exclude an entirely new agreement between the parties in perpetuity.

Likewise, BOA's argument that the Bailee Letters did not create a binding agreement because they were not signed by BOA is unavailing. A countersignature on a bailee letter is not required to form a contract. *See, e.g., Goldman Sachs Mortg. Co.*, 2008 WL 1999522 (a bailee's failure to countersign a bailee letter does not make bailment unenforceable as a matter of law); Fla. Stat. Ann. § 679.3131, comment 9; 4 White, Summers, & Hillman, <u>supra</u> § 31-8. Instead,

acceptance can be conveyed through performance or implied from the circumstances. *See* 8A Am. Jur. 2d Bailments § 38 (2012); 8 C.J.S. Bailments § 25 (2012) ("If the contract is in writing, its enforceability is not affected by the fact that it is not signed[.]"). "A contract may be binding on a party despite the absence of a party's signature. The object of a signature is to show mutuality or assent, but these facts may be shown in other ways, for example, by the acts or conduct of the parties." *Gateway Cable T.V., Inc. v. Vikoa Constr. Corp.*, 253 So. 2d 461, 463 (Fla. Dist. Ct. App. 1971). Indeed, the Bailee Letters themselves provide that BOA became "bound by the terms, provisions and conditions of the Bailee Letter" by its "acceptance of the [Participated Mortgage Loans]." (Dkt. No. 36, Myles Decl., Ex. B at p. 2.).

Moreover, the cases cited by BOA do not support its motion. First, their applicability to the present situation is limited because they do not involve the use of bailee letters in the mortgage warehouse lending industry which, the FDIC correctly points out, receives special statutory treatment because of the nature of the industry. *See, e.g.*, Fla. Stat. Ann. § 679.3131(8), n. 9 (noting that "[r]equiring [lenders] to obtain authenticated acknowledgments …would be unduly burdensome and disruptive of established practices" in the warehouse lending industry).). The cases are distinguishable in other ways as well. For example, BOA's reliance on *First American* is misplaced. First, importantly, *First American* was decided on summary judgment. 2011 WL 3737435 at *2. The decision is replete with references to the fact that there was "no evidence" to support First American's position that the agreement in question had been amended. *Id.* at *4. Here, the FDIC is not required to produce such evidence in order to defeat BOA's motion to dismiss. Second, the question in *First American* was whether the existing contract between the parties—the closing instructions—had been modified by a later agreement—the funding letter. *Id.* Here, the FDIC maintains that the Bailee Letters represent new, independent

contracts between Colonial and BOA that are separate and distinct from the Custodial Agreement. As such, the *First American* court's conclusion that the funding letter did not clearly evidence the parties' intent to modify the closing instructions is inapplicable to the present situation. Likewise, *Gulf Power Co. v. Coalsales II, LLC*, 661 F. Supp. 2d 1270 (N.D. Fla. 2009) and *Newkirk Constr. Corp. v. Gulf Cnty.*, 366 So. 2d 813 (Fla. Dist. Ct. App. 1979) are distinguishable on the same grounds.

BOA refers this Court to a Pennsylvania case for the proposition that a bailee letter cannot supersede an existing agreement. (Dkt. No. 36 at 26-27 (citing *Pioneer Commercial Funding Corp. v. Am. Fin. Mortg. Corp*., 579 Pa. 275 (Pa. 2004).). However, the *Pioneer* court merely made a passing reference to this issue and specifically limited its finding to "the circumstances presented" in that case. *Pioneer*, 579 Pa. at 296 (reversing and remanding for entry of judgment notwithstanding a jury verdict in favor of bank). And again, the issue was decided after the parties had the benefit of discovery. *Id.*

Therefore, construing the Counterclaims in the FDIC's favor as this Court must do in deciding BOA's Rule 12(b)(6) Motion, this Court concludes that the FDIC has plausibly alleged the existence of a new contract pursuant to the Bailee Letters. *See Sierra Equity Grp., Inc. v. White Oak Equity Partners, LLC*, 650 F. Supp. 2d 1213, 1228 (S.D. Fla. 2009) (noting that whether the contract was accepted is a question of fact that cannot be resolved on a motion to dismiss).

### b.    *Whether the Breach of Bailment Counterclaims State a Claim for Relief*

Next, BOA argues that even if the Bailee Letters constitute valid, enforceable agreements between the parties, the individual bailment Counterclaims fail to state a claim upon which relief may be granted. BOA moves to dismiss Counts 6 and 7, alleging that the provisions of the Bailee

Letters on which the FDIC bases these claims are inconsistent with the terms of the Custodial Agreement, and therefore, unenforceable. This argument fails for the reasons discussed in the previous section. BOA's motion to dismiss Counts 6 and 7 is denied.

In Counts 8 and 9, the FDIC alleges that, under the terms of the Bailee Letters, BOA was obligated to either remit to Colonial the proceeds for the sale of the Participated Mortgage Loans or to return the Loans to Colonial within 45 days of the initiation of the bailment. (*See* Dkt. No. 25 at ¶¶ 107, 112, and 113.). The FDIC alleges that more than 45 days have passed since the 4,808 Participated Mortgage Loans were transferred to BOA, and BOA has not returned the Loans, nor has it remitted the proceeds for the 4,808 Loans to Colonial, an amount that the FDIC alleges is approximately $898,873,958. (*Id*. at ¶ 108.). The FDIC alleges that this failure constitutes a breach of the bailment. (*Id*. at ¶ 109.).

In moving to dismiss Counts 8 and 9, BOA mischaracterizes the claims as a demand that BOA "pay" the sale proceeds. (Dkt. No. 36 at 31-32.). It argues that neither the Custodial Agreement nor the Bailee Letters require BOA to "pay" for the Loans. The FDIC makes no such claim. To the contrary, the FDIC alleges that BOA breached the bailment by failing to either "remit", *i.e.*, transmit, the sale proceeds to Colonial or return the Loans (with Colonial's ownership interest intact) within the 45 day timeframe. (Dkt. No. 25 at ¶ 108.). The FDIC alleges that BOA's failure to comply with this obligation under the Bailee Letters has damaged Colonial in the amount of nearly $1 billion. These allegations are sufficient to state a claim for relief.

BOA also maintains that it returned the Loans to Colonial. (Dkt. No. 36 at 32-33.). This argument borders on farcical. As the FDIC correctly maintains, BOA did not "return" the Loans to Colonial in Colonial's capacity as owner of the Loans, but sent them to Colonial's Trust Department in Colonial's capacity as custodian for Freddie Mac. What is more, BOA returned

"qualitatively different [L]oans," that are now "owned by Freddie Mac." (Dkt. No. 41 at 36; Dkt. No. 25 at ¶ 38.). Again, the FDIC has alleged factual allegations that are sufficient to state a claim for relief. Accordingly, BOA's motion to dismiss Counts 8 and 9 is denied.

In Count 10, the FDIC alleges that BOA breached the bailment agreement by failing to subordinate its alleged interest in the Participated Mortgage Loans to Colonial's interest. (Dkt. No. 25 at ¶¶ 118-120.). The FDIC alleges that, "based in part on the allegations of BOA's Amended Complaint, BOA has asserted alleged interest of its own which BOA claims to be superior to, rather than subordinate to, Colonial's interest in the Participated Mortgage Loans." (*Id*. at ¶ 119.). The FDIC asserts that by bringing these claims, BOA has breached the bailment. (*Id*. at ¶ 120.).

BOA counters that it does not assert any interest in the Loans on its own behalf. (Dkt. No. 36 at 34.). Rather, it brings these claims in its representative capacity on behalf of Ocala, DB, and BNP. (*Id*.). Contrary to BOA's assertion, the record is not clear that BOA is not asserting any interest of its own in the Loans. For instance, in its opposition to the FDIC's motion to dismiss the Amended Complaint, BOA argues that it seeks to recover for losses incurred by Ocala, "*including* losses incurred by all investors in the Ocala facility and by BOA itself." (Dkt. No. 35 at 18) (emphasis in original). BOA states further that it "sought an administrative remedy for Ocala *and* all parties with interests in Ocala assets, including Ocala's investors and BOA itself." (*Id*.) (emphasis in original). In addition, the proofs of claim state "[t]he tax ID number shown is for [BOA]. *Many* of the claims described in this proof of claim, however, are made by [BOA] in its capacity as Trustee on behalf of the secured parties with respect to [Ocala Notes]." (Dkt. No. 20 at Ex. A, n. 1.) (emphasis added). This statement indicates that at least *some* of the claims in the proofs of claim were brought by BOA on behalf of its own purported interest in the

Loans. Accordingly, the FDIC has stated a plausible claim that BOA breached the bailment by failing to subordinate its interest in the Loans to that of Colonial. Count 10 will not be dismissed.

In Counts 11 and 12, the FDIC alleges that BOA exercised its alleged rights with respect to the Participated Mortgage Loans without first receiving written authorization to do so from Colonial and, instead, acted pursuant to instructions from TBW. (Dkt. No. 25 at ¶¶ 123-126 and 130-131.). The FDIC asserts that these actions breached the terms of the bailment. (*Id*. at ¶¶ 127 and 132.). BOA counters that the requirement to seek written authorization from Colonial before acting and the prohibition from following TBW's instructions are inconsistent with the terms of the Custodial Agreement and therefore cannot be the basis for a claim for relief. This argument fails for the reasons discussed above at Section IV.D.3.a. BOA's motion to dismiss Counts 11 and 12 is denied.

### 4.  *Whether the Tort Counterclaims Fail As a Matter of Law*

The final four Counterclaims against BOA sound in tort. The FDIC alleges that BOA breached its duty of care as Colonial's agent, as well as its fiduciary duties of care and loyalty to Colonial, by pledging the Participated Mortgage Loans as collateral for the Ocala Notes and then selling them to Freddie Mac without first ensuring that Colonial was paid. (*See* Dkt. No. 25 at ¶¶ 135-137, 140-142, and 145-147.). The FDIC also asserts that BOA breached its duty of care under a common law bailment by encumbering the loans and selling them to Freddie Mac. (*Id*. at ¶¶ 150-153.). BOA argues that these claims must be dismissed for two reasons: (1) the economic loss doctrine bars the tort claims, and (2) the Custodial Agreement limits or precludes BOA's tort liability.

### a.   *Whether the Economic Loss Doctrine Bars the Tort Claims*

"The economic loss rule is a judicially created doctrine that sets forth the circumstances under which a tort action is prohibited if the only damages suffered are economic losses." *Indem. Ins. Co. of N. Am. v. Am. Aviation, Inc.*, 891 So. 2d 532, 536 (Fla. 2004). One of the circumstances in which the economic loss doctrine applies is "when the parties are in contractual privity and one party seeks to recover damages in tort for matters arising out of the contract." *Id*. The economic loss doctrine "is designed to prevent parties to a contract from circumventing the allocation of losses set forth in the contract by bringing an action for economic loss in tort." *Id*. Any recovery in tort "requires proof of facts that are distinct from breach of contract." *Invo Fla., Inc. v. Somerset Venturer, Inc.*, 751 So. 2d 1263, 1265 (Fla. Dist. Ct. App. 2000); *accord Electronic Sec. Sys. Corp. v. S. Bell Tel. and Tel. Co*., 482 So. 2d 518, 519 (Fla. Dist. Ct. App. 1986).

BOA argues that the only loss asserted by the FDIC is the loss of the 4,808 Participated Mortgage Loans, for which Colonial should have been paid a Takeout Amount of $898,873,958. BOA maintains that because Colonial was entitled to this Takeout Amount only by virtue of the written agreements between the parties, the alleged damages fall squarely within the definition of economic losses barred by the economic loss rule. (*See* Dkt. No. 36 at 38-39.). The FDIC counters that this argument is not ripe for review at this stage in the litigation because BOA has moved to dismiss the FDIC's breach of contract claims and Federal Rule of Civil Procedure 8(d)(3) expressly permits a party to plead claims in the alternative, even if the claims are inconsistent. (*See* Dkt. No. 41 at 39.)

The Court agrees. At this early stage of the litigation, the Court finds that the tort claims are adequately pled and not barred by the economic loss doctrine. To the extent that discovery or further case development show that the duties allegedly breached by BOA are in fact based on or inextricably intertwined with valid written agreements between Colonial and BOA, the Court will revisit the issue. *Bd. of Trs. of the City of Lake Worth Emps.' Ret. Sys. v. Merrill Lynch Pierce Fenner & Smith, Inc.*, No. 3:10–cv–845–J–32MCR, 2011 WL 2144658 at *4 (M.D. Fla. May 31, 2011); *see also Scott v. District of Columbia*, 101 F.3d 748, 753 (D.C. Cir. 1996) (stating that plaintiff can properly plead alternative theories of liability, regardless of whether such theories are inconsistent with one another); *Robinson v. District of Columbia*, 736 F. Supp. 2d 254, 262 (D.D.C. 2010) ("Federal Rule of Civil Procedure 8(d)(3) permits a plaintiff to plead inconsistent claims in support of alternative theories of recovery…").

### b.    Whether the Custodial Agreement Limits BOA's Tort Liability

BOA's final argument is that the Custodial Agreement precludes tort liability for BOA. (*See* Dkt. No. 36 at 40.). As discussed *supra*, BOA contends that the Custodial Agreement expressly limits BOA's liability to breaches committed through "gross negligence or willful misconduct." (*Id*. citing the *Custodial Agreement* at ¶¶ 10A, 11.). BOA argues that the FDIC seeks to do an "end-run" around this contractual limitation by alleging breaches of non-contractual tort duties, none of which amount to gross negligence or willful misconduct. (*Id*.). Therefore, BOA argues, the tort claims must be dismissed as a matter of law.

BOA's argument fails for two reasons. First, as discussed in Section IV.D.1., *supra*, the exculpatory clauses in the Custodial Agreement are simply too ambiguous to effectively limit BOA's liability. Second, the claims in Counterclaim 13 through Counterclaim 16 relate to the bailment relationship created by the Bailee Letters, not the Custodial Agreement. As discussed in

Section IV.D.3.a., *supra*, the FDIC has plausibly stated that the Bailee Letters created a new agreement between Colonial and BOA that is independent of the Custodial Agreement. Accordingly, BOA's motion to dismiss Counterclaims 13 through 16 is denied.

## V.    CONCLUSION

### A.    As to the FDIC's Rule 12(b)(1) Motion to Dismiss, the Court Finds and Rules as Follows:

1.    BOA did not oppose the portion of the FDIC's Rule 12 (b)(1) Motion seeking dismissal of the equitable relief claims (Counts II, IV, and VII) for lack of subject matter jurisdiction. Accordingly, the Court treats this portion of the Motion as conceded and hereby GRANTS it as to Counts II, IV and VII;

2.    BOA failed to exhaust Ocala's administrative remedies under FIRREA. Accordingly, this Court lacks subject matter jurisdiction over any portion of the remaining claims that seek relief on behalf of Ocala. Accordingly, the Court GRANTS the FDIC's Rule 12(b)(1) Motion to the extent that the Amended Complaint states claims on behalf of Ocala;

3.    BOA has standing under the Ocala Facility Documents to bring claims on behalf of itself and Ocala's investors. Accordingly, this Court has subject matter jurisdiction over the remaining claims to the extent that BOA seeks relief on behalf of itself and on behalf of DB and BNP. The Court DENIES the FDIC's Rule 12(b)(1) Motion to the extent that it seeks to dismiss such claims on grounds of lack of standing;

4.    The proofs of claim alleged sufficient factual allegations to administratively exhaust BOA's claims for civil conspiracy and actual and constructive transfer. Accordingly, this Court has subject matter jurisdiction over Counts IX, X, and XI and DENIES the FDIC's Rule 12(b)(1) Motion as to these Counts;

**B.     As to the FDIC's Rule 12(b)(6) Motion to Dismiss, the Court Finds and Rules as Follows:**

1.      BOA pled fraud (Count V) with the requisite specificity under Fed. R. Civ. P. 9(b). Accordingly, the FDIC's Rule 12(b)(6) Motion is DENIED as to Count V;

2.      BOA alleged sufficient facts to state a plausible claim for fraudulent transfer (Counts IX and X). Accordingly, the FDIC's Rule 12(b)(6) motion is DENIED as to Counts IX and X;

**C.     As to BOA's Rule 12(b)(6) Motion to Dismiss, the Court Finds and Rules as Follows:**

1.      The FDIC alleged facts sufficient to state claims for breach of the Custodial Agreement (Counterclaims 1 – 2, and 4). These Counterclaims are not barred by the exculpatory clauses contained in the Custodial Agreement and otherwise sufficiently allege claims for relief. Accordingly, BOA's Rule 12(b)(6) Motion is DENIED as to Counterclaims 1 – 2, and 4;

2.      The FDIC failed to allege which statute BOA allegedly ran afoul of in administering its obligations under the Custodial Agreement. As such, Counterclaim 3 fails to state a claim upon which relief may be granted. Accordingly, BOA's Rule 12(b)(6) Motion is GRANTED as to Counterclaim 3;

3.      The FDIC alleged facts sufficient to state claims for breach of bailment (Counterclaims 6 – 12). Accordingly, BOA's Rule 12(b)(6) Motion is DENIED as to Counterclaims 6 – 12;

4.      The FDIC alleged facts sufficient to state claims for tort liability against BOA (Counterclaims 13 – 16). Neither the Economic Loss Doctrine nor the exculpatory clauses in the Custodial Agreement bar such claims. Accordingly, BOA's Rule 12(b)(6) Motion is DENIED as to Counterclaims 13 – 16.

An appropriate Order accompanies this Memorandum Opinion.

Dated this 10th day of December, 2012.

Barbara Jacobs Rothstein
U.S. District Court Judge